ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG (179109)
TRIG R. SMITH (237399)
ALEXI H. PFEFFER-GILLETT (313709)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com
agillett@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASE HAMANO, Individually and on Behalf of All Others Similarly Situated, ) <br><br> Plaintiff, ) <br><br> vs. ) <br><br> ACTIVISION BLIZZARD, INC., ROBERT A. KOTICK, SPENCER NEUMANN AND COLLISTER JOHNSON, ) <br><br> Defendants. ) | Case No. 2:19-cv-03788-SVW-AFM <br><br> <u>CLASS ACTION</u> <br><br> CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

4845-2956-5084.v1

Lead Plaintiff United Association Local Union 393 Defined Benefit Pension Plan and Defined Contribution Plans ("UA Local 393" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters.  Plaintiff's information and belief is based upon the ongoing independent investigation of its counsel, Robbins Geller Rudman & Dowd LLP.  This investigation includes, *inter alia*, a review and analysis of: (a) public filings by Activision Blizzard, Inc. ("Activision" or the "Company") with the Securities & Exchange Commission ("SEC"); (b) public reports and news articles; (c) research reports by securities and financial analysts; (d) securities prices and price movements; (e) transcripts of investor calls and conferences conducted by Activision executives; (f) interviews with former employees of Activision, Bungie, LLC ("Bungie") and other relevant entities; (g) court-filings in prior litigation involving Activision; and (h) other publicly available material and data identified herein. Counsel's investigation of the facts underlying this action continues, and counsel further believes that relevant facts are known only by Defendants or are exclusively within their custody or control.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

1.   The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

2.   This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

-1-

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because a significant portion of Defendants' actions, and the subsequent damages, took place within this District.

4.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of national securities exchanges.

**INTRODUCTION**

5.      This is a securities class action complaint on behalf of purchasers and acquirers of Activision common stock between August 2, 2018 and January 10, 2018 (the "Class Period").  Defendants violated the federal securities laws by misstating and failing to disclose the truth about Activision's relationship with its licensing partner Bungie.  During the Class Period, Activision and Bungie were negotiating the termination of a Software Publishing and Development Agreement ("Licensing Agreement")[1] that had allowed Activision to publish and profit from the key gaming franchise *Destiny*, which had been developed by Bungie.  Defendants failed to disclose the problems with the relationship between Activision and Bungie or the negotiations to end the Licensing Agreement, which would result in Activision losing all revenue and profits from the *Destiny* franchise.  It was not until January 10, 2019, after the companies had already terminated the Licensing Agreement, that Activision revealed it would no longer control or derive profits from the *Destiny* franchise.  As a result of this unexpected disclosure, Activision's stock price dropped $4.77 per share in one day and the Company's market capitalization plummeted $3.64 billion.

---

[1]   A copy of the Licensing Agreement is attached as Ex. 1.

## THE PARTIES

**Plaintiff**

6. **United Association Local Union 393 Defined Benefit Pension Plan and Defined Contribution Plans**: UA Local 393 purchased Activision common stock during the Class Period on the Nasdaq National Market and was damaged thereby when Defendants' fraud was revealed. *See* Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel, Exhibits B-C, *Hamano v. Activision Blizzard, Inc.*, No. 1:19-cv-01741 (N.D. Ill. Mar. 19, 2019) (ECF No. 21).

7. The United Association is an international labor organization. For more than 100 years, the United Association has represented plumbers, pipefitters, sprinkler fitters, service technicians and welders in local unions across North America. UA Local 393 is a local labor organization affiliated with the United Association. UA Local 393 is headquartered in San Jose, California and has more than 3,000 current members. UA Local 393 sponsors the Defined Benefit Pension Plan and the Defined Contribution Plans, which were appointed by the Court as Lead Plaintiff on June 10, 2019. Order Granting U.A. Local No. 393 Defined Benefit Pension Plan and Defined Contribution Plans' Motion for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel (ECF No. 69). The Defined Benefit Pension Plan provides lifetime pensions, including disability benefits, for all eligible members of UA Local 393, and is supplemented by the Defined Contribution Plan. As of December 31, 2018, the Plans had assets of approximately $498 million and more than 3,200 participants and beneficiaries.

