# EXHIBIT 1

Exhibit 1
27



3100 Ocean Park Boulevard
Santa Monica, California 90405
Tel:  310.255.2000
Fax:  310.255.2152
www.activision.com

| | |
|---|---|
| Party: | Bungie, LLC |
| Product: | Destiny |
| Deal Type: | Software Publishing and Development Agreement |

### SOFTWARE PUBLISHING AND DEVELOPMENT AGREEMENT

This Software Publishing and Development Agreement (this "**Agreement**") is entered into effective as of April 16, 2010 (the "**Effective Date**") by and between **Bungie, LLC** ("**Licensor**" or "**Bungie**"), a Delaware limited liability company with offices at 434 Kirkland Way, Kirkland, WA 98033, and **Activision Publishing, Inc.** ("**Activision**"), a Delaware corporation with offices at 3100 Ocean Park Boulevard, Santa Monica, California 90405, U.S.A.

**RECITALS:**

A.    Activision is engaged in the business of developing, publishing, licensing and distributing entertainment software products;

B.    Licensor is in the business of developing and producing entertainment software products, and owns and holds the rights to develop, manufacture, publish, license, market and distribute a series of entertainment software products currently being developed by Licensor entitled **"Destiny"** (also sometimes referred to herein or in the exhibits hereto as "*Tiger*") (the "**Destiny Property**");

C.    Activision and Licensor entered into a Development and Publishing Letter of Intent dated March 31, 2010 (the 'LOI") pursuant to which Licensor and Activision entered in a relationship whereby Licensor agreed to develop certain interactive entertainment software products based on the Destiny Property to be exclusively published and distributed by Activision; and

D.    Activision and Licensor wish to enter into a long-form software development and publishing agreement with respect to the Destiny Property based on the terms set forth in the LOI and as provided by the LOI, which long-form agreement will supersede and replace the LOI.

The parties to this Agreement agree as follows:

**1.    Products**

"**Product**" or "**Products**" means the following that are developed during the Development Term (as such term is defined in Section 4.1): (a) a series of interactive entertainment software products being developed by Licensor based on the Destiny Property, planned to be massively-multiplayer-style (i.e., client-based mission structures with persistent elements), sci-fantasy, action-shooter games (collectively, "**Destiny Games**" and individually, each a "**Destiny Game**" or "**Destiny Game #1**", "**Destiny Game #2**", "**Destiny Game #3**" and "**Destiny Game #4**" as applicable) for operation on the platforms and formats described in Section 2; (b) major downloadable content expansion pack-type software releases developed by Licensor for each Destiny Game (collectively, "**Comets**" and individually, each a "**Comet**" or "**Comet #1**", "**Comet #2**", "**Comet #3**" and "**Comet #4**" as applicable); (c) smaller interstitial downloadable content software releases developed by Licensor for each Destiny Game (collectively, "**DLC Releases**" and individually, each a "**DLC Release**"); (d) Conversions (as defined in Section 5.1); and (e) any related value-added services or other premium content offered in connection with the Destiny Games and/or Comets; but Products exclude Ancillary Markets (as such term is defined in Section 5.5) and Bungie.net (as described in Exhibit B hereto).  The concept document for Destiny Game #1 is attached hereto as Exhibit A.

*Bungie Development and Publishing Agreement (Destiny)v11*    1    *CC*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY    ACT-WZ08638533

Exhibit 1
28

**1A. Release Plan**

The release plan for the Destiny Games ("**Release Plan**") is currently comprised of four (4) major retail Destiny Game releases tentatively scheduled for the Fall of 2013, 2015, 2017 and 2019 and four (4) Comet releases following each Destiny Game release tentatively scheduled for the Fall of 2014, 2016, 2018 and 2020. In addition, as part of the Destiny Games Licensor shall also produce DLC Releases as mutually agreed by the parties in the time periods between retail Destiny Games and Comet releases. The expected business model for the Products is a blend of retail packaged goods sales (although the parties acknowledge and agree that the future retail model for iterations of the Destiny Games may be via digital download rather than disk or packaged goods), subscriptions, downloadable content, value-added services and micro-transactions, the exact mix of which shall be determined by mutual agreement of Licensor and Activision. Pricing strategy for the Products shall be subject to mutual approval, provided in the event of a deadlock, Activision shall have the tie-breaking vote. Activision will have control and final approval over all decisions relating to retail sales and promotions, discounts, rebates, etc., provided that Activision shall meaningfully consult with Licensor on such decisions in advance.

**2. Platforms**

2.1    Subject to <u>Section 5</u> of this Agreement:

(a) A cross-console and console transition plan for Destiny Games #1 and #2 is attached hereto as <u>Exhibit C</u> ("**Native Release Plan**"), which shall be the plan of record for Destiny Games #1 and #2. The parties hereto shall discuss and mutually agree on the operating platforms for all other Products, as well as plans to manage cross-platform development efforts and platform transition to next generation consoles during the Development Term (as such term is defined in <u>Section 4.1</u>), in good faith.

(b) As described in the Native Release Plan, Destiny Game #1, along with any related DLC Releases as well as Comet #1, shall be initially developed by Licensor to operate on and be compatible with the Microsoft Xbox 360 video game console ("**Xbox 360**") and the next successor console platform released by Microsoft configured for both the NTSC and PAL television/video system standards ("**Xbox 720**"). The parties acknowledge and agree that the budget set forth in the Payment Schedule set forth on <u>Exhibit E</u> attached hereto is scoped to delivery of only the Xbox 360 SKU (plus content pipeline) for Destiny Game #1. The parties also currently contemplate the development and commercial release of Destiny Game #1 for the PlayStation 3 computer entertainment system ("**PS3**") in the Fall of 2014, subject to the parties hereto conducting a joint technical feasibility analysis that reasonably establishes to the parties' mutual satisfaction that Destiny Game #1 is able to be developed for the PS3 at quality and feature parity to the Xbox 360 version of Destiny Game #1 (the Xbox 360, the Xbox 720 and the PS3 are collectively referred to herein as the "**Destiny Game #1 Platforms**"). The parties hereto shall mutually agree to the incremental budget to fund the PS3 technical feasibility analysis. The cost of the technical feasibility analysis shall be included in the overall Project Accounting (as such term is defined in <u>Section 11.5</u>) for purposes of calculating Operating Income (as such term is defined in <u>Section 11.1</u>); provided, however, that in the event the parties hereto agree that a PS3 version of Destiny Game #1 is not feasible, any costs of the technical feasibility analysis in excess of Two Million Dollars ($2,000,000) shall be excluded from the overall Project Accounting. The parties shall seek to conclude technical diligence on whether to develop Destiny Game #1 for the PS3 by no later than January 31, 2011. The parties shall then commence a business diligence phase ending no later than March 31, 2011, to ascertain the commercial desirability of the PS3 SKU, taking into consideration the then prevailing information regarding expected market conditions and console transitions. The baseline framework for analyzing the SKU-plan of the Products is attached hereto as Exhibit F. Licensor agrees that it shall not willfully take any actions (or make any omissions) in its development of the Xbox 360 version of Destiny Game #1 to hinder or undermine the ability to also develop Destiny Game #1 for the PS3. In no event shall Licensor be required to simultaneously ship Destiny Game #1 for the Xbox 360 and PS3 in the Fall of 2013.

(c) Subject to the terms of <u>Section 5</u>, Destiny Game #2, along with any related DLC Releases as well as Comet #2, shall be initially developed by Licensor to operate on and be compatible with the Xbox 360, Xbox 720 and the Sony PlayStation 4 computer entertainment system (i.e., the next successor platform released by Sony after PlayStation 3) configured for both the NTSC and PAL television/video system standards ("**PS4**", and collectively, the Xbox 360, Xbox 720 and PS4 are referred to herein as the "**Destiny Game #2 Console Platforms**"), and  personal computer with Windows-based operating system ("**PC**")(the "**Destiny Game #2 PC Platform**") (the Destiny Game #2 Console Platforms and the Destiny Game #2 PC Platform are collectively referred to herein as the "**Destiny Game #2 Platforms**"). The parties hereto agree that prior to commencing production on the Xbox 720, PC and PS4 SKUs of Destiny Game #2, Activision and

*Bungie Development and Publishing Agreement (Destiny)v11*    2                                                          *CC*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                                          ACT-WZ08638534

Exhibit 1

29

Licensor shall mutually agree on the business case and technical feasibility of such SKUs, the incremental development budget, and production schedule therefor.

(d) The Destiny Game #1 Platforms, the Destiny Game #2 Platforms and such operating platforms as the parties may mutually agree pursuant to Section 2.1(a) are collectively referred to herein as the "**Platforms**" and each individually as a "**Platform**". Xbox 360, Xbox 720, PS3 and PS4 are collectively referred to herein as "**Console Platforms**" and each individually as a "**Console Platform**".

## 3.  Territory

The territory of this Agreement shall be worldwide, except where prohibited by applicable law or regulation (the "**Territory**").

## 4.  Term

4.1     The commencement date of the development term (the "**Development Term**") is April 16, 2010 and the Development Term shall continue until Licensor's delivery to Activision of the Release to Certification Version (as such term is defined in Section 9.1) of Comet #4.

4.2     Activision and Licensor shall mutually agree upon a budget to support the continuing operation of the Products for a period of three (3) years following the commercial release of Comet #4 ("**Support Term**"). During the Support Term, Licensor shall be responsible for continuing support obligations with respect to the Products as described in Section 7.1(xviii). If Activision fails to continue publication and distribution of the Products in a manner consistent with other equivalent interactive entertainment software products that it publishes and distributes and customary market practices (it being expressly understood that over the course of the Development Term, one (1) or more of the Products could become technically obsolete), or fails to fund Licensor's dedicated support team during the Support Term, such failure will be deemed a material breach of this Agreement, subject to all applicable cure-periods contained in Section 17.2 of this Agreement.

4.3     The distribution term for the Products (the "**Distribution Term**") shall commence on the Effective Date and shall be perpetual (subject to the restrictions set forth in, and termination in accordance with, this Agreement). Upon conclusion of the Development Term, Activision agrees that it shall not exercise its publishing and distribution rights to the Products under this Agreement to intentionally create confusion in the marketplace regarding any future Licensor game. In the event Licensor terminates this Agreement in accordance with Section 17.2, or in the event Activision terminates this Agreement pursuant to Section 17.1, then the Distribution Term for the Products shall automatically cease and all such rights shall revert to Licensor in perpetuity, provided, however, that in the event of a termination by Activision pursuant to Section 17.1, Activision shall retain certain rights as set forth in Section 17.1.

## 5.  Grant of Rights

5.1     During the Distribution Term, Licensor hereby grants to Activision, and Activision hereby accepts, subject to the terms set forth in this Agreement (including Licensor's exclusive right to develop all Products and Conversions as set forth in Section 5.4), the exclusive, royalty-bearing, non-transferable (except as set forth in Section 21.13), non-sublicensable (except as set forth in Section 5.3) right and license in the Territory to: (a) publish and distribute the Products on the Platforms, (b) publish and distribute all versions, conversions and adaptations of the Products for all other platforms, operating systems, media, devices, or methods of distribution, whether now known or hereafter created or devised, including, but not limited to, Sony PlayStation (e.g., PS3, PS4), PC, handheld (e.g., Nintendo DS and Sony PSP), mobile operating systems, online and server based systems, and/or casual extensions of the Products which may be playable via handheld gaming devices, a PC or mobile handset, which versions, conversions and adaptations are developed during the Development Term (the "**Conversions**"), but Conversions specifically exclude remakes and spinoffs of the Products and Ancillary Markets, (c) subject to mutual written approval of the parties, distribute the Products for the Platforms in combination or bundled with hardware, software and other products distributed by third parties, and (d) publish and distribute localized versions of the Products in the Territory.

5.2     During the Distribution Term, Licensor hereby grants to Activision, and Activision hereby accepts, subject to the terms set forth in this Agreement (including Licensor's exclusive right to develop all

*Bungie Development and Publishing Agreement (Destiny)v11*   3                                                    CC

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                              ACT-WZ08638535

Exhibit 1
30

Products and Conversions as set forth in Section 5.4), the exclusive, royalty-bearing, non-transferable (except as set forth in Section 21.13), non-sublicensable (except as set forth in Section 5.3) right and license in the Territory to manufacture, reproduce, display, perform, advertise, promote, market, sell and license the Products, Conversions, and localized versions of the Products solely to the extent necessary for Activision to exercise its rights and licenses granted in Section 5.1.