**Defendants**

8. **Activision Blizzard**: Activision is incorporated in Delaware and describes itself as a leading worldwide developer, publisher and distributor of interactive entertainment and leisure products for various consoles, handheld platforms and personal computers. The Company's principal offices are located at

3100 Ocean Park Boulevard, Santa Monica, California 90405.  During the Class Period, the Company's stock traded in an efficient market on the Nasdaq National Market under the symbol "ATVI."

9. **Robert "Bobby" A. Kotick**: Robert A. Kotick ("Kotick")  served as Activision's Chief Executive Officer at all relevant times.  Kotick has been CEO of Activision since 1991 and was Activision's President until June 2017.  According to Activision's April 30, 2018 Annual Proxy Statement, Kotick has a "[d]epth of institutional knowledge and understanding of our organization, as well as practical experience in a chief executive officer role, that he possesses by virtue of his 25 years of service to the Company."

10. Kotick certified that he had reviewed Activision's Form 10-Q interim reports filed with the SEC for the quarters ended June 30, 2018 ("2Q18 Form 10-Q") and for the quarter ended September 30, 2018 ("3Q18 Form 10-Q") and that they "[do] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."  He also certified, pursuant to §906 of the Sarbanes-Oxley Act of 2002 ("SOX"), that the information contained in 2Q18 Form 10-Q and 3Q18 Form 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

11. Kotick made or had authority over the content and dissemination of the false statements and omissions set forth herein at ¶¶44-46, 48, and is liable for those false statements and omissions.  Kotick is also a control person of Activision within the meaning of §20(a) of the Exchange Act.

12. **Collister "Coddy" Johnson**: Collister Johnson ("Johnson") served as Activision's President and Chief Operating Officer at all relevant times.  He has served in that capacity since June 2017.  From 2008 to 2016, Johnson held a number of positions at Activision, including Chief Financial Officer and head of operations of Activision Publishing, one of Activision's principal operating units; Chief

Operating Officer of studios for Activision; and Senior Vice President and Chief of Staff to Activision's Chief Executive Officer.

13. Johnson made or had authority over the content and dissemination of the false statements and omissions set forth herein at ¶¶44-46, 48, and is liable for those false statements and omissions. Johnson is also a control person of Activision within the meaning of §20(a) of the Exchange Act.

14. **Spencer Neumann**: Spencer Neumann ("Neumann") served as Activision's Chief Financial Officer from May 2017 until December 31, 2018. Prior to joining Activision, Neumann served as the Chief Financial Officer and Executive Vice President of Global Guest Experience of Walt Disney Parks and Resorts. On December 31, 2018, Activision announced that Neumann was fired for cause.

15. Neumann signed Activision's 2Q18 Form 10-Q and 3Q18 Form 10-Q that were filed with the SEC. Neumann further certified that he had reviewed the 10-Q filings and they "[do] not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." He also certified, pursuant to §906 of the SOX, that the information contained in 2Q18 Form 10-Q and 3Q18 Form 10-Q "fairly presents, in all material respects, the financial condition and results of operations of the Company."

16. Neumann made or had authority over the content and dissemination of the false statements and omissions set forth herein at ¶¶44-46, 48, and is liable for those false statements and omissions. Neumann is also a control person of Activision within the meaning of §20(a) of the Exchange Act.

17. Defendants Kotick, Johnson and Neumann are referred to herein, collectively, as the "Individual Defendants." Defendants Activision, Kotick, Johnson and Neumann are referred to herein, collectively, as "Defendants."

18. Pursuant to Activision and Bungie's 2010 Licensing Agreement, all senior-level executives, which would include the Individual Defendants, were kept

-5-

informed of decisions requiring the mutual agreement or approval of Bungie and Activision to the extent those decisions could not be resolved by day-to-day personnel. Ex. 1 at ¶20.