5.3     During the Distribution Term and subject to the terms set forth in this Agreement (including Licensor's exclusive right to develop all Products and Conversions as set forth in Section 5.4), Activision shall have the right to sublicense the rights granted under Sections 5.1 and 5.2 to (a) an Affiliate (as such term is hereinafter defined) of Activision for so long as it remains an Affiliate of Activision if the Affiliate agrees to be bound by the terms of this Agreement, Activision guarantees the Affiliate's compliance with the terms of this Agreement, and Activision and the Affiliate agree to be jointly and severally liable for all obligations related to the Affiliate's compliance with the terms of this Agreement; and (b) third parties that have been approved in writing by Bungie to the extent that, and only for so long as, the third party is acting on Activision's or an Activision Affiliate's behalf; Activision and the applicable Activision Affiliate guarantee third party's compliance with the terms of this Agreement; and Activision indemnifies Licensor from all damages, costs, and expenses resulting from the third parties compliance with the terms of this Agreement; provided that Activision shall not in any way be relieved of its obligations under this Agreement and shall ensure that any such sublicensee complies with the terms of this Agreement. Activision must secure written agreements with each non-Affiliate sublicensee to ensure that (x) sole and exclusive ownership of all Licensor Product Intellectual Property (as such term is defined in Section 6.2) created or developed by the non-Affiliate sublicensee shall be fully transferred and assigned to Licensor (including the right to seek damages for past and future infringement) without any payment of compensation to the non-Affiliate sublicensee and Licensor shall thereafter own all rights to improvements, additions, and modifications to and enhancements and derivatives of the Licensor Product Intellectual Property; and (y) the non-Affiliate sublicensee shall, upon Licensor's request, take any step that Licensor may reasonably require to ensure that all Licensor Product Intellectual Property created or developed by the non-Affiliate sublicensee is assigned to Licensor, including the execution and delivery to Licensor an assignment of rights with respect to the Licensor Product Intellectual Property substantially in the form reasonably specified by Licensor. Notwithstanding the foregoing, to the extent an Activision Affiliate sublicensee creates Licensor Product Intellectual Property, Activision shall ensure that the sole and exclusive ownership of such Licensor Product Intellectual Property is fully transferred and assigned to Licensor (including the right to seek damages for past and future infringement) without any payment of compensation to such Activision Affiliate sublicensee, including taking any action that Licensor may reasonably require to ensure that all Licensor Product Intellectual Property created or developed by the Activision Affiliate sublicensee is assigned to Licensor (such as the execution and delivery to Licensor of an assignment of rights to such Licensor Intellectual Property substantially in the form requested by Licensor), and Licensor shall thereafter own all rights to improvements, additions and modifications to and enhancements and derivatives of such Licensor Product Intellectual Property. For the purposes of this Agreement, "**Affiliate**" means, with respect to any entity, any other entity that (i) owns or is owned by that entity or (ii) that controls, is controlled by, or is under common control with that entity. For any entity to "control" or "own" another entity, it must do one of the following: (1) hold or own more than 50% of the ownership or equity of the owned or controlled entity, or (2) have the right to vote more than 50% of that entity's voting equity.

5.4     Licensor shall have the exclusive right to develop all Products including any Conversions. This right includes Licensor's sole discretion (after consultation with Activision) to define the creative and technical scope for all Products and Conversions, subject to the mutual approval of the parties hereto to the final project scope, budget, development plan and production schedule. Either party hereto shall have the right to propose a Conversion. In the event of a Conversion proposed by Activision, Licensor and Activision shall commence a technical diligence period not to exceed five (5) months (excluding a PS3 Conversion, which is addressed in Section 2.1(b)). During the technical diligence period, the parties will analyze the technical feasibility and business case for the Conversion proposed by Activision. In all cases, a Conversion for a Console Platform must have the ability to achieve feature parity in all material respects with the applicable Destiny Game for the other Console Platforms, and satisfy technical, security, design and quality guidelines as determined above (any other guidelines to be discussed in good faith and mutually determined by Licensor and Activision during the technical and business diligence process). In the event of a casual Conversion, or Conversion intended for a Console Platform or any other Platform with technical specifications incapable of achieving feature parity with a Destiny Game developed for Console Platforms (e.g., handheld or mobile extensions to the Destiny Property), then Licensor shall determine (in consultation with Activision) the game and technical design of such Conversion. In the event Licensor elects not to develop any such Conversion requested by Activision

*Bungie Development and Publishing Agreement (Destiny)v11*    4                                    CC

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                    ACT-WZ08638536

Exhibit 1

31

and approved by Licensor, Activision shall have the right to have such Conversion developed by one of its internally-owned studios or by a third party developer, provided that Licensor shall have the right to approve any third party developer proposed to be utilized by Activision, such approval not to be unreasonably withheld or delayed (it being expressly understood and agreed by the parties that (a) only an AAA-caliber developer that is not a competitive risk to Licensor is reasonable for Licensor to approve, and (b) Licensor hereby expressly disapproves of Valve, Epic and Gearbox as potential third party developers for Conversions (unless such third party developer should become an Activision majority or wholly-owned studio), and (c) Licensor cannot disapprove of the use by Activision of an Activision majority or wholly-owned studio), and Licensor shall otherwise provide production, QA, associated  management services, and other reasonable assistance to Activision and any internal Activision studio or third party developer in connection with the development of any such Conversions. All rights to any and all work performed by a developer on any such Conversions shall be fully and irrevocably assigned to and exclusively owned by Licensor, excluding any Activision Product Intellectual Property (as such term is defined in Section 6.2) and subject to the license rights to Activision relating to such Conversions as described in Section 6.2.  The parties will mutually agree on the exact structure of and parties to any contract with a third party developer engaged for any such Conversion; provided that such contract must ensure that (x) sole and exclusive ownership of all Licensor Product Intellectual Property created or developed by the third party developer shall be fully transferred and assigned to Licensor without any payment of compensation to the third party developer and Licensor shall thereafter own all rights to improvements, additions, and modifications to and enhancements and derivatives of the Licensor Product Intellectual Property; and (y) the third party developer or Activision, as applicable, shall, upon Licensor's request, take any step that Licensor may reasonably require to ensure that all Licensor Product Intellectual Property created or developed by the third party developer is assigned to Licensor, including the execution and delivery to Licensor an assignment of rights with respect to the Licensor Product Intellectual Property substantially in the form reasonably specified by Licensor.

5.5     All ancillary market opportunities in connection with the Products including, without limitation, all linear media deals (e.g., films), book publishing and traditional licensing and merchandising (collectively, "**Ancillary Markets**"), shall be led by Licensor, but subject to the mutual approval of the parties hereto. Ancillary Markets shall specifically exclude soundtrack and/or music publishing related arrangements in connection with the Products, which such rights are exclusively reserved to Licensor.

5.6     During the Distribution Term, Activision and its Affiliates shall have a royalty-bearing, non-transferable (except as set forth in Section 21.13), non-sublicensable (except as set forth in Section 5.3) right and license in the Territory under all Intellectual Property (as such term is defined in Section 6.1) laws to utilize the Licensor Product Intellectual Property (as such term is defined in Section 6.2) to the extent necessary to exercise its exclusive rights under Section 5, including, subject to the limitations set forth in this Agreement, in the event of the approved development of any Conversions by an Activision internal studio or third party developer in accordance with Section 5.4, having access to and use of relevant source and object code, Game Assets (as such term is defined in Section 6.2), technology, engines, characters, settings, storylines, and other Intellectual Property that is Licensor Product Intellectual Property solely in connection with, and for the purpose of and to the extent necessary for, the development of any Conversions not developed, but approved, by Licensor.

## 6.  Ownership

6.1.    For purposes of this Agreement, the term "**Intellectual Property**" shall mean, regardless of form, know-how, techniques, inventions, discoveries, improvements, methods, processes, patents, patent rights, patent registrations and applications, renewals, continuations and extensions thereof, published and unpublished works of authorship, art, copyrightable materials and copyrights, titles, computer code, designs, themes, objects, buildings and architecture, automobiles, characters, character names, stories, dialog, catch phrases, locations, game play, rules, concepts, artwork, animation, sounds, musical compositions, sound recordings, graphics and visual elements and other works, audio-visual effects and other works, methods of operation, databases, collective works, compilations, literary works and any related documentation, copyright registrations and applications, renewals and extensions therefor, mask works, industrial rights, words, names, symbols, devices, designs, and other designations, and combinations of the preceding items, used to identify or distinguish a business, good, group, product, or service, trademarks, service marks, trade names, logos, trademark registrations and applications, renewals and extensions therefor, rights in information that is not generally known or readily ascertainable, trade secrets, rights in trade dress, product designs, product features, and packaging, publicity, personality and privacy rights, rights of attribution and integrity and other similarly afforded

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY     ACT-WZ08638537

Exhibit 1
32

"moral" rights, and all other forms of intellectual property and proprietary rights recognized by the U.S. or any other countries in the Territory, or under any foreign and international laws, treaties and conventions.

6.2.    Subject to the licenses granted to Activision in Section 5 of this Agreement and Activision's rights to obtain ownership or licensing thereof pursuant to Sections 6.3 and 6.4, Licensor shall retain all rights, title and interest (including all rights in the Intellectual Property related thereto or embodied therein and the right to seek damages for past and future infringement) in and to the Destiny Property and the Products and Conversions, including all source and object code, Game Assets, technology, engines, packaging and marketing materials, characters, settings, storylines, etc. relating thereto now existing or hereafter created by Licensor, Activision, an Activision Affiliate, a sublicensee, or any third party (collectively, the "**Licensor Product Intellectual Property**"), but specifically excluding (a) any Intellectual Property owned or controlled by Activision before the Effective Date; (b) any non-Game Assets solely developed by or for Activision; and (c) any improvements, additions, and modifications to and enhancements and derivatives of the materials described in the immediately preceding clauses (a) and (b) (collectively, the "**Activision Product Intellectual Property**"). Activision hereby grants to Licensor a non-exclusive, royalty-free license, without the right of sublicense (except in accordance with the same procedures for sublicensing by Activision set forth in Section 5.3) to (A) use the Activision Product Intellectual Property for purposes of developing the Products during the Development Term as provided in this Agreement and (B) use non-Game Assets that are Activision Product Intellectual Property and that are incorporated into a Product only in the Products (and not in any other products) during and after the Development Term of this Agreement pursuant to Sections 17.1(iii) and 17.5. For the avoidance of doubt, the license granted in clause (B) of the immediately preceding sentence does not permit use of the non-Game Assets that are Activision Intellectual Property in any products other than the Products in which such non-Game Assets are incorporated.  Subject to the immediately preceding sentence, Activision shall retain all rights, title and interest in and to the Activision Product Intellectual Property.  Subject to the licenses granted to Activision in Section 5 and Activision's rights to obtain ownership or licensing thereof pursuant to Sections 6.3 and 6.4, (x) Activision, on behalf of its Affiliates, sublicensees, agents and contractors, hereby assigns to Licensor the sole and exclusive ownership of all right, title and interest (including rights in Intellectual Property and the right to seek damages for past and future infringement) in and to all Licensor Product Intellectual Property created by Activision, its Affiliates, sublicensees, agents and/or contractors, whether solely or jointly with Licensor or any other person, without any payment of compensation; (y) Licensor shall own all rights to improvements, additions, and modifications to and enhancements and derivatives of the Licensor Product Intellectual Property; and (z) Activision shall, upon Licensor's request, take any step that Licensor may reasonably require to ensure that, as described in clauses (x) and (y) above, all Licensor Product Intellectual Property created by Activision or its Affiliates, sublicensees, agents and/or contractors, whether jointly or solely with Licensor or any other person and improvements, additions, and modifications to and enhancements and derivatives of the Licensor Product Intellectual Property created by Activision or its Affiliates, sublicensees, agents and/or contractors, whether jointly or solely with Licensor or any other person, are assigned to Licensor, including the execution and delivery to Licensor of an assignment of rights with respect to such Licensor Product Intellectual Property substantially in the form specified by Licensor. "**Game Assets**" means (i) all text, video, visual displays, scripts, literary treatments, characters, backgrounds, environments, rules and play patterns, and other elements visible to the user of a game or other product; (ii) all sounds, sound effects, sound tracks, and other elements audible to the user of a game or other product; (iii) all methods in which the user interacts with the characters, backgrounds, environments, or other elements of a game or other product; and (iv) the distinctive and particular elements of graphic design, organization, presentation, look and feel, layout, user interface, navigation, trade dress, and stylistic convention (including the digital implementations thereof) within a game or other product and the total appearance and impression substantially formed by the combination, coordination and interaction of these elements (i.e., the "look and feel").