## BACKGROUND AND RELEVANT FACTS

**Activision's Licensing Agreement With Bungie and the *Destiny* Franchise**

19. Bungie is a privately held, Seattle-based company known for developing the acclaimed *Halo* franchise of videogames while it was a subsidiary of Microsoft. In 2007, Bungie became an independent company and agreed to grant all *Halo* intellectual property to Microsoft as part of its departure. Following the separation from Microsoft, Bungie has been primarily known for developing the *Destiny* franchise of videogames.

20. Like *Halo*, *Destiny* is a role-playing first-person shooter-type videogame. Gamers play online and take on the role of a Guardian and are tasked with saving Earth's last safe city.

21. On April 16, 2010, Bungie and Activision entered into a Licensing Agreement. Under the terms of the Licensing Agreement, Bungie agreed to continue development of the *Destiny* franchise with Activision handling publication and distribution of the product. According to Bungie President Harold Ryan, the parties had "work[ed] together over the past nine months on this agreement."

22. The Licensing Agreement provided that Bungie would develop four major retail installments in the *Destiny* franchise, as well as four expansions (an add-on with new game areas, equipment and weapons) for each installment. The installments were tentatively scheduled to be released beginning in fall 2013 and every other year afterward ending in 2019. The expansions were to be released in the even-numbered years through 2020. Ex. 1, ¶1A. Activision agreed to pay development advances and fully fund Bungie's operations as Bungie developed the *Destiny* installments and expansions.

23.     In return for funding and marketing the *Destiny* franchise, Activision was entitled to up to 80% of all *Destiny*-related revenue.  *Id.*, ¶11.  Unlike Bungie's *Halo* arrangement with Microsoft, however, the Licensing Agreement with Activision allowed Bungie to keep the intellectual property rights in *Destiny* during the contractual period.  After release of the four installments and accompanying expansions, Activision would "have a right of first negotiation to publish and distribute such Future Destiny Games."  *Id.*, ¶19.

24.     Under the terms of the Licensing Agreement, Activision – but not Bungie – possessed the right to terminate the agreement, without penalty, following the release of the second *Destiny* expansion (then referred to as "Comet #2") "for any reason in Activision's sole discretion."  *Id.*, ¶17.1.  An Activision-initiated termination would automatically cause licenses for future works in the *Destiny* franchise to revert back to Bungie.  *Id.*  Both parties could terminate the agreement in the event of an uncured, material breach.  *Id.*, ¶17.2

25.     The Licensing Agreement gave Activision certain supervisory privileges over Bungie's development of *Destiny*.  Activision was granted the right to designate one person to attend and participate as a non-voting observer in all meetings of Bungie's Board of Directors.  *Id.*, ¶18.2.  Bungie further agreed, *inter alia*, to share all of the data it captured with Activision, which would allow Activision to facilitate decisions on downloadable content, release timings, and future features.  *Id.*

26.     The Licensing Agreement also required that any disputed issue requiring the mutual approval of the parties had to be "elevated to senior-level executives to try to resolve the disagreement" and that "[s]uch senior-level dispute resolution procedures may also be triggered by either party hereto in the event a party reasonably believes that any activity or action being taken by the other party could adversely impact (a) the long-term viability of the Destiny Property franchise, (b) sales or revenues associated with the Products, and/or (c) the ability to attract and

-7-

retain top talent and community viability." *Id.*, ¶20.  The Licensing Agreement further specified that "[a]ll notices, statements and payments to be given to Activision shall be delivered to" Activision's Vice President of Finance, as well as the Company's General Counsel.  *Id.*, ¶21.15.

27.    Although the parties initially kept the terms of the Licensing Agreement under wraps, it was eventually unsealed as part of separate litigation between Activision and the former heads of another developer.

28.    The first installment of the *Destiny* franchise was released on September 9, 2014.  Activision shipped $500 million worth of the game in just the first 24 hours after the release and proclaimed it "the biggest new video game franchise launch in history."  In subsequent SEC filings, Activision identified *Destiny* as one of Activision's two "key product franchises" along with *Call of Duty*. Between 2014 and 2018, *Destiny* games generated over $1.6 billion in revenue for Activision and represented one of the Company's most successful game franchises.