6.3.    If (i) Activision terminates this Agreement due to the business cessation or bankruptcy of Licensor pursuant to Section 17.3, (ii) Activision terminates this Agreement pursuant to Section 17.2 prior to the Licensor's delivery of the Release to Certification Version (as such term is defined in Section 9.1) of Destiny Game #1 on the Xbox 360, or (iii) Activision terminates this Agreement during the development of Destiny Game #1 on the Xbox 360 due to Licensor's failure to cure a Critical Risk (as such term is defined in Section 8.2) (or failure to deliver to Activision an acceptable mitigation plan therefor) pursuant to Section 8.2 prior to the delivery of Destiny Game #1 on the Xbox 360, then (a) exclusive ownership of the Game Assets that are Licensor Product Intellectual Property excluding Third Party Elements (as such term is defined in Section 14.1.2) and Licensor's rights and licenses to Third Party Elements shall

*Bungie Development and Publishing Agreement (Destiny)v11*    6    CC

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                    ACT-WZ08638538

Exhibit 1

33

be fully transferred and assigned to Activision without any payment of compensation to Licensor and Activision shall thereafter own all rights to improvements, additions, and modifications to and enhancements and derivatives of the Licensor Product Intellectual Property (excluding Third Party Elements to the extent prohibited by the applicable terms) made by or for Activision; (b) Licensor shall be deemed to grant Activision a perpetual, non-exclusive, fully-paid and royalty-free license to the Destiny game engine, including without limitation all non-Game Assets that are Licensor Product Intellectual Property (provided Licensor shall not exploit its rights in such non-Game Assets until a date that is four (4) years from the date Activision terminates this Agreement as set forth above); and (c) Licensor shall, upon Activision's request, execute and deliver to Activision an assignment of rights with respect to the Licensor Product Intellectual Property substantially in the form attached hereto as Exhibit D.

6.4.    If Activision terminates this Agreement at any time after the commercial release of Destiny Game #1 pursuant to Section 17.2 or due to Licensor's failure to cure a Critical Risk (or failure to deliver an acceptable mitigation plan therefore) pursuant to Section 8.2 on any Product other than Destiny Game #1, then Licensor shall be deemed to grant Activision an exclusive, royalty-bearing, non-transferable (except as set forth in Section 21.13) license to the Licensor Product Intellectual Property (including, but not limited to, access to source code pursuant to Section 6.5), with the right to sublicense to third parties (subject to the transfer and assignment requirements set forth in Section 5.3), during the remainder of the contemplated Development Term (excluding the Support Term) and in the Territory, solely for the purpose of permitting Activision the right to take over and complete development of (either on its own and/or with a third party developer subject to the transfer and assignment requirements of Section 5.3) and commercially release the Product then in development as well as any other Products covered under this Agreement (the "**Activision Completion Right**"), provided that Activision shall be obligated to continue to pay Royalties to Licensor as required under this Agreement on all Products commercially released prior to the date of such termination and on all associated subscriber revenue only for those subscriptions in effect at the time of termination for a period of twelve (12) months following the date of such termination (or such lesser time should the subscription terminate/churn prior to the end of such twelve (12) month period) and further provided that Third Party Elements are subject to the applicable terms. Further, during the term of Activision's Completion Right, Licensor agrees not license any Game Assets that are Licensor Product Intellectual Property to any third party for development of interactive entertainment software products or sell the Licensor Product Intellectual Property to any third party, provided, however that this prohibition of the sale of the Licensor Product Intellectual Property shall not preclude Licensor from entering into a Change of Control transaction, subject to Section 18.1. Activision shall not exercise the Activision Completion Right to create confusion in the marketplace regarding any Licensor game. Upon completion of the contemplated Development Term, the Activision Completion Right will terminate.

6.5.    Should Activision elect to exercise the Activision Completion Right, Bungie shall deliver all necessary source code for the Licensed Product Intellectual Property to Activision as soon as practicable after written request therefor.

## 7    Licensor's Responsibilities

7.1    Except as otherwise specifically provided in this Agreement, Licensor shall be responsible for and agrees to diligently perform the following, subject to review by Activision in accordance with Section 8.2, which obligations are set forth more particularly for Destiny Game #1 in the Payment and Milestone Schedule for Destiny Game #1 set forth on Exhibit E attached hereto, and for other Products in the applicable Milestone Schedules to be mutually agreed by the parties in good faith, including, without limitation, delivery dates/time frames and deliverables, as such documents may be amended in writing by the parties from time to time: (a) the complete development and production of the Products, including without limitation the creation of all software, programs, computer code, visual assets and related materials required to release the Products commercially, and the design, creation and integration of all audio and sound assets; and (b) the payment of any and all development costs. Without circumscribing the generality of the foregoing, such development shall include:

(i)   develop the Products to AAA status/quality (or equivalent);

(ii)   creating or implementing all computer code for the Products;

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

ACT-WZ08638539

Exhibit 1
34

(iii)  creating all visual and audio assets for the Products, including, as applicable, all game design aspects, art direction and creation, character development, script writing, screen graphics, character development, animation, in-game cut scenes, movies and cinematics, sound design, sound recording, sound effects, music composition, music production, music recording, voice talent, motion capture, video production, sound recording and effects, and ambient music creation, production and recording;

(iv)  as necessary, hiring talent for motion capture and acting;

(v) integrating all visual and audio assets into the Products;

(vi)  build Verification Testing as specified in the Production Schedule for the applicable Product;

(vii)  creating foreign language versions of the Products;

(viii)  abide by the applicable agreed upon Milestone Schedule and deliver each Product in accordance with the date/time frames and agreed upon deliverables; in this regard, Licensor shall provide Activision production personnel with reasonable ongoing access to Licensor offices and key personnel to facilitate periodic review of builds, production schedules, game assets, etc. for each of the applicable Products;

(iv)  develop the Products to a "Teen" rating and equivalent worldwide standards as mutually determined by Activision and Licensor; in this regard, Licensor shall work closely with Activision to obtain a "Teen" rating in the United States and a "PEGI-16" or equivalent in other markets.  In no event shall a failure to obtain a "Teen" or "PEGI-16" or equivalent rating be deemed a breach of this Agreement.

(x) external community support, including on-going philanthropic initiatives;

(xi) in-game community management;

(xii) run servers for game service (persistent state data, authentication layer and content activation);

(xiii) delivering Product art and style bible (and appropriate updates thereto) (which such style bible shall be subject to the approval of Activision, such approval not to be unreasonably withheld) and otherwise providing Activision staff (and/or its designated agencies) with reasonable and regular access to and review of subject matter experts, game assets and other related materials such that Activision is sufficiently able to create and generate customary (i.e., consistent with other AAA interactive software entertainment products published by Activision) events, marketing, advertising, promotional and packaging materials for the Products;

(xiv) collaborate with Activision, including supplying marketing asset materials and public relations and community support, as agreed by the parties, such that such support does not interfere with the delivery of a Project Review Deliverable (as such term is defined in Section 8.2(b));

(xv) integration of localized assets;

(xvi) maintain live support team of the Products (e.g., in-game game masters);

(xvii) assistance, support and consultation on marketing and public relations for the Products, including making key development personnel reasonably available for public relations appearances, interviews, etc.;

(xviii) ongoing support for Products released, including online player support, for a period of three (3) years following commercial release of the applicable Product; and

(xix) provide Activision with consumer play data such that Activision will have visibility to key strategic metrics and can run analytics to facilitate decisions on downloadable content, release timings, future features, etc.

*Bungie Development and Publishing Agreement (Destiny)v11*    8    *CC*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY    ACT-WZ08638540

Exhibit 1
35

7.2    Licensor shall provide to Activision prior to Release to Certification of each Product a list of all hidden content and so-called "easter eggs" for such Product that are not otherwise disclosed to Activision during development of such Product.

## 7A  Activision's Responsibilities

Activision shall be responsible for and agrees to diligently perform the following:

7A.1    In connection with the development and production of the Products, Activision shall provide Developer with development production support in a manner that is customary for other AAA caliber (or equivalent) interactive entertainment software products published by Activision.

7A.2    Activision will assign a dedicated production staff, including a senior level producer, to oversee development of the Products and who shall make periodic visits to Licensor's facilities to review each Product's progress (including builds thereof) and to walk through detailed production schedules.

7A.3    Activision will be responsible for providing customer support for the Products in a manner that is customary for other AAA caliber (or equivalent) interactive software entertainment products published by Activision.

7A.4    Activision will publish the Products in a manner that is customary for other AAA caliber (or equivalent) interactive software entertainment products published by Activision.

7A.5    Activision will distribute the Products on a worldwide basis (i.e., in those countries in which Activision customarily distributes other AAA caliber (or equivalent) interactive software entertainment products) in a manner that is customary for other AAA caliber (or equivalent) interactive entertainment software products published by Activision.

7A.6    Activision will develop and execute marketing plans and programs for the Products in a manner that is customary for other AAA caliber (or equivalent) interactive software entertainment products published by Activision, including dedicated marketing staff during the 2-year period prior to each Product release.

7A.7    Activision will develop and execute public relations plans and programs for the Products in a manner that is customary for other AAA caliber (or equivalent) interactive software entertainment products published by Activision.

7A.8    Activision will abide by the art and style bible and subject matter experts as mutually agreed by Licensor and Activision when creating marketing materials and other assets associated with the Destiny Property and the Products, subject to the provisions of Section 13.

7A.9    Activision will handle billing and/or coordination for billing through the First Parties (as such term is defined in Section 7A.15(k)) or other third party service providers for any online subscription service and other online transactions, as applicable, relating to the Products.

7A.10    If, during the Development Term, Activision has, or can obtain at commercially reasonable rates, a license to the "Perforce" source-code management tool software, Activision shall extend its license to cover all necessary seats at Licensor's facilities, provided such licenses are able to be extended to Licensor.

7A.11    Activision will provide licenses for the then-current versions of key development software products (i.e., products necessary or useful to develop a Product) including, but not limited to, Hansoft, 3DS Max and Maya, Photoshop (CS4 or its then-current version), illustrator, After Effects, InDesign, Crazybump, Microsoft Windows, Microsoft Office, Microsoft Exchange, Microsoft Visual Studio and Microsoft SQL Server products.

7A.12    Activision will provide Licensor will five hundred (500) copies of each Product release, plus an additional five hundred (500) copies that will be used to support Licensor's marketing, public relations and philanthropic activities.

*Bungie Development and Publishing Agreement (Destiny)v11*    9    CC

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY    ACT-WZ08638541

Exhibit 1

36

7A.13   To the extent reasonable and feasible, Activision will provide Licensor with three hundred (300) copies of all Product promotional items.

7A.14   Activision will provide up to two (2) copies of other (i.e., non-Destiny Property related) Activision-published interactive entertainment products to each Licensor employee each year during the Development Term.

7A.15   The following items will be managed by and be the responsibility of Licensor, but shall be subject to prior review and approval of Activision, (budget to mutually approved) such approval not to be unreasonably withheld:

 (a) Provide user game research testing facilities (e.g., the Microsoft usability lab), the scope and cost of which shall be negotiated in good faith by the parties hereto. The parties anticipate that game research and usability will be housed in the Licensor's facilities.

 (b) Provide alpha and beta support for the Products and Conversions developed by Licensor (First Party certification, localization costs, etc.) as mutually determined by the parties hereto;

 (c) Provide multiple certification runs and green and red disk requests with respect to the Products and Conversions developed by Licensor.

 (d) QA and test, which shall be collocated at the Licensor's facilities;

 (e) Localization;

 (f) ESRB and rating submissions;

 (g) Provide or provide funding for servers and datacenter operations team along with ongoing hosting costs at a facility of Licensor's choosing, the scope and cost of which to be negotiated in good faith by the parties hereto;

 (h) Translation for localization and geopolitical review for the Products on all platforms developed by Licensor (including casual extensions) and websites;

 (i) Development kits for current generation hardware and future consoles (if applicable), the number of which to be mutually agreed upon by the parties hereto.

 (j) Conducting legal reviews of the Products to ensure that all Intellectual Property and other rights are fully cleared for use.

 (k) Assuring that the Products receive approval from any first party proprietary system licensor, such as Sony Computer Entertainment , Microsoft Corporation and Nintendo of America, Inc. and/or their Affiliates (each a "**First Party**", collectively, "**First Parties**"), as necessary for the commercial release of the Products (in this regard, Licensor agrees to make any and all changes that may be required by such First Parties so as to allow Activision to commercially release and distribute the Products worldwide). In this regard, Bungie shall be responsible for all release management activities with the First Parties; and

 (l) Preparation of the user game manuals.