**Escalating Problems Between Activision and Bungie**

29.    Despite the success of the original *Destiny* installment, the relationship between Bungie and Activision began to sour within a few years.  While Bungie prioritized the individual playing experience, as it had done with the *Halo* franchise, Activision was focused on generating additional revenue through the sale of expansions and adding in-game micro-transactions (such as letting a player purchase new armor).

30.    Under the terms of the Licensing Agreement, *Destiny 2* was scheduled for  release in the fall of 2015.  Because the first installment was only released in September 2014, Bungie and Activision instead released a first expansion for *Destiny 1* in September 2015.  Then, in mid-January 2016, it was announced that there would be significant delays in the release of *Destiny 2*. Industry analysts at the time noted a growing sense of "malaise" among the game's hardcore fans triggered by a "drought of new content."

31.    On January 27, 2016, just days after the *Destiny 2* delay announcement, Bungie disclosed that its president was stepping down and would be replaced by Bungie's then-COO, Pete Parsons.  Parsons issued a statement reassuring *Destiny* gamers that the franchise would be his "number one priority," stating his belief that gamers "ha[d] yet to see our studio's best work" and that he would be "entirely focused on fulfilling that promise."

32.    Analysts and insiders attributed the delays and lack of updates to a host of behind-the-scenes disputes regarding how to best manage the *Destiny* franchise. For example, in October 2015, Bungie added new "micro-transactions" to the game at Activision's request.  Although Bungie had initially told gamers that these for-purchase additions would be "cosmetic only," the industry publication *Kotaku* reported that "soon enough the studio quietly started selling level boosters as well" to allow players to actually advance more quickly in the game.

33.    In December 2015, Bungie quietly introduced changes to *Destiny 1*'s online matchmaking system.  But a month later, on January 26, 2016, Bungie reversed course and announced that in response to player concerns about connection speeds, they would change the matchmaking system to prioritize connection quality. Meanwhile, Activision vacillated on whether future content would be free or paid. *Kotaku* reported that Bungie employees were frequently kept in the dark about these decisions, indicating that Activision – rather than Bungie – was driving the moves pursuant to its contractual authority over the process.  One Bungie designer, for example, said the matchmaking changes were "made behind the scenes that I wasn't aware of at the time."  And *Kotaku* reported that "[i]t's a tough situation for everyone, exacerbated by . . . Activision's revenue demands," among other issues.

34.    Bungie released *Destiny 2* on September 6, 2017.  The game was widely praised by critics and, on September 15, 2017, Activision announced that *Destiny 2* had "surpassed the original's records for engagement and digital sales in launch week."

35. Despite the success of *Destiny 2*, the tension between Activision and Bungie continued to grow as Activision prevented Bungie from pursuing the direction it wanted to take with the *Destiny* franchise. Bungie understood the gaming industry was moving away from boxed gameplay releases in favor of persistent releases of gaming content. That trend was advantageous for Bungie but bad for Activision, who wanted more blockbuster releases in the form of the first two *Destiny* games and as stipulated in the Licensing Agreement. Prior to and during the Class Period, Bungie had become frustrated with Activision's push for increased control over *Destiny*, which took the form of Activision demanding more micro-transactions in *Destiny 1* (released September 2014), *Destiny 2* (released September 2017) and *Destiny 2: Forsaken* (released September 2018). Activision's push for these micro-transactions created the perception among loyal *Destiny* players that they had to pay to win. It also created the perception at Bungie that Activision had prioritized short-term profit over the long-term gaming experience.

36. In order to maximize the financial performance of the *Destiny* franchise, including through the increased use of micro-transactions, Activision had devoted significant amounts of additional developer talent to augment Bungie's own developers. Specifically, Activision utilized developers from two of the Company's subsidiaries: High Moon Studios and Vicarious Visions. But in late Spring 2018, High Moon development personnel gathered for an all-hands meeting during which the status of High Moon's work on *Destiny* was discussed. During the meeting, High Moon senior management informed the *Destiny* developers that Activision was shifting significant amounts of High Moon's development team away from *Destiny* and onto the *Call of Duty* franchise.