7A.16   Activision shall provide to Licensor prior to Release to Certification of each Product incorporating Third Party Elements provided by Activision to Licensor and each Conversion not developed by Licensor, a list of all hidden content  and so-called "easter eggs" for such Product incorporating Third Party Elements provided by Activision or such Conversion not developed by Licensor, as applicable, that are not otherwise disclosed to Licensor during development of such Product incorporating Third Party Elements or such Conversion not developed by Licensor, as applicable.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY     ACT-WZ08638542

Exhibit 1
37

8    **Development Team, Development Review and Exclusivity/Non-Compete**

8.1.    Exhibit G attached hereto specifies key members of Licensor's development team for the Products who have signed or will sign long term employment agreements with Licensor substantially in the form approved by Activision (collectively, "**Employment Agreements**" and individually, each an "**Employment Agreement**") ("**Key Member(s)**"). Licensor agrees during the Development Term to reasonably and diligently enforce such Employment Agreements and not amend or waive any material provisions of such Employment Agreements outside the ordinary course of business without Activision's prior written consent, which consent will not be unreasonably withheld or delayed. The parties acknowledge and agree that for purposes of the immediately preceding sentence: (a) any change to any provision to a Key-Key Member (as such term is defined in Section 8.5) Employment Agreement shall not be considered in the ordinary course of business; and (b) any shortening of the term or modification of the Restrictive Covenants (as such term is defined in the Employment Agreements) in any other Key Member Employment Agreement shall not be considered in the ordinary course of business. During the Development Term, Licensor shall ensure that each Key Member devotes his/her full time and effort on a first priority, no material interference basis to the completion and support of the Products according to the agreed upon specifications and Milestone Schedule for the applicable Products; except that the Key Members will be permitted to fulfill their obligations with respect to Halo: Reach (as defined in Section 17.1) and the related downloadable content.

Unless Activision has provided its prior written consent, which consent will not be unreasonably withheld or delayed, Licensor agrees during the Development Term not to act in a manner outside the ordinary course of business that will trigger the "Good Reason" provisions in the Employment Agreements. The parties acknowledge and agree that for purposes of the immediately preceding sentence: (x) relocation of Licensor's business shall be considered in the ordinary course of business; and (y) any other triggering of the "Good Reason" provisions of the Employment Agreements shall not be considered in the ordinary course of business.

In the event a Key Member leaves the employment of Licensor or such Key Member's employment with Licensor is terminated for any reason prior to the initial commercial release of Destiny Game #2, all of such Key Member's unvested equity ownership (any and all classes and/or series, whether voting or non-voting), if any, in Licensor shall be placed in escrow and, unless otherwise approved by Activision, such equity ownership may be released from escrow and utilized by Licensor only for the purpose of attracting and/or promoting talent as a replacement for a Key Member. Any such Key Member equity ownership remaining in escrow at the time of either (a) a Change of Control (as such term is defined in Section 18) or (b) termination or expiration of this Agreement (except termination by Licensor pursuant to Section 17.2), shall be released from escrow and transferred to Activision, unless at least One Billion Dollars ($1,000,000,000) in cumulative Operating Income (as such term is defined in Section 11.1) has been achieved as of the date of the Change of Control or termination or conclusion of this Agreement, as applicable, in which case such equity ownership shall be released from escrow and revert to Licensor at such time.

In the event thirty three percent (33%) or more of the then current Key Members leave the employment of Licensor within any consecutive twelve (12) month period prior to the initial release of Comet #4, such event shall be considered a Critical Risk (as such term is defined in Section 8.2) and accordingly Licensor must deliver a mitigation plan therefore in accordance with the terms of Section 8.2, provided that if Activision does not approve the mitigation plan, Licensor must continue to deliver the applicable Product on time and on budget in accordance with the approved Milestone Schedule for the next two (2) applicable quarterly Project Reviews (as such term is defined in Section 8.2) or will otherwise be deemed to be in material breach.

Activision shall have the right of approval (not to be unreasonably withheld) over the replacement for any Key Member who leaves the employment of Licensor or whose employment is otherwise terminated for any reason during the Development Term. Any such replacement for a Key Member will be deemed a Key Member for all purposes under this Agreement, including, without limitation, for purposes of this Section 8.1, and will sign an Employment Agreement.

8.2    Activision shall have the right to review the Products as follows:

(a) The Milestone Schedule for Destiny Game #1 is attached hereto as part of Exhibit E and includes a definition of key milestones, including objective and technical standards. The parties hereto shall

*Bungie Development and Publishing Agreement (Destiny)v11*    11                                                                      CC

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                          ACT-WZ08638543

Exhibit 1
38

mutually agree in writing on a Milestone Schedule and associated deliverables for each of the Products subsequent to Destiny Game #1 during the Development Term. The parties agree that the Milestone Schedule for each applicable Product shall be mapped to Activision's formal management "Greenlight" process (the parties acknowledge that Exhibit E is the mapping of Destiny Game #1 Milestone Schedule to Activision's greenlight process) wherein Milestones and builds, as applicable, will be presented in person (or via teleconference) at Activision's offices during the relevant Project Review (defined below).

(b) The parties hereto shall hold quarterly "**Project Reviews**" in either party's office, to review required deliverables (the "**Project Review Deliverables**", defined as deliverables necessary for the financial success of the Product as mutually agreed by Licensor and Activision) and the overall status of the then-current Product. The parties shall agree to the specific agenda in advance of each such Project Review, as appropriate to the stage of production. The Project Review schedule and Project Review Deliverables for Destiny Game #1 through October 2011 are detailed in the Milestone Schedule attached hereto as part of Exhibit E. After October 2011, the applicable Project Review Deliverables for all subsequent Project Reviews to be conducted up until the next successive milestone will be mutually defined at or before each then-current milestone set forth in the Milestone Schedule. The parties also agree to conduct an executive level Project Review to conduct an overall business review in person on a semi-annual basis during the Development Term.

(c) Activision's production representative shall prepare a monthly production report. Licensor shall have the right to audit any such report to ensure its accuracy.

In the event that any Project Review Deliverable is mutually determined to be in a "**Critical Risk**" state, by Licensor and Activision during a Project Review (in the event of any disagreement or deadlock with respect to the determination of a Critical Risk, Thomas Tippl, or if Thomas Tippl is no longer working for Activision, the then-current President and/or CEO of Activision, shall have the tie-breaking vote), Licensor shall deliver such deliverable, or a mitigation plan therefore (which such mitigation plan shall be subject to review and approval of Activision), with the quarterly Project Review following the Project Review in which a Critical Risk has been determined. During any period when a Critical Risk exists, all other Bungie obligations, excluding those with respect to any Products that have been greenlit by Activision prior to such Critical Risk determination, shall be satisfied on a second priority, as available basis. In the event Licensor fails to deliver a Project Review Deliverable designated a Critical Risk or an approved mitigation plan therefor by the second quarterly Project Review following the Project Review in which a Critical Risk has been determined, then Activision shall have the option to either (i) terminate this Agreement pursuant to Section 17.2 (except in the case of a Critical Risk on a PS3 version of a Product, in which case there shall be no right of termination of this Agreement) without any opportunity for Licensor to cure, notwithstanding anything to the contrary in Section 17.2, and/or (ii), as applicable, activate the Activision Completion Right as set forth in Section 6.4 ("**Activision Completion Right Option**") (in the case of a PS3 version of a Product, Activision shall not continue any development activities on such version past Fall/Winter 2015).

8.3     Except with respect to its obligations related to Halo: Reach and the related downloadable content (provided that no more than sixty (60) full-time Licensor employees (specifically no more than five (5) engineers and nor more than fifty-five (55) artists) will work on the Halo: Reach downloadable content through March 31, 2011), it is agreed by the parties hereto that one hundred percent (100%) of Licensor's studio/development personnel shall be exclusively dedicated to working on the Products during the Development Term (the "**Exclusive Period**"); provided, however, subject to the further restrictions set forth in Sections 8.4 and 8.5, Licensor shall have the right to utilize (i) no more than seven (7) employees (but excluding any Key Members) and no more than ten (10) contractors to work on and operate Bungie.net (unless any Product is in a state of Critical Risk, then the immediately foregoing numbers shall be reduced to no more than three (3) employees and no more than three (3) contractors), (ii) no more than the greater of five percent (5%) of Key Members and one (1) Key Member, and no more than the greater of five percent (5%) of all other employees and one (1) other employee, to staff, fund and operate a prototype team for a future Licensor action-shooter interactive entertainment software product tentatively known as "Marathon" ("**Marathon**"), (iii) no more than ten percent (10%) of the Key Member resources and no more than ten percent (10%) of all other employees after the achievement of at least Three Hundred Seventy Five Million Dollars ($375,000,000) in cumulative Operating Income to continue to staff, fund and operate a prototype team for Marathon or otherwise engage in work on other Licensor projects or business activities, (iv) no more than twenty five percent (25%) of the Key Member resources and no more than twenty five percent (25%) of all other employees after the achievement of at least Seven Hundred Fifty Million Dollars ($750,000,000) in

*Bungie Development and Publishing Agreement (Destiny)v11*   12                                              CC

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                    ACT-WZ08638544

Exhibit 1
39

cumulative Operating Income to continue to staff, fund and operate a prototype team for Marathon or otherwise engage in work on other Licensor projects or business activities, and (v) whatever percentage of the Key Member resources and all other employees Licensor deems reasonable and appropriate after the achievement of at least One Billion Dollars ($1,000,000,000) in cumulative Operating Income to work on Marathon and/or other Licensor project or business activities; it being understood that (1) the above-mentioned business activities will be clearly separate from the budget for the Products and therefore will not be funded in any manner by Activision, and (2) the exceptions set forth in subsections (ii) through (v) above shall not apply in the event any Product is in a state of Critical Risk. Activision may approve exceptions/increases to the foregoing limitations on a case-by-case basis.

8.4   (a) During the Development Term, Licensor agrees that it shall not engage in any development activities (either for itself or on behalf of another company) on any other Destiny Property related product not covered hereunder.

(b) At the end of the Development Term, Licensor may commence development activities on other Destiny Property related products not covered under this Agreement, provided that for a period of two (2) years following the Development Term, it shall not publish or commercially release itself or grant any rights to any other company for the purpose of developing, publishing or commercially releasing, any such other Destiny Property related product.

(c) Until such time as Licensor has completed and delivered to Activision Comet #3, Licensor shall not engage in any development activities (either for itself or on behalf of another company) on any other interactive entertainment software product in the action/shooter genre ("**Action-Shooter Game**"). At such time as Licensor has completed and delivered to Activision Comet #3, Licensor may commence development activities on an Action/Shooter Game, provided that, (1) for a period of one (1) year following the Development Term, it shall not publish or commercially release itself or grant any rights to any other company for the purpose of developing, publishing or commercially releasing any such Action/Shooter Game, and (2) Activision shall have a right of first negotiation to publish and distribute such Action/Shooter Game in accordance the procedures applicable to Future Destiny Games as set forth in Section 19. The parties agree that Marathon shall be specifically excluded from the restrictions of this Section 8.4(c), provided that (1) unless otherwise approved by Activision, Licensor shall not publish or commercially release itself or grant any rights to any other company for the purpose of developing, publishing or commercially releasing Marathon until after at least Three Hundred Seventy Five Million Dollars ($375,000,000) in cumulative Operating Income has been achieved, (2) Activision shall have a right of first negotiation to publish and distribute Marathon in accordance with the procedures applicable to Future Destiny Games (as such term is defined in Section 19) as set forth in Section 19; and (3) if the Operating Income Hurdle (as such term is defined in Section 11.1) has not been achieved and the operating income margin to Licensor for Marathon is over thirty five percent (35%), the operating income margin to Licensor for Marathon in excess of the thirty five percent (35%) shall be contributed to cumulative Operating Income hereunder.

(d) Until such time as Licensor has completed and delivered Destiny Game #2 and at least Three Hundred Seventy Five Million Dollars ($375,000,000) in cumulative Operating Income has been achieved, Licensor shall not engage in any development activities (either for itself or on behalf of another company) on any other interactive entertainment software product. At such time as Licensor has completed and delivered to Activision Destiny Game #2 and at least Three Hundred Seventy Five Million Dollars ($375,000,000) in cumulative Operating Income has been achieved, Licensor may commence development activities on any interactive entertainment software product that is neither a Destiny Property related product nor an Action/Shooter Game and shall be permitted to publish or commercially release itself or grant the rights to another company for the purpose of developing, publishing or commercially releasing any such product at any time thereafter, whether or not such commercial release is during the Development Term, provided that Activision shall have a right of first negotiation to publish and distribute such product in accordance with the procedures applicable to Future Destiny Games as set forth in Section 19.

(e) Until such time as Licensor has completed and delivered Comet #2, Licensor shall not invest any more than Five Million Dollars ($5,000,000) (including any outside funding) in the aggregate in any other independent game development or publishing companies.

(f) Activision may approve exceptions to the limitations set forth in this Section 8 on a case-by-case basis.

*Bungie Development and Publishing Agreement (Destiny)v11*   13                                    CC

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                          ACT-WZ08638545

Exhibit 1
40

8.5    In addition to the foregoing in this Section 8, the parties expressly acknowledge and agree that a certain subset of the Key Members as more particularly identified as "Key-Key" on Exhibit G (the "**Key-Key Members**"), shall be exclusively dedicated to working on the Products during the Development Term and shall not work on any other development activities or engage in work on any other Licensor projects or business during the Development Term, notwithstanding any of the exceptions set forth in Sections 8.3 and 8.4; provided, however, that (i) this provision shall not be deemed to prohibit such Key Members from exercising their managerial/executive roles in Licensor, and (ii) a further subset of Key-Key Members as more particularly identified on Exhibit G with an asterisk may transition off to other projects with Activision's approval, such approval not to be unreasonably withheld, after delivery of Comet #1 if such Key-Key Members are in turn replaced by other Key Members in connection with the development of the Products.