37. Concurrently, in June 2018, Bungie announced that it had reached a deal with another publisher, China-based NetEase, which netted Bungie $100 million in exchange for granting NetEase a minority stake in Bungie and a seat on Bungie's Board of Directors. *Game Industry*, an industry news site, reported that

-10-

"it's not hard to frame the deal as Bungie teaming up with a partner who can bring its games into the Chinese market," even though Bungie at the time denied that it planned to have NetEase publish existing games like *Destiny* in China.  Despite denying that the deal reflected any tension with Activision, Bungie's CEO, Parsons, said the move was "really about who are the teams we want to build with and what are the games we want to make [and] what are the business models[.]"  An *Engadget* reporter noted that the deal "apparently" did not impact Bungie's agreement with Activision but also speculated that "Bungie may be setting itself up for life after the arrangement ends."

38.    Following the disclosure of the deal with NetEase, Bungie and Activision continued to clash about the future of the *Destiny* franchise and began negotiations on the termination of the Licensing Agreement.  Because the Licensing Agreement did not allow Bungie to terminate the contract, other than for an uncured, material breach, Bungie would have to pay Activision to extricate itself from the Licensing Agreement.  As a result, the parties negotiated the amount it would cost Bungie to terminate the Licensing Agreement.

39.    The negotiations between Activision and Bungie heightened the tension between the two companies.  On November 8, 2018, Activision held its 3Q18 conference call.  During the call, defendant Johnson blamed Activision's poor results on *Destiny* and its purported "underperformance against our expectations to date."  In an unusual public response, Bungie released a Tweet objecting to the characterization that *Destiny* was not meeting expectations: "We are not disappointed with Forsaken [the most recent *Destiny* expansion].  We set out to build a game that Destiny players would love, and at Bungie, we love it too . . . Building Destiny for players who love it is and will remain our focus going forward."

40.    Despite the building tension between the companies and ongoing negotiations to terminate the Licensing Agreement, Activision did not disclose that

-11-

Activision and Bungie were parting and ending their relationship until January 10, 2019, after the termination was completed.

**Activision's Deteriorating Financial Condition and Stock Price**

41.     As its relationship with Bungie was deteriorating and the companies were negotiating an end to the Licensing Agreement, Activision was simultaneously trying to cope with a number of separate public problems that negatively affected the company's stock price.

42.     During the fall of 2018, Activision was dealing with fallout from the departure of Activision Blizzard CEO and President Mike Morhaime, the resignation of Blizzard CFO Amrita Ahuja, the termination of defendant Neumann, disappointing sales of the *Call of Duty: Black Ops 4* game and the failure to release another installment in the *Diablo* franchise.  And in the shooter game genre, Activision was seen as continuing to lose ground to competitor *Fortnite* and it was reported that Activision's overall player base had declined by 7 million players.

43.     As a result of this cascade of bad news, between July 2018 and December 2018, Activision's stock price steadily fell from over $80.00 per share to under $47.00 per share.  In an effort to break the cycle of bad news and stock price declines, Defendants delayed disclosing the truth about Activision's relationship with Bungie and the negotiations to end the Licensing Agreement for as long as possible.

**DEFENDANTS' MISLEADING STATEMENTS
AND MATERIAL OMISSIONS**

44.     On August 2, 2018, Activision held a conference call with analysts and investors to discuss the Company's 2Q18 operational and financial results. Defendants Johnson, Kotick and Neumann participated in the conference call. During the call, Johnson engaged in the following exchange with Andrew Crum, a Stifel, Nicholas & Company equity analyst:

-12-

[CRUM:] I was hoping you could provide more of an update on the Destiny franchise and just your expectations for the major expansion this fall.

[JOHNSON:] . . . As you'll remember, we've talked a lot about listening to the Destiny community to provide a deeper ongoing experience, more engaging moment-to-moment gameplay and a series of updates with better rewards in the ongoing live game. *And the team at Bungie and the team at Activision have made a lot of strides in doing that, particularly [the] last 2 quarters with the ongoing improvements in the end game and the overall gameplay experience*. But in particular, with the Warmind expansion in May, that really showed us the ability to evolve the game and regrow engagement and regrow users.