8.6    The parties also acknowledge that individual Key Members are further bound by Restrictive Covenants (as such term is defined in the Employment Agreements) (including a non-compete provision) in the Employment Agreements.  To ensure the enforceability of these Restrictive Covenants, Licensor affirms that it reasonably believes it has provided the Key Members with additional consideration to enter into these Employment Agreements provided, however, that in the event that a court of competent jurisdiction determines that Licensor has not provided the Key Members additional consideration to enter into these Employment Agreements, Licensor shall not be deemed to be in breach of this provision unless such court determines that Licensor did not reasonably believe that it had provided such Key Men with additional consideration to enter into these Employment Agreements. In addition, Licensor acknowledges that by virtue of this Agreement that Activision is a beneficiary of these Restrictive Covenants.  Licensor shall not waive any of the Restrictive Covenants without the mutual consent of the parties hereto.  In the event of a deadlock or disagreement between the parties hereto with respect to the waiver of any of the Restrictive Covenants, then the mutual consent of the parties shall be deemed to have not been given.

8.7    For purposes of this Agreement, "delivery" and "delivered" shall mean with respect to each Product delivery of the Release to Certification Version (as such term is defined in Section 9.1) of the first applicable release of such Product to First Parties with a copy to Activision.

## 9   Delivery of Release To Certification Version

9.1    Licensor shall deliver to the applicable First Party and Activision a final, "Release to Certification" (as such term is commonly understood in the entertainment software industry) version (or equivalent thereof) ("**Release to Certification Version**") of Destiny Game #1 at the same time Licensor delivers the Release to Certification Version of Destiny Game #1 to the applicable First Party for release in accordance with the Milestone Schedule for Destiny Game #1, in which the Release to Certification Version of Destiny Game #1 is referred to as "**Tiger RTX**". Licensor shall deliver to the applicable First Party and Activision a final Release to Certification Version of each Product other than Destiny Game #1 at the same time Licensor delivers the Release to Certification Version of such Product other than Destiny Game #1 to the applicable First Party for release in accordance with the applicable Milestone Schedule for such Product.

9.2    In the event that any Severity Level 1 or Severity Level 2 Bugs (as defined in Exhibit H) are found in a Product after its commercial release , Licensor will use diligent efforts to issue a patch within a commercially reasonable time period, in no event to exceed 30 days. If any such Severity Level 1 or Severity Level 2 Bug is discovered within 12 months after final release for manufacturing of a Product, and failure to discover the applicable Severity Level 1 or Severity Level 2 Bug during the Bug-testing process prior to final release for manufacturing is, as between Licensor and Activision, the sole fault of Licensor, then Licensor must bear all costs associated with fixing the Bug.  In all other circumstances, the costs associated with fixing the relevant Bug shall be mutually agreed between the parties.

## 10  Development Advances and Bonuses

10.1    Activision shall pay development advances ("**Development Advances**") to Licensor for the development of each of the Products. Development Advances shall be paid in quarterly installments over the course of development of the Products in accordance with the production budget and Project Reviews schedule (as described in Section 8.2), which shall be subject to the mutual approval of Activision and Licensor. Attached hereto as part of Exhibit E is the Milestone Schedule and definition of key milestones for Destiny Game #1.  Activision's obligations in this Section 10 are subject to its right to

*Bungie Development and Publishing Agreement (Destiny)v11*  14                                        *CC*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY         ACT-WZ08638546

Exhibit 1
41

review and approve the Products as set forth in Sections 8.2 and 9. The total amount of the Development Advances for Destiny Game #1 is set forth in the Payment Schedule for Destiny Game #1 also attached hereto as Exhibit E, as such schedule and amounts may be adjusted from time to time by mutual approval of the parties hereto (including, for example, to take into account adjustments related to inflation and cost of living). The parties hereto shall mutually agree in writing on a schedule of Development Advances and associated milestone and Project Review deliverables (as described in Section 8.2) for each of the Products subsequent to Destiny Game #1 during the Development Term. Activision and Licensor understand and acknowledge that the Development Advances shall fully fund Licensor's operations directly related to the development of the Products (including overhead costs associated therewith, but excluding any built-in profit margin) during the Development Term. Any amounts not spent against the approved budget for any given quarter shall be applied to funding of the budget with respect to the following quarter, but in no event shall the total agreed-upon budget and/or Development Advances for any given Product be reduced unless otherwise mutually approved by the parties hereto, except as provided in the immediately following sentences. Any amounts so applied can be added to a future Development Advance at Licensor's request. In the event that there are amounts not spent against the agreed-upon budget at the completion of a Product, Activision shall not have any obligation to provide the remainder of the budget to Licensor; in the event, after payment of all outstanding obligations and liabilities, there is surplus money remaining in Licensor's account as the result of Licensor not spending the total agreed-upon budget, then Licensor will refund such surplus money to Activision. For the sake of clarity, Activision shall have no obligation to provide funding for the development of a Product beyond the mutually agreed Development Advances for such Product.

10.2    For so long as Licensor is on-time and on-budget and has otherwise delivered applicable Product milestone deliverables in accordance with key milestone definitions mutually agreed by the parties hereto set forth in Exhibit E, Activision shall pay to Licensor an annual development on-time/on-budget bonus (the "**Annual Development On-Time/On-Budget Bonus**") in accordance with the following schedule:

> 2010 through 2013: Two Million Five Hundred Thousand Dollars ($2,500,000) per year (commencing April 1, 2010 and to be payable ninety (90) days following the end of each calendar year, e.g., the Annual Development On-Time/On-Budget Bonus for 2010 would be payable by March 31, 2011, if applicable).

10.3    Activision shall pay to Licensor a quality bonus (the "Quality Bonus") in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000) should Destiny Game #1 achieve a rating of at least 90 as determined by gamerankings.com (or equivalent reputable services if gamerankings.com is no longer in service) as of thirty (30) days following the commercial release of Destiny Game #1 on Xbox 360.

10.4    The foregoing Annual Development On-Time/On-Budget Bonus and Quality Bonus (collectively, the "**Development Bonuses**"), if payable, shall not be deductible from Net Revenues for purposes of calculating Operating Income or recoupable from Licensor Royalties. Licensor agrees that no more than twenty percent (20%) of the total Development Bonuses, if any, shall be allocated and distributed to Key Members unless otherwise approved by Activision.

## 11    Royalty, Threshold Bonuses and Overage Penalty

11.1    Definitions:

(i)    "**Ancillary Markets Net Revenues**" means all amounts actually received from Ancillary Markets by Licensor and/or Activision, respectively, less actual costs, and shall be accounted for and paid as part of Operating Income (as such term is defined below) under the single project/umbrella basis described in Section 11.5 and will include amounts due and owing through the conclusion of the Support Term.

(ii)    "**Gross Revenues**" means one hundred percent (100%) of all amounts credited, received, billed, charged or invoiced (including amounts for which proceeds have not yet been received) by Activision directly or indirectly in connection with the publishing and distribution of the Products (including any Conversions) by Activision from all sources, as well as all Ancillary Markets Net Revenues. For clarity, Gross Revenues shall include all amounts attributable to, or otherwise derived by Activision from the Products, including, but not limited to, Product in-game advertising revenues (if any) and all downloadable content relating to the Products whether or not such Products were developed by Licensor.

CC

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

ACT-WZ08638547

Exhibit 1
42

(iii)  "**Net Revenues**" means Gross Revenues less only returns (including a reasonable returns reserve), rebates/credits, defectives, bad debt, price protection, and any First Party or other third party distribution fees.

(iv)  "**Operating Income**":  Consistent with the manner in which Activision accounts for the other interactive entertainment software products it publishes, Operating Income means Net Revenues less all of Activision's costs directly attributable to and/or associated with the development, production, marketing, advertising, promotion, distribution and sale of the Products (including, without limitation, all of the costs Activision incurs in fulfilling the Activision Responsibilities pursuant to Section 7A), as well as a percentage of Activision's corporate overhead/shared services (including General and Administrative, Sales and Marketing, and Supply Chain) equal to six percent (6%) of Net Revenues (see Exhibit I – "Operating Income Cost Centers" attached hereto for illustrative purposes).  Operating Income will be calculated on a rolling, quarterly and annual basis and shall be crossed and aggregated on a rolling, cumulative basis. To the extent that Operating Income falls short of the annual Operating Income Hurdle (as such term is defined below), the difference between actual annual Operating Income and the Operating Income Hurdle shall be accounted for in a "**Deficit Account**".  To the extent that the absolute Deficit Account balance is greater than zero, the balance amount shall be subtracted from the following year's annual Operating Income (until that year's annual Operating Income reaches zero) to arrive at adjusted annual Operating Income for purposes of the calculation of Royalties.

(v)  "**Operating Income Hurdle**" means twenty five percent (25%) of Net Revenue and shall be calculated annually.

11.2   Provided the Operating Income Hurdle is achieved, Activision shall pay Licensor a quarterly royalty (which shall be payable ninety (90) days following the end of each calendar quarter) ("**Royalty**" or "**Royalties**") equal to the following percentages of cumulative Operating Income below:

> 20% of $0 to $100,000,000 of cumulative Operating Income

> 24% of $100,000,001 to $400,000,000 of cumulative Operating Income

> 35% of $400,000,001 and above of cumulative Operating Income

The above Royalty percentages shall be applied retroactive to the first dollar of annual Operating Income, subject to Activision receiving one hundred percent (100%) of the initial Operating Income dollars up to the Operating Income Hurdle.

An illustration of such Royalty accounting (including the operating of the Deficit Account) is attached hereto as Exhibit J.

11.3   Activision shall pay to Licensor one-time threshold bonuses (collectively, the "**Threshold Bonuses**" and each a "**Threshold Bonus**") upon the achievement of the following cumulative Operating Income thresholds (each an "**Operating Income Threshold**"):

> $25,000,000 Threshold Bonus at $750,000,000 of cumulative Operating Income

> $25,000,000 Threshold Bonus at $1,000,000,000 of cumulative Operating Income

Upon achievement of the respective Operating Income Threshold Licensor may, in its sole discretion, elect to reduce Activision's Liquidation Interest (as such term is defined in Section 18) by five percent (5%) instead of receiving the corresponding Threshold Bonus (for either one of the Threshold Bonuses for a reduction of the Liquidation Interest to fourteen and nine-tenths percent (14.9%), or both of the Threshold Bonuses for a maximum reduction of the Liquidation Interest to nine and nine-tenths percent (9.9%).

11.4   In the event of an unapproved schedule delay in the delivery of the Release to Certification Version of the applicable Product to the applicable First Party that is in Licensor's reasonable control, Activision shall have the right to reduce the Royalty provided in Section 11.2 by the following amounts (collectively, the "**Overage Penalties**"):

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                          ACT-WZ08638548

Exhibit 1
43

| Royalty as provided in Section 11.2 | Overage Penalty |
|---|---|
| 20% | 2% (i.e., 20% is reduced to 18%, etc.) |
| 24% | 2.4% (i.e., 24% is reduced to 21.6%, etc.) |
| 35% | 3.5% (i.e., 35% is reduced to 31.5%, etc.) |

The Overage Penalties shall be assessed per quarter of delay and shall be in effect starting the first day of the month following the scheduled delivery date of the applicable Product release. The Overage Penalties shall not apply to any delay in the scheduled delivery of the PS3 version of Destiny Game #1 of six (6) months or less. All Overage Penalties shall immediately terminate and the Royalty shall revert to the applicable Royalty as provided in Section 11.2 once the subsequent major Product release (i.e., a Destiny Game retail release or Comet release) is delivered on time.

In the event that Development Advances paid to Licensor in connection with only the Xbox360 version of Destiny Game #1 (excluding any and all Conversions thereof) exceeds $140,000,000 (inclusive of both Development Advances paid to Licensor in connection with the Xbox 360 version of Game #1 and marketing funds as provided in Section 13.7), amounts in excess of $140,000,000 shall be considered unapproved overages, and shall trigger the Overage Penalties set forth in the table above until the next Destiny Game or Comet release.