45. Immediately after the August 2, 2018 conference call, defendants filed Activision's 2Q18 Form 10-Q with the SEC. Defendant Neumann signed the 2Q18 Form 10-Q and defendants Kotick and Neumann certified that the information in the 2Q18 Form 10-Q fairly represented, in all material respects, the financial condition and results of operations of Activision. The 2Q18 Form 10-Q stated that *Destiny* is one of the Company's "*key product franchises*" and "*[w]e have also established a long-term alliance with Bungie to publish its game universe, Destiny*."

46. On November 8, 2018, Activision held a conference call with analysts and investors to discuss the Company's 3Q18 operational and financial results. Defendants Johnson, Kotick and Neumann participated in the conference call. During the call, Johnson engaged in another exchange with Andrew Crum, the Stifel, Nicholas & Company equity analyst:

[CRUM:] You touched on this a little bit, but maybe spend a little more time on the health of the Destiny franchise, just what you've seen in terms of engagement post the Forsaken launch.

-13-

[JOHNSON:] . . . I guess I'll start by reiterating that Forsaken is a high-quality expansion of content into the universe. Honestly, it's in the highest-quality content we've seen in the franchise to date. ***And it really kind of have [sic] Activision and Bungie working together to address community concerns post-Destiny 2 holistically***. Talking to players, [we knew it came from users,] really doing a fundamental review of how to offer deeper end game, greater powers and greater rewards and engaged players seem to be really enjoying the content. In particular, it was very well-received both by reviewers and by the community and has ongoing deep engagement by those that are playing it.

47.    While the investing public was unaware that Activision and Bungie were negotiating terms to terminate the Licensing Agreement, Defendants claimed that the real problem was that *Destiny* players were losing patience with the quality of the game experience. Specifically, during the November 8, 2018 conference call, Defendants told investors that "we have not yet seen the full core re-engage in *Destiny*, which has kind of led to the underperformance against our expectations to date. And some players, we think, are still in wait-and-see mode."

48.    Immediately after the November 8, 2018 conference call, Defendants filed Activision's 3Q18 Form 10-Q with the SEC. Defendant Neumann signed the 3Q18 Form 10-Q, and defendants Kotick and Neumann certified that the information in the 3Q18 Form 10-Q fairly represented, in all material respects, the financial condition and results of operations of Activision. The 3Q18 Form 10-Q repeated that *Destiny* is one of the Company's "***key product franchises***" and "***[w]e have also established a long-term alliance with Bungie to publish its game universe, Destiny***."

-14-

49.     As a result of Defendants' misleading statements and material omissions between August 2, 2018 and January 10, 2019, Activision's stock price traded at artificially inflated levels up to $82.73 per share.

50.     Defendants' Class Period statements, set forth in ¶¶44-46, 48, which succeeded in artificially inflating Activision's stock price, were false and misleading when made.  When Defendants made statements regarding the Company's business relationship with Bungie and Destiny being a key product franchise, Defendants failed to disclose to investors that: (a) Activision and Bungie were already in the process of negotiating the terms of the termination of the Licensing Agreement; and (b) as a result, *Destiny* would no longer be a key product at Activision or generate revenue for the Company.

## DISCLOSURE OF THE TRUTH ABOUT BUNGIE

51.     After the market closed on January 10, 2019, Activision revealed in a Form 8-K filing that Bungie would "assume full publishing rights and responsibilities for the Destiny franchise" and, as a result, Activision "d[id] not expect to recognize material revenue, operating income or operating loss from the Destiny franchise in 2019."  In a release issued after the Form 8-K filing, Bungie reported that "[t]he planned transition process is already underway in its early stages."

52.     Investors were stunned by the disclosure that the relationship between Activision and Bungie had ended.  A *Forbes* article on January 11, 2019 described it as "earthshattering news that Bungie was extracting itself from its deal with Activision" and reported that it "is being received as a big win for Bungie and a loss for Activision."  Similarly, a January 10, 2019 *Business Insider* article was headlined "Activision loses major developer in split with 'Destiny' maker Bungie."