11.5    The parties hereto acknowledge and agree that all economics, revenues, and costs associated with the Products, including any Conversions and any Ancillary Markets Net Revenues, shall be accounted for on a single project/umbrella basis under U.S. GAAP principles consistent with Activision's customary means of fiscal year accounting for purposes of determining Operating Income and the Operating Income Hurdle. Under an "open book" project accounting philosophy mutually agreed by the parties hereto, Activision shall have the right to periodically review Licensor's books and accounting records relating to costs, budgets and expenses associated with the Products (specifically including, but not limited to, average cost per employee per department); provided, however, that Activision shall have the right to approve any merit increase to any Key Member compensation in excess of four percent (4%) of total compensation (excluding royalty bonuses) per calendar year unless such excess is funded by Licensor out of its own cash reserves and not out of the Destiny production budget. For the avoidance of doubt, it is understood and agreed by the parties that all revenues associated with the Products and Conversions, regardless of source, including, but not limited to, any Ancillary Markets Net Revenues and credits, discounts or co-marketing dollars provided by third parties, shall flow through and be accounted for by Activision under the above-described principles ("**Project Accounting**").

11.6    Notwithstanding the provisions of Section 11.5 and in addition thereto, Licensor shall maintain books of account relating to the Project Accounting. Activision may, at its expense, have a certified public accountant (or its equivalent) reasonably acceptable to Licensor audit these books solely for the purpose of verifying the accuracy of the Project Accounting during normal business hours upon fifteen (15) business days prior written notice to Licensor, but no more frequently than once a year and not later than two years after the Release to Certification of the applicable Product. Any costs associated with any such audit shall be borne by Activision. Any certified public accountant engaged by Activision to conduct an audit pursuant to this Section shall (a) keep secret and confidential all information received by it from Licensor; (b) deliver to Licensor a copy of its audit report; and (c) not be paid on a contingent fee or value added basis or according to the results or findings of the audit. Activision shall require the certified public accountant when engaged for the audit to execute and deliver to the audited party a certificate stating the accountant's agreement with the aforementioned items (a), (b) and (c).

11.7    Licensor shall retain one hundred percent (100%) of revenues associated with Bungie.net, including the Bungie store and any advertising on Bungie.net, and all such revenues, costs and profits associated with Bungie.net shall be excluded from the Project Accounting hereunder, provided the annual profit derived from Bungie.net is less than Two Million Dollars ($2,000,000) and such revenues do not pertain or relate to the Products. If the annual profit derived from Bungie.net is greater than or equal to Two Million Dollars ($2,000,000), all such profit will be included in the Project Accounting hereunder until such time as Three Hundred Seventy Five Million Dollars ($375,000,000) in cumulative Operating Income has been achieved, but revenues and costs shall be excluded from the Project Accounting hereunder. For purposes of this section, annual profits of Bungie.net shall exclude amounts derived from Halo products and contracts executed prior to May 1, 2010.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                                                ACT-WZ08638549

Exhibit 1
44

## 12  Payments and Reports

12.1    Statements as to the actual Royalties payable under this Agreement shall be sent by Activision to Licensor within ninety (90) calendar days following the end of each quarterly calendar period for that preceding quarterly period (commencing with the first quarterly calendar period in which the Destiny Game #1 shall have been commercially released by Activision), together with the Royalties due as reflected on the Royalty Statement, if any, earned by Licensor during the preceding quarterly period.

12.2    Activision shall maintain books of account relating to Project Accounting, including calculation of Operating Income and the Royalty payments to be made by Activision pursuant to this Agreement. Such books of account shall be in sufficient detail so as to allow for verification of the Project Accounting, including calculation of Operating Income and the Royalties paid or payable. Licensor may, at its expense, have a certified public accountant (or its equivalent) reasonably acceptable to Activision audit these books solely for the purpose of verifying the accuracy of the Project Accounting during normal business hours upon fifteen (15) business days prior written notice to Activision, but no more frequently than once a year and not later than two (2) years after the date the statement was rendered. Any costs associated with any audit shall be borne by Licensor unless there is a discrepancy of more than five percent (5%) between Royalties actually paid and Royalties actually owed, in which case Activision shall bear the actual and documented costs of such audit and Licensor shall be permitted to conduct one (1) additional audit of Activision's books within six (6) months. Any certified public accountant engaged by Licensor to conduct an audit pursuant to this Section shall (a) keep secret and confidential all information received by it from Activision; (b) deliver to Activision a copy of its audit report if and when Licensor requests Activision to pay any discrepancy; and (c) not be paid on a contingent fee or value added basis or according to the results or findings of the audit. Licensor shall require the certified public accountant when engaged for the audit to execute and deliver to the audited party a certificate stating the accountant's agreement with the aforementioned items (a), (b) and (c).

12.3    Each Royalty statement rendered by Activision pursuant to this Agreement will be conclusively binding on Licensor and not subject to any objection unless Licensor gives Activision specific notice of Licensor's objection to the statement and its reasons for such objection within twenty four (24) months after the date the statement was rendered.

## 13  Marketing and Distribution; Credits

13.1    Activision shall, in close collaboration with Licensor throughout the entire marketing life-cycle of the Products, manage and be responsible for all aspects of the marketing, advertising and promotion (including, but not limited to, creation of the packaging, marketing, and advertising and promotional materials), sales/trade/distribution and public relations programs for the Destiny Property and the Products consistent with the standard for other AAA caliber (or equivalent) titles published by Activision.

13.2    Activision and Licensor shall have the mutual right to approve key marketing and public relations plans and briefs. Activision shall include Licensor in key meetings and discussions regarding Product marketing (such key meetings to be determined by the parties hereto in good faith), and Licensor shall have the right to provide feedback for all such material marketing and public relations plans discussed and/or generated for the Products. In the event of any disagreement or deadlock with respect to any marketing strategy decisions under this Agreement, such disagreement shall be resolved as set forth in Section 20.

Activision shall abide by the Product art and style bible and subject matter experts supplied by Licensor, provided that such art and style bible shall be subject to the approval of Activision, such approval not to be unreasonably withheld. In close collaboration with Activision and subject to the prior approval of Activision (such approval not to be unreasonably withheld), Licensor shall retain the right to release screenshots, videos, concept art or any other marketing and public relations information or statements via its community website, corporate public relations and other outreach channels like community events and conventions. Activision and Licensor shall collaborate to maximize community development and outreach efforts. In light of Licensor's history of community building and expertise in sustaining consumer engagement, Licensor shall have the continuing right to drive community via Bungie.net, community events and other touch points. These community-building efforts shall be funded out of the marketing budget for the Products.

*Bungie Development and Publishing Agreement (Destiny)v11*    18                                                     CC

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                          ACT-WZ08638550

Exhibit 1
45

13.3    Licensor shall provide Activision with reasonable assistance for marketing and promotion of the Products, including, but not limited to the creation of assets such as video trailers, screen shots, art pieces, and demo versions.  To the extent that Licensor determines that it may incur any costs in connection with marketing and promotional activities that have not been previously identified, approved by Activision and accounted for, including expenses, Licensor shall identify these costs to Activision and Activision shall have the right to approve such costs and expenses (such approval not to be unreasonably withheld) in advance of their being incurred.

13.4    Activision shall include Licensor personnel at every major (to be negotiated by the parties in good faith) press and marketing event involving the Products.  The reasonable costs of including such Licensor personnel (such costs to be mutually approved in advance by the parties hereto) shall be included in the marketing budget for the Products.

13.5    Activision shall reasonably provide consumer insight research (which shall include frequent and timely sales data), channel information and other marketplace research materials as mutually determined by the parties, provided that such research exists or is already being conducted by Activision or, if to be newly conducted research, such research is otherwise mutually agreed to by the parties as part of the overall marketing plan and budget for the Products.

13.6    The parties hereto agree that Activision's and Licensor's logos will be shown, subject to the approval of the applicable First Parties, with equal prominence on the front of all packaging for the Products; the instruction manuals for the Products; television commercials for the Products; and other marketing materials for the Products.  In addition, the designation "Published and Distributed by Activision" will appear on the packaging and the instruction manuals for the Products and on all marketing and promotional materials for the Products.  Bungie shall receive, in its sole discretion, a splash screen in all Products and Conversions, and all Products, Conversions and Ancillary products produced hereunder shall prominently display "Based on the Destiny Universe created by Bungie", or substantially similar language.

13.7    The parties shall mutually agree to a pre-beta marketing fund (not to exceed One Million Dollars ($1,000,000) or Two Hundred Fifty Thousand Dollars ($250,000) every six (6) months over a two (2) year period) for Destiny Game #1 for Licensor-driven marketing initiatives including, without limitation, the creation of ViDocs and marketing assets and executions consistent with its expertise and historical practice.  Such amount will be a specific line item in the Product marketing budget.

**14  Representations and Warranties**

14.1    Licensor represents and warrants to Activision that:

14.1.1    At such time as Halo: Reach achieves in excess of Two Hundred Ninety Five Million Dollars ($295,000,000) in net revenues after commercial release ("**Earnout**"), no third party shall have any consent or veto rights over any issuances or transfers of Licensor equity or any Licensor corporate transactions, including a Change of Control.

14.1.2    Licensor owns and/or controls all rights, title and interest in the Licensor Product Intellectual Property (excluding Third Party Elements as defined below) and that the Licensor Product Intellectual Property (excluding Third Party Elements) other than patents and trademarks, and, to the best of Licensor's knowledge with respect to patents and, after reasonable investigation by Licensor, trademarks, and the use, development, distribution and publishing thereof as contemplated by and set forth in this Agreement, shall not infringe upon or violate the rights of, nor require the consent of, any other party.  Notwithstanding the foregoing, it is understood that the Products may contain certain third party licensed elements incorporated by Licensor, including without limitation:  (i) any licensed primary or middleware technology or assets, games engines, physics engines, sound and graphics middleware, required CODECS or other media player technologies, including, but not limited to, any code, technology, tools or software owned by Microsoft; and (ii) copyrighted art, photos, music or sound incorporated in the Products (collectively, "**Third Party Elements**").  The ownership and license to use any Third Party Elements in any way shall be governed by licenses granted by the licensors of such Third Party Elements.  To the extent that Licensor incorporates any Third Party Elements into the Products, its shall ensure that it has secured on behalf of itself and Activision the full rights and licenses necessary to exploit such Third Party Elements consistent in all respects with this Agreement

*Bungie Development and Publishing Agreement (Destiny)v11*   19                                                    *CC*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                    ACT-WZ08638551

Exhibit 1
46

(provided that Licensor shall use reasonable best efforts to obtain rights to the source code for the Third Party Elements and to provide such source code to Activision in accordance with Section 6.5 and shall, upon request, provide a list of all such Third Party Elements to Activision and copies of all licenses or equivalent agreements evidencing such rights to utilize such Third Party Elements).

14.1.3    Licensor shall use its reasonable best efforts to register in a timely fashion, diligently maintain and enforce its rights in and to the Licensor Product Intellectual Property, each using its reasonable business judgment.

14.1.4    All Development Advances paid by Activision to Licensor hereunder shall be utilized by Licensor solely to fund the costs of creation and development of the Products and otherwise cover day-to-day overhead and operational expenses that are reasonably necessary and related to the creation and development of the Products (e.g., office lease, computers; employee salaries, etc.), but excluding any built-in profit margin.

14.1.5    Licensor has full and exclusive power and authority to enter into and perform this Agreement and that such ability is not limited or restricted by any agreements or understandings between Licensor and other persons or companies.

14.1.6    The execution, delivery and performance by Licensor of this Agreement have been duly authorized by any and all necessary corporate action by Licensor, and this Agreement constitutes the legal, valid and binding obligation of Licensor enforceable in accordance with its terms.

14.1.7    Licensor is fully capable of performing its obligations under this Agreement and shall not take actions that will interfere with such performance.

14.1.8    Excluding only content developed as part of the legitimate game development process and the planned content release calendar and disclosed to Activision prior to Release to Certification of the applicable Product, the Products developed by Licensor will not contain any hidden content that would modify the rating of the Products that was not included in the list of hidden content provided by Licensor to Activision for each Product prior to Release to Certification, including, without limitation, any hidden or undisclosed cut scenes, "easter eggs" (except as disclosed pursuant to Section 7.2 above), code, art, feature, game play elements, or other hidden or undisclosed content, regardless of whether or not such content is programmed to be accessible or inaccessible to the player.

14.1.9    As of the Effective Date, there are no claims, demands or actions pending or threatened against Licensor with respect to the Licensor Product Intellectual Property.

14.2    Activision represents and warrants to Licensor that:

14.2.1    Activision has full and exclusive power and authority to enter into and perform this Agreement and that such ability is not limited or restricted by any agreements or understandings between Activision and other persons or companies.

14.2.2    The execution, delivery and performance by Activision of this Agreement have been duly authorized by any and all necessary corporate action by Activision, and this Agreement constitutes the legal, valid and binding obligation of Activision enforceable in accordance with its terms.

14.2.3    Activision is fully capable of performing its obligations under this Agreement and shall not take actions that will interfere with such performance.