53.     Analysts covering Activision also reacted negatively to the surprise disclosure that Bungie had ended the relationship with Activision.  For example, in a January 14, 2019 report, BTIG analyst Brandon Ross reported that "the severing

of Activision's relationship with Bungie will create a hole in earnings" and "[o]ver the past several days, we have thoroughly questioned our ability to continue to recommend ATVI stock." Morgan Stanley analyst Brian Nowak issued a report on January 11, 2019 about the "early and unexpected end to the publishing arrangement" and emphasized "[t]o be clear we don't like losing a multi-hundred million dollar annual game franchise." A CFRA analyst report, also on January 11, 2019, remarked that "the loss of the publishing rights for Bungie is a notable negative" for Activision, which "seems to be in need of some new game momentum."

54. As a result of investors learning the truth about the termination of Activision's licensing agreement with Bungie, Activision's stock priced dropped by $4.77 per share to close at $46.17 on January 11, 2019. This 9% decline came on volume of 35.4 million shares traded, more than five times the average daily trading volume for Activision stock.

55. Subsequently, it was disclosed that Bungie agreed to pay Activision $164 million to end the Licensing Agreement. The Licensing Agreement itself did not have a provision under which Bungie could pay to terminate the relationship with Activision, but the parties had negotiated the one-time payment prior to the January 10, 2019 disclosure. A *Forbe*s article following the disclosure reported: "We don't really know the financial situation at Bungie as an independent entity, but they recently got a $100 million investment from China mobile giant NetEase, which no doubt made this transition easier, if it's not the entire reason it's possible."

## LOSS CAUSATION/ECONOMIC LOSS

56. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive investors and the market with a course of conduct that artificially inflated the price of Activision stock and operated as a fraud or deceit on Class Period purchasers of Activision stock by misrepresenting and omitting material information about the Licensing Agreement status and relationship with Bungie.

-16-

When the truth about that relationship was disclosed to the market on January 10, 2019, Activision's stock price fell precipitously, as the prior artificial inflation came out of the price. As a result of their purchases of Activision stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

57. Defendants' misleading statements and omissions, identified herein at ¶¶44-46, 48, had the intended effect and caused Activision's stock to trade at artificially inflated levels during the Class Period.

58. As a direct result of the disclosure on January 10, 2019, detailed in ¶¶51-53, Activision's stock price suffered a significant decline. On January 11, 2019, the first trading day following the disclosure of the truth about the Activision-Bungie relationship, the price of Activision stock declined $4.77 per share, a drop of over 9%.

59. The decline in Activision's stock price on January 11, 2019 was a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors and the market. The timing and magnitude of Activision's stock price decline negates any inference that the losses suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' fraudulent conduct. Indeed, on January 11, 2019, the Nasdaq Composite was flat and other gaming companies did not suffer significant stock price declines like Activision.

60. The economic losses suffered by Plaintiff and other members of the Class were a direct result of Defendants' fraudulent scheme to inflate Activision's stock price and the subsequent decline in the value of that stock when Defendants' prior misrepresentations and omissions were revealed.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE

61.     Plaintiff and the Class are entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because, during the Class Period, Activision stock traded in an efficient market on the Nasdaq National Market, the material misstatements and omissions alleged herein would induce a reasonable investor to misjudge the value of Activision stock and without knowledge of the misrepresented or omitted material facts, Plaintiff and other members of the Class purchased or acquired Activision stock between the time Defendants misrepresented and failed to disclose material facts about the relationship with Bungie and the time the true facts were disclosed.  Accordingly, Plaintiff and other members of the Class relied, and are entitled to have relied, upon the integrity of the market for Activision common stock, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

62.     Plaintiff and the Class are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the common stock of Activision between August 2, 2018 and January 10, 2019, inclusive (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of Activision, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

64.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide

-18-

substantial benefits to the parties and the Court. Throughout the Class Period, Activision stock was actively traded on the Nasdaq National Market, one of the largest stock exchanges in the world. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. During the Class Period, there were more than 760 million shares of Activision common stock outstanding and the average daily trading volume was over 7 million shares. Record owners and other members of the Class may be identified from records maintained by Activision or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

65. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented and omitted material facts about the relationship between Activision and Bungie; and

(c) To what extent the members of the Class have sustained damages and the proper measure of damages.

66. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages as a result of Defendants' wrongful conduct.

67. Plaintiff will adequately protect the interests of the Class and has retained counsel who is experienced in securities and class action litigation. Plaintiff has no interests which conflict with those of the Class.

68.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

69.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.  Count I is brought pursuant to §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

70.   During the Class Period, Activision, through its officers, management and agents, including defendants Kotick, Johnson and Neumann, made or were responsible for the statements specified in ¶¶44-46, 48, which they knew or recklessly disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.   Defendants and the Company's officers, management and agents directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange: (a) employed devices, schemes and artifices to defraud; (b) made misleading statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Activision common stock during the Class Period.  All Defendants are sued as

primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

72. Defendants and the Company's officers, management and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Activision common stock during the Class Period.

73. Activision is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondent superior*.

74. Defendants and the Company's officers, management and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about Activision's relationship with Bungie and the Licensing Agreement.

75. The allegations above establish a strong inference that Activision, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about the relationship with Bungie and the Licensing Agreement. By concealing these material facts from investors, Activision's share price was artificially inflated during the Class Period.

76. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts

-21-

were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about the status of Activision's relationship with Bungie and artificially inflating the price of Activision common stock.

77. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Activision common stock. Plaintiff and the Class would not have purchased Activision common stock at the prices they paid if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

78. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Activision common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

79. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. Count II is brought pursuant to §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

80. Defendants Kotick, Johnson and Neumann acted as controlling persons of Activision within the meaning of §20(a) of the Exchange Act. Activision controlled all of its employees, including Kotick, Johnson and Neumann. By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the relationship with Bungie and status of the Licensing Agreement, as well as their intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, defendants Kotick, Johnson and Neumann had the power to influence and control, and did influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements that

-22-

Plaintiff contends are false and misleading. Defendants Kotick, Johnson and Neumann participated in the conference calls with investors and analysts, described herein at ¶¶44, 46, and prepared and approved the Company's SEC filings, described herein at ¶¶45, 48, alleged by Plaintiff to be misleading.

81.    In particular, Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. By reason of such conduct, Defendants are liable pursuant to §20(a).

82.    As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Activision common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, and certifying Plaintiff as Class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as Class counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' violations of the federal securities laws, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

-23-

D.     Awarding such equitable, injunctive or other and further relief as the Court may deem just and proper, including, but not limited to, rescission.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: July 10, 2019                    Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
TOR GRONBORG
TRIG R. SMITH
ALEXI H. PFEFFER-GILLETT


                                        s/ Tor Gronborg
                                        TOR GRONBORG

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff

-24-

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 10, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

 s/ TOR GRONBORG
TOR GRONBORT

ROBBINS GELLER RUDMAN & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  TorG@rgrdlaw.com

-25-

# Mailing Information for a Case 2:19-cv-03788-SVW-AFM Chase Hamano v. Activision Blizzard, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Alaina Ashley Bird**
  lbird@irell.com

- **Ryan E Blair**
  rblair@cooley.com,efiling-notice@ecf.pacerpro.com,chourani@cooley.com

- **Koji F Fukumura**
  kfukumura@cooley.com,efiling-notice@ecf.pacerpro.com,chourani@cooley.com

- **Carol V Gilden**
  cgilden@cohenmilstein.com

- **Tor Gronborg**
  torg@rgrdlaw.com,crosini@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Todd L Kammerman**
  tkammerman@aftlaw.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Marvin A Miller**
  mmiller@millerlawllc.com,JRamirez@millerlawllc.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Heather Marie Speers**
  hspeers@cooley.com,bbrant@cooley.com,efiling-notice@ecf.pacerpro.com

- **Erin Carey Trenda**
  etrenda@cooley.com,kjones@cooley.com,efiling-notice@ecf.pacerpro.com

- **Craig Varnen**
  cvarnen@irell.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

-26-