14.2.4    Excluding only content developed as part of the legitimate game development process and the planned content release calendar and disclosed to Licensor prior to Release to Certification of the applicable Product, Conversions not developed by Licensor and Third Party Content provided by Activision to Licensor for use in the Products will not contain any hidden content that would modify the rating of such Products or Conversions not developed by Licensor, as

*Bungie Development and Publishing Agreement (Destiny)v11*    20    *CC*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

ACT-WZ08638552

Exhibit 1
47

applicable, that was not included in the list of hidden content provided by Activision to Licensor for such Third Party Content or such Conversion not developed by Licensor, as applicable, prior to Release to Certification of the applicable Product, including, without limitation, any hidden or undisclosed cut scenes, "easter eggs" (except as disclosed pursuant to Section 7.2 above), code, art, feature, game play elements, or other hidden or undisclosed content, regardless of whether or not such content is programmed to be accessible or inaccessible to the player.

14.3    EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES STATED IN THIS SECTION 14, NEITHER PARTY MAKES ANY ADDITIONAL REPRESENTATION OR WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED (EITHER IN FACT OR BY OPERATION OF LAW), OR STATUTORY, AS TO ANY MATTER WHATSOEVER. EACH PARTY EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, QUALITY, ACCURACY, TITLE, AND NON-INFRINGEMENT. EACH PARTY WILL NOT HAVE THE RIGHT TO MAKE OR PASS ON ANY REPRESENTATION OR WARRANTY ON BEHALF OF THE OTHER PARTY TO ANY THIRD PARTY

## 15. Indemnification

15.1    Licensor shall indemnify and hold harmless Activision, its successors, assigns, licensees and the officers, employees, and agents of all of them, against any suits, losses, liabilities, damages, claims, settlements, costs and expenses, including reasonable attorney's fees with respect to third party claims (collectively, "**Claims**"), arising out of or related to (i) any breach by Licensor of this Agreement or any breach of its representations and warranties contained in this Agreement or (ii) any infringement of a third party's rights in Intellectual Property caused by a Product as delivered by Licensor. In the event that Activision reasonably determines that Licensor is unable to adequately defend any third party claims brought hereunder, Activision shall have the right to assume full control over the defense and/or settlement of any such claims; provided that in any event no settlement may be made by Activision in connection with any such matter without Licensor's consent, which may not be unreasonably withheld. With respect to Claims under Section 15.1(ii), Licensor will have no obligation under this Section 15.1 for any infringement to the extent that it arises out of or is based upon (a) use of a Product in combination with other products if such infringement or misappropriation would not have arisen but for such combination, i.e., if the combination of the Product and another product is the direct cause of such infringement or misappropriation, as opposed to the mere execution of the Product on a hardware system; for the avoidance of doubt, if a visual asset in the Product infringes a third party copyright, then the mere execution of the Product on a hardware system will not eliminate Licensor's indemnity obligation under Section 15.1(ii); (b) function of the Product with one or more other products unless the infringement directly relates to functionality of the specific Product as opposed to functionality generally applicable to a variety of interactive entertainment software products with the same other product; (c) a Product that is provided to comply with designs, requirements, or specifications required by or provided by or behalf of Activision or a third party, if the alleged infringement or misappropriation would not have arisen but for the compliance with such designs, requirements, or specifications; (d) use of a Product for purposes not intended or otherwise recommended in writing; (e) failure to use a Product in accordance with instructions provided by Licensor, if the infringement or misappropriation would not have occurred but for such failure; (f) any modification of a Product not made or authorized in writing by Licensor where such infringement or misappropriation would not have occurred absent such modification; or (g) Third Party Elements or Activision Intellectual Property.

15.2    Activision shall indemnify and hold harmless Licensor, its successors, assigns, licensees and the officers, employees, and agents of all of them, against any Claims arising out of or related to any breach by Activision of this Agreement or any breach of its representations and warranties contained in this Agreement. In the event that Licensor reasonably determines that Activision is unable to adequately defend any third party claims brought hereunder, Licensor shall have the right to assume full control over the defense and/or settlement of any such claims; provided that in any event no settlement may be made by Licensor in connection with any such matter without Activision's consent, which may not be unreasonably withheld.

15.3    If a party requests to be indemnified pursuant to this Section ("**Requesting Party**"), it must give prompt notice of the Claim to the other party ("**Requested Party**") specifying all details relevant thereto. The Requested Party may, at its option, assume the defense of a Claim brought by a third party, in which event the Requesting Party will cooperate fully in such defense and may participate in such defense with

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY

ACT-WZ08638553

Exhibit 1
48

counsel of its own choice, provided that the Requesting Party will be responsible for all expenses relating to such separate counsel. The Requesting Party is required to use reasonable efforts to mitigate damages arising from a Claim.

## 16   Confidential Information and Non-Solicitation

16.1   Any information, records, documents, descriptions or other disclosures of whatsoever nature or kind which are made or disclosed by one party to the other, or are learned or discovered by a party in the course of performing its obligations under this Agreement and not known by or available to the public at large, including the terms of this Agreement, shall be received by such party in confidence.  Such party shall not disclose or make use of any such information nor shall it authorize anyone else to make use thereof without the prior written consent of the other party, unless required by law.  Neither party shall have any confidentiality obligation with regard to any information that was (i) independently developed by such party without use of or reference to the other party's confidential information, (ii) publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party, or (iii) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party.  Furthermore, provided that the disclosing party has, to the extent permitted by law, the opportunity to seek appropriate protective order or confidential treatment with respect to items (a), (b), and (d), as applicable, a party may disclose the terms of this Agreement to a third party without the other party's consent (a) as required by securities or other applicable laws; (b) in connection with the requirements of a public offering or securities filing; (c) in confidence, to accountants, banks, and financing sources and their advisors; (d) in confidence, in connection with the enforcement of this Agreement or rights under this Agreement; or (e) in confidence, in connection with a merger or acquisition or proposed merger or acquisition, or the like.

16.2   Activision and Licensor agree that, during the Development Term, neither Activision nor Licensor shall, on behalf of itself or any other person, entity or organization, directly or indirectly, through its officers, directors, employees, agents or others ("**Employer**"): (i) solicit or otherwise induce or influence any Restricted Employee (as such term is hereinafter defined) to discontinue such employment or other relationship with the Employer or to enter into an employment or service arrangement of any kind with any person or entity other than Employer, (ii) initiate contact with any Restricted Employee for the purpose of employing, soliciting for employment, or otherwise seeking to employ or retain such person, or (iii) assist or facilitate any person or business other than the Employer in the hiring or recruitment of any Restricted Employee (the foregoing restriction not being intended to prohibit any person from providing reference to a third party with respect to a Restricted Employee). "**Restricted Employee**" means any person who is an employee of Employer.  The above notwithstanding, the distribution of job posting or other advertisement for a job in the ordinary course of business does not constitute solicitation and is not prohibited under this Agreement even if a Restricted Employee presents themselves as a candidate for the advertised posting.

## 17   Termination/Effect of Termination/Expiration of Development Term

17.1   (i)     Activision shall have the right to terminate this Agreement without penalty upon written notice to Licensor in any of the following instances:  (a) after the launch of Destiny Game #1 if retail sales of Destiny Game #1 on a sell-through basis have not reached at least five million (5,000,000) units (across all SKUs, regardless of the method of distribution) during the first six (6) months following commercial release; (b) at any time after the launch of Comet #2 (across all SKUs) for any reason in Activision's sole discretion; (c) in the event Licensor's "Halo: Reach" game (currently under development and to be published by Microsoft) ("**Halo: Reach**") does not commercially release in 2010, unless Microsoft unilaterally determines to not release Halo: Reach for other than Licensor's failure to deliver per Licensor's contractual obligations; (d) in the event Halo: Reach fails to score a game rating of at least eighty (80) according to gamerankings.com or metacritic.com as measured one (1) month after release; or (e) if retail sales of Halo: Reach on a sell-in basis have not reached at least six million (6,000,000) units during the first six (6) months following commercial release.

(ii)     Should Activision terminate this Agreement as provided in this Section 17.1, at any time prior to the conclusion of the Development Term, then the Distribution Term for the Product shall automatically cease and all licenses conveyed by Licensor to Activision shall automatically terminate and revert to Licensor, provided, however, that Activision shall retain all such rights and licenses as necessary to continue to publish and distribute those Products commercially released by Activision prior to the date of such termination for a period of two (2) years following the date of such termination, during which time

*Bungie Development and Publishing Agreement (Destiny)v11*   22                                                                            *CC*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                                             ACT-WZ08638554

Exhibit 1
49

Activision shall continue to pay Royalties to Licensor in accordance with the terms hereof and fund Licensor during the 2-year period in accordance with the support budget mutually agreed by the parties hereto for such Products.

(iii)    Further, with respect to any Products in development at the time of termination pursuant to this Section 17.1 or termination by Licensor pursuant to Section 17.3, Activision shall be deemed to assign, and does hereby assign, to Licensor all agreements, licenses, contracts and assets (including, but not limited to, all Licensor Product Intellectual Property, but specifically excluding any Activision Product Intellectual Property) for the purpose of permitting Licensor to complete development of (either on its own and/or with a third party developer) and commercially release such Products; provided, however, that Activision shall grant Licensor a non-exclusive, royalty-free license, without the right of sublicense (except in accordance with the same procedures for sublicensing by Activision set forth in Section 5.3), to use the Activision Product Intellectual Property for purposes of completing development of and publishing such Products for the commercial life of such Products and also provide to Licensor a commercially reasonable level of technical support at Activision's costs with respect to the Activision Product Intellectual Property for a period of two (2) years following termination.

(iv)    Termination pursuant to this Section 17.1 shall not affect Activision's right to receive Net Revenues on any and all monetization and commercial exploitation of the Products and Ancillary Markets prior to the date of termination up until the date that is two (2) years following the date of termination, as well as Activision's right to receive all associated subscriber revenue only for those subscriptions in effect at the time of termination for a period of up to twelve (12) months following the date of such termination (or such lesser time should the subscription terminate/churn prior to the end of such twelve (12) month period). Activision shall continue to be obligated to pay Royalties to Licensor on all such above-mentioned commercial exploitation in this Section 17.1. Furthermore, Activision shall continue to fund the cost of maintaining the backend and community for Products in the marketplace for two (2) years from commercial release of the applicable Product. Upon such termination without cause pursuant to this Section 17.1, Licensor shall have the unfettered right to execute a new publishing agreement with a third party with respect to those Products not yet commercially released without further obligation to Activision, except for continuing confidentiality obligations hereunder with respect to Activision Product Intellectual Property and other confidential information.

17.2    Either party may terminate this Agreement in the event of an uncured, material breach by the other party. In the event a party is given written notice that it is in material breach, it shall have thirty (30) days from receipt to cure its breach in all material respects. If the party fails to cure such material breach within such thirty (30) day period, the non-breaching party may immediately terminate upon further written notice to the breaching party. If all breaches are corrected, mended or waived within the thirty (30) day period to cure the material breach, this Agreement shall remain in effect according to its terms and conditions.

17.3    In addition to the above, each party may terminate this Agreement immediately if the other party substantially ceases to do business, with no opportunity to cure, or if the other party initiates or has initiated against it, voluntarily or involuntarily, any act, process or proceeding under the provisions of any bankruptcy statute or law, or under any other insolvency law or other statute or law providing for the modification or adjustment of the rights of creditors and such process or proceeding has not been dismissed within sixty (60) days of its initiation. Licensor acknowledges and agrees that this Agreement is an executory contract governed by U.S.C Section 365 and includes a license of Intellectual Property rights to Activision and, accordingly, in the event of any of the circumstances described in the preceding sentence affecting Licensor, Activision may avail itself of any protection afforded it under 11 U.S.C Section 365(n). If Activision terminates this Agreement pursuant to this Section 17.3, the terms of Section 17.2 will apply subject to Section 6.3(i).  If Licensor terminate this Agreement pursuant to Section 17.3, the terms of Section 17.1 will apply.

17.4    Upon completion of the Development Term, all Net Revenues and Royalties shall continue to be accounted for, received and/or paid, as applicable, in accordance with the Project Accounting terms of this Agreement with respect to any and all monetization and commercial exploitation of Products and Ancillary Markets released during the Development Term, and Activision will also have the right to receive all associated subscriber revenue for those subscriptions in effect as of the date that is one (1) day prior to the launch of the next successive Destiny related product that is not published by Activision for a period of up to twelve (12) months following such date (or such lesser time should the subscription terminate/churn prior to the end of such twelve (12) month period).

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                         ACT-WZ08638555

Exhibit 1
50

17.5   With respect to the Products, upon termination of this Agreement pursuant to Section 17.1, and with respect to the first Future Destiny Game to be developed by Licensor, upon termination of this Agreement pursuant to Section 17.1 or expiration of the Development Term, subject to Section 19, Activision shall grant Licensor a non-exclusive, royalty-free license, without the right of sublicense (except in accordance with the same procedures for sublicensing by Activision set forth in Section 5.3), to use the Activision Product Intellectual Property for purposes of development of and publishing of the Products (whether in development at the time of such termination or not) and the first Future Destiny Game to be developed by Licensor for the commercial life of such Future Destiny Game.

17.6   **Survivability.** The following sections shall survive the expiration or termination of this Agreement:  4.3, 5.3, 6.1, 6.2, 6.3, 6.4, 6.5, 8.4(b), 11.6, 12.2, 12.3, 14.1, 14.2, 14.3, 15.1, 15.2, 15.3, 16.1, 17.1, 17.3, 17.4, 17.5, 17.6 and 21; Section 19 shall survive expiration of this Agreement or Activision's termination of this Agreement pursuant to Section 17.2 or 17.3.

## 18  Approval of Change of Control/Board Observer Right

18.1 The parties hereto agree that until such time as Licensor has delivered to Activision the Release to Certification Version of Comet #2 (which, for informational purposes, is scheduled for release in the Fall of 2016), Activision shall have a right of approval, which such approval may be withheld in Activision's sole discretion, over any "Change in Control" of Licensor ("**Change of Control**" being defined as a merger or consolidation of Licensor with another company, sale or transfer of any of Licensor's significant and/or material assets, or a transaction or series of related transactions resulting in the transfer of fifty percent (50%) or more of the equity ownership of Licensor, but excluding issuances or transfers to employees).  The parties shall enter into a Change of Control agreement by no later than March 31, 2011 (provided that a failure to enter into a Change of Control agreement by this date shall not be a material breach of this Agreement, and provided further that the failure by the parties hereto to enter into a Change of Control Agreement by March 31, 2011 shall not in any way vitiate the Change of Control provisions in this Agreement, which shall remain in full force and effect ) wherein Licensor shall agree that, in the event of a Change of Control at any time prior to the conclusion of the Development Term, Bungie shall pay to Activision an amount equal to 19.9% of the net proceeds of such transaction (the "**Liquidation Interest**") which proceeds shall include all consideration paid to Bungie and/or its equity and/or debt owners (not including debt incurred by Bungie in the ordinary course of business for working capital purposes not exceeding Nine Million Dollars ($9,000,000) in the aggregate) as a result of any Change of Control. In the event that the parties hereto fail to enter into a Change of Control Agreement by March 31, 2011, the parties shall continue to work in good faith to finalize and sign such Change of Control Agreement soon thereafter.  Concurrently with the execution of this Agreement, Licensor shall deliver to Activision a side letter substantially in the form attached hereto as Exhibit K signed by all of its current Class B Members (as such term is defined in the Amended and Restated Limited Liability Company Agreement of Bungie, dated as of October 1, 2007, as amended on June 12, 2008).  For clarity, Activision's right to the Liquidation Interest shall terminate immediately and without further action by either party upon conclusion of the Development Term, or termination of this Agreement by either party (except in the event Activision should terminate this Agreement due to a material breach by Bungie in accordance with Section 17.2).  Bungie agrees to act in good faith to not intentionally structure any transaction for the purpose of avoiding or reducing the payment of the Liquidation Interest contemplated by this Section 18.1.

18.2   Activision shall be granted the right to designate one person to attend and participate as a non-voting observer in all meetings of the Board of Directors of Licensor during the Development Term.  Such individual, and any replacement therefor, shall be subject to the prior written approval of Licensor, such approval not to be unreasonably withheld.  The Activision observer shall have the right to receive all materials provided to the members of Licensor's Board of Directors and to participate fully (except voting) in all meetings of Licensor's Board of Directors as if such observer were a voting director, unless such participation and/or receipt of materials could, in the reasonable opinion of Licensor's counsel, result in the loss of attorney-client privilege or violate confidentiality obligations to third parties, in which case the participation and/or receipt of materials shall be limited only to the extent necessary to avoid the loss of the privilege and/or violation of third party confidentiality obligations.

## 19  Future Destiny Games

Licensor shall have no obligation to produce future Destiny interactive software entertainment products (including any sequels, spin-offs or remakes) after the completion of the final Product required to be delivered to

*Bungie Development and Publishing Agreement (Destiny)v11*   24                                                   *CC*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                    ACT-WZ08638556

Exhibit 1
51

Activision under this Agreement. Should Licensor elect to produce any future Destiny related interactive entertainment software products ("**Future Destiny Games**"), Activision shall have a right of first negotiation to publish and distribute such Future Destiny Games according to such terms and conditions as shall be negotiated in good faith between the parties hereto. In the event Activision passes on a Future Destiny Game, the right of first negotiation with respect to all subsequent Future Destiny Games shall be terminated. Licensor agrees to submit to Activision, prior to offering such rights to such Future Destiny Games to any third party (which is not an Affiliate of Licensor), proposed principal terms for granting the rights to such Future Destiny Games to Activision, and Activision shall have thirty (30) calendar days to respond to any such proposal. During the thirty (30) day period, Licensor and Activision agree to negotiate in good faith on an exclusive basis with respect to the terms of such proposal. If the parties fail to reach an agreement within thirty (30) calendar days after Activision receives Licensor's proposal or Activision elects to initially reject Licensor's proposal with respect to such Future Destiny Games, Licensor may offer the rights to publish and distribute such Future Destiny Games to a third party; provided, however, that if Activision and Licensor have made substantial progress in reaching an agreement within such thirty (30) calendar day period, the parties shall continue to work in good faith to finalize the negotiation within a reasonable period of time. If Licensor offers any more favorable economic terms to a third party or otherwise reaches an agreement with a third party containing more favorable economic terms to the third party than the proposal submitted to Activision, then Licensor will give Activision notice of such modified proposal/terms and Activision and Licensor shall re-engage in negotiations over such modified proposal/terms for a further fifteen (15) calendar days from the date of notice to Activision. Except as otherwise provided in this Section 19, Licensor agrees that it will not solicit or encourage, directly or indirectly, any inquiries or proposals or offers with respect to Future Destiny Games, or engage in any negotiations concerning, or have any discussions with, any third parties with respect to any such Future Destiny Games.

## 20 Disagreements Between the Parties/Senior Executive Dispute Resolution Procedure

With respect to any decisions under this Agreement requiring the mutual agreement or approval of the parties hereto, including, but not limited to, any development, production, marketing, retail or other decisions, to the extent the parties' day-to-day business personnel are unable to reach a mutual agreement on any such decision, the parties agree that such decision will be elevated to senior-level executives to try to resolve the disagreement, except when Thomas Tipple or, if Thomas Tipple is no longer working for Activision, the then-current President and/or CEO of Activision, has the tie-breaking vote under this Agreement. Such senior-level dispute resolution procedure may also be triggered by either party hereto in the event a party reasonably believes that any activity or action being taken by the other party could adversely impact (a) the long-term viability of the Destiny Property franchise, (b) sales or revenues associated with the Products, and/or (c) the ability to attract and retain top talent and community viability, and the parties' day-to-day business personnel are not otherwise able to reach an agreement on addressing such party's concerns.

## 21 Miscellaneous

21.1    Amendment. No amendment or modification of this Agreement will be made except by an instrument in writing signed by both parties.

21.2    Governing Law and Jurisdiction. This Agreement shall be deemed entered into in Los Angeles County, California and shall be governed by and interpreted in accordance with the substantive laws of the State of California and, if applicable, United States Federal Law. The parties agree that any dispute arising under this Agreement shall be resolved exclusively in the state or federal courts within Los Angeles County, State of California and expressly consent to jurisdiction therein. The parties agree that process may be served upon it by mailing such process to its address for notices as provided in this Agreement.

21.3    Severability. Should any provision of this Agreement be held to be void, invalid or inoperative, such provision shall be enforced to the extent possible and the remaining provisions of this Agreement shall not be affected.

21.4    Headings. The headings of the sections of this Agreement are for convenience only and shall not be of any effect in construing the meanings of the sections.

21.5    No Agency. The relationship of the parties during the term of this Agreement shall be that of an independent contractor. Neither party shall have, or represent that it has, any power, right or authority to bind the other party, or to assume or create any obligation or responsibility, express or implied, on behalf of the other party or in the other party's name, except as herein expressly provided. Nothing stated in this

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                      ACT-WZ08638557

Exhibit 1
52

Agreement shall be construed as constituting the parties hereto as partners or as creating the relationships of employer/employee, franchisor/franchisee, or principal/agent between the parties.

21.6    Integration.  This Agreement, including all Exhibits, which are incorporated into this Agreement by this reference, constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all prior negotiations, preliminary agreements, correspondence or understandings, written or oral, including, without limitation, the LOI.

21.7    Waiver.  No waiver of any obligation by any party hereto under this Agreement shall be effective unless in writing, specifying such waiver, executed by the party making such waiver. A waiver by a party hereto of any of its rights or remedies under this Agreement on any occasion shall not be a bar to the exercise of the same right or remedy on any subsequent occasion or of any other right of remedy at any time.

21.8    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original Agreement for all purposes, including the judicial proof of any of the terms hereof, provided, however that all such counterparts shall constitute one and the same Agreement.

21.9    Presumption.  Because the parties hereto have participated in drafting and negotiating this Agreement, there shall be no presumption against any party on the ground that such party was responsible for preparing this Agreement or any part of it.

21.10    Remedies.  Unless expressly set forth to the contrary, either party's election of any remedies provided for in this Agreement shall not be exclusive of any other remedies available hereunder or otherwise at law or in equity, and all such remedies shall be deemed to be cumulative.

21.11    **Consequential Damages. Neither party shall be liable to the other party for any consequential, incidental, special, indirect, or punitive damages arising out of this Agreement or its termination, or the breach of any of its provisions, whether liability is asserted in contract or tort (including negligence and strict product liability), and irrespective of whether the parties have been advised or been advised of the possibility of any such loss or damage.**

21.12    Attorneys' Fees.  Should any litigation be commenced among the parties in relation to this Agreement, the party prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to a reasonable sum for attorneys' fees in connection with such litigation or in a separate action brought for that purpose.

21.13    Assignment.  This Agreement is personal to Licensor and the performance of the duties as required by this Agreement may not be assigned or delegated by Licensor without the prior written consent of Activision except as otherwise provided in this Section 21.13.  Except as otherwise provided in Section 21.13, this Agreement may not be assigned in whole or in part by Activision without prior written consent of Licensor. Either party may assign this Agreement without seeking such consent to its parents, majority-owned subsidiaries, and Affiliates or to any third party that either (a) succeeds the assigning party by operation of law, (b) merges, combines or consolidates with the assigning party, or (c) purchases or otherwise acquires at least a majority of the assets or voting equity of such party, and, in any event, such third party assignee assumes the assigning party's obligations under this Agreement; provided that assignment by Licensor is subject to Activision's right of approval over any Change of Control pursuant to Section 18.1. Notwithstanding the foregoing, this Agreement shall be binding upon the personal representatives, successors and assigns of Licensor, and the personal representatives, successors and assigns of Activision.

21.14    Equitable Relief.  Each party recognizes and agrees that in the event of a material breach or threatened breach of its obligations under this Agreement, irreparable injury to the other party could result and money damages alone would not adequately compensate the other party, and therefore agrees that, in addition to all other remedies available to the other party at law, in equity, by agreement or otherwise, the injured party shall be entitled to specific performance or other injunctive or equitable relief for the enforcement of any such obligation.

21.15    Notices. All notices, statements and payments to Licensor shall be delivered to it at the address specified on the first page of this Agreement to the attention of the President of Licensor, with a copy to the Chief Financial Officer of Licensor, or at such other address as it shall designate in writing by notice given in accordance with this section from time to time. All notices, statements and payments to be given to

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                    ACT-WZ08638558

Exhibit 1
53

Activision shall be delivered to the undersigned at the address specified on the first page of this Agreement, to the attention of the Vice President, Finance, with a copy to the General Counsel, or at such other address as it shall designate in writing, by notice given in accordance with this section from time to time. All notices shall be in writing and shall either be served by personal delivery, certified mail return receipt requested, or internationally recognized overnight courier service, all charges prepaid. Except as otherwise provided herein, such notices shall be effective only after the actual receipt thereof.

21.16    Counterparts:   This Agreement may be executed in counterparts, each of which shall be deemed an original Agreement for all purposes, including the judicial proof of any item of the terms hereof, provided, however, that all such counterparts shall constitute one and the same Agreement.

**ACCEPTED AND AGREED TO:**

**ACTIVISION:**                                    **LICENSOR:**

**ACTIVISION PUBLISHING, INC.**                    **BUNGIE, LLC**

By: _____                      By: _____

Name:   Thomas Tippl                               Name:   Harold Ryan

Title:   COO                                       Title:   President

*Bungie Development and Publishing Agreement (Destiny)v11*   27                                    *CC*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY                                    ACT-WZ08638559

Exhibit 1
54