ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG (179109)
TRIG R. SMITH (237399)
ALEXI H. PFEFFER-GILLETT (313709)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
torg@rgrdlaw.com
trigs@rgrdlaw.com
agillett@rgrdlaw.com

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASE HAMANO, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　Plaintiff,<br><br>　vs.<br><br>ACTIVISION BLIZZARD, INC., et al.,<br><br>　　　　　　Defendants. | Case No. 2:19-cv-03788-SVW-AFM<br><br>CLASS ACTION<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED COMPLAINT<br><br>DATE:　　September 16, 2019<br>TIME:　　1:30 p.m.<br>JUDGE:　Hon. Stephen V. Wilson |

4849-0972-3298.v1

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................................. 1

II.    STATEMENT OF FACTS ..................................................................... 3

    A.   Activision's Licensing Agreement with Bungie and the *Destiny* Franchise .................................................................................. 3

    B.   Escalating Problems Between Activision and Bungie ......................... 5

    C.   Activision's Deteriorating Financial Condition and Stock Price ......... 7

    D.   Defendants' Misleading Statements and Material Omissions .............. 8

    E.   Disclosure of the Truth About the Licensing Agreement .................... 8

III.   LEGAL STANDARD ........................................................................... 9

IV.    THE COMPLAINT ADEQUATELY ALLEGES DEFENDANTS' MISLEADING STATEMENTS AND MATERIAL OMISSIONS ............. 10

    A.   Defendants Were Under a Legal Obligation to Disclose the True Status of the Activision/Bungie Relationship ........................... 11

V.     THE COMPLAINT'S ALLEGATIONS RAISE A STRONG INFERENCE OF SCIENTER .................................................................. 17

    A.   The Terms of the Licensing Agreement Raise a Strong Inference of Scienter ........................................................................ 18

    B.   Core Business Inference:  Destiny Was a "Key Product Franchise" ................................................................................. 19

    C.   Defendants' Motive and Opportunity to Commit Fraud Only Adds to the Strong Inference of Scienter .......................................... 21

VI.    THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION ....... 22

VII.   THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY .......................................................................... 24

VIII.  CONCLUSION .................................................................................. 24

4849-0972-3298.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Basic, Inc. v. Levinson*,
485 U.S. 224 (1988) ..................................................................................... 12, 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................ 9

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................ 20

*Caiola v. Citibank, N.A.*,
295 F.3d 312 (2d Cir. 2002) ............................................................................. 11

*Curry v. Yelp, Inc.*,
875 F.3d 1219 (9th Cir. 2017) .......................................................................... 21

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ..................................................................................... 2, 23

*Hutchins v. NBTY, Inc.*,
No. CV 10-2159 (LDW) (WDN), 2012 WL 1078823
(E.D.N.Y. Mar. 30, 2012) ...................................................................... 13, 14, 15

*In re DDi Corp. Sec. Litig.*,
No. CV 03-7063 NM, 2005 WL 3090882
(C.D. Cal. July 21, 2005) ................................................................................. 12

*In re High-Crush Partners L.P. Sec. Litig.*,
No. 12 Civ. 8557 (CM), 2013 WL 6233561
(S.D.N.Y. Dec. 2, 2013) ................................................................................... 13

*In re Questcor Sec. Litig.*,
No. SA CV 12-01623 DMG, 2013 WL 5486762
(C.D. Cal. Oct. 1, 2013) .............................................................................. 10, 11

*In re Rhodia S.A. Sec. Litig.*,
531 F. Supp. 2d 527 (S.D.N.Y. 2007) ............................................................... 23

4849-0972-3298.v1

**Page**

*In re Snap Inc. Sec. Litig.*,
   No. 2:17-CV-03679-SVW-AGR, 2018 WL 2972528
   (C.D. Cal. June 7, 2018) ...................................................................................9, 22

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996) .................................................................................12

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ........................................................................9, 10, 22

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ...................................................................................20

*Lapin v. Goldman Sachs Grp., Inc.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ....................................................................11

*Levinson v. Basic, Inc.*,
   871 F.2d 562 (6th Cir. 1989) ..................................................................................12

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ..................................................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ...........................................................................................11, 12

*Matrixx v. Siracusano Initiatives, Inc.*,
   585 F.3d 1167 (9th Cir. 2009),
   *aff'd*, 562 U.S. 27 (2011)................................................................................17, 20

*Miller v. Thane Int'l., Inc.*,
   519 F.3d 879 (9th Cir. 2008) ..................................................................................14

*Mineworkers' Pension Scheme v. First Solar, Inc.*,
   881 F.3d 750 (9th Cir. 2018), *cert. denied*,
   _U.S._, 139 S. Ct. 2741 (2019) ...........................................................................22

*Nasyrova v. Immunomedics, Inc.*,
   No. 14-1269 (SRC), 2015 WL 382846
   (D.N.J. Jan. 25, 2015)...........................................................................................16

4849-0972-3298.v1

**Page**

*Reese v. Malone*,
 747 F.3d 557 (9th Cir. 2014) ................................................................. 17, 19, 22

*River Birch Capital, LLC v. Jack Cooper Holdings Corp.*,
 No. 17CV9193, 2019 WL 1099943
 (S.D.N.Y. Mar. 8, 2019) ................................................................................... 17

*S. Ferry LP, No. 2 v. Killinger*,
 542 F.3d 776 (9th Cir. 2008) ..................................................................... 19, 21

*SEC v. Capital Gains Research Bureau, Inc.*,
 375 U.S. 180 (1963) ......................................................................................... 2

*Steckman v. Hart Brewing, Inc.*,
 No. 96-1077-K, 1996 WL 881659
 (S.D. Cal. Dec. 24, 1996) ................................................................................ 17

*Swartz v. KPMG LLP*,
 476 F.3d 756 (9th Cir. 2007) ........................................................................... 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007) ......................................................................... 9, 17, 18, 22

*Thompson v. Paul*,
 547 F.3d 1055 (9th Cir. 2008) ..................................................................... 12, 14

*Vess v. Ciba-Geigy Corp. USA*,
 317 F.3d 1097 (9th Cir. 2003) ......................................................................... 10

*Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*,
 5:10-cv-02604, 2012 WL 3835078
 (N.D. Cal. Sept. 4, 2012) ................................................................................. 20

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
 §78j(b) .................................................................................. 2, 11, 23, 24
 §78t(a) ........................................................................................................ 24
 §78u-4(b)(1)(B)-(2)(A) .................................................................................. 10
 §78u-4(b)(2)(A) ............................................................................................. 17

4849-0972-3298.v1

**Page**

Federal Rules of Civil Procedure
    Rule 8(a)(2)..................................................................................................3, 4, 5
    Rule 9(b) .............................................................................................*passim*
    Rule 12(b)(6) ................................................................................................ 9

17 C.F.R.
    §2401.10b-5(b) ............................................................................................ 11

4849-0972-3298.v1

Lead Plaintiff United Association Local Union 393 Defined Benefit Pension Plan and Defined Contribution Plans ("Plaintiff"), submits this opposition to Defendants' Motion to Dismiss Consolidated Complaint (ECF No. 78) ("MTD").[1]

## I.    INTRODUCTION

Starting on August 2, 2018, Defendants issued misleading statements concerning the status of the relationship between Activision and an important external game developer, Bungie, Inc. ("Bungie").  The game at issue in this case, *Destiny*, was developed by Bungie.  Defendants repeatedly characterized the Activision/Bungie relationship as a "long-term alliance" and *Destiny* as a "key product franchise."  Defendants made these statements to assure investors that the Activision/Bungie relationship was strong and would continue to underpin billions of dollars in future *Destiny* revenue.  Between August 2, 2018 and January 10, 2019 (the "Class Period"), however, Activision and Bungie were already in the process of terminating a 2010 Software Publishing and Development Agreement ("Licensing Agreement"), attached to the Complaint as Ex. 1 (ECF No. 76-1) that governed the parties' relationship and had allowed Activision to publish and profit from *Destiny*.  Termination of the Licensing Agreement would (and did) result in Activision losing all revenue and profits from the *Destiny* franchise.

On January 10, 2019, Activision revealed that the relationship with Bungie was over, and the Company would no longer control or derive profits from *Destiny*.  As a result, on January 11, 2019, Activision's stock price dropped $4.77 per share, reducing the Company's market capitalization by $3.64 billion.

---

[1]    Defendants are Activision Blizzard, Inc. ("Activision" or the "Company"), Robert "Bobby" A. Kotick ("Kotick"), Collister "Coddy" Johnson ("Johnson") and Spencer Neumann ("Neumann") (collectively, "Defendants").  Kotick, Johnson and Neumann are also referred to herein as the "Individual Defendants."  All "¶__" references are to the Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 76) (the "Complaint").  Emphasis is added and citations are omitted unless otherwise stated.

- 1 -

4849-0972-3298.v1

The fundamental purpose of the federal securities laws is "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 186 (1963).  When, as here, corporate officers fail to provide full and accurate disclosure, a plaintiff states a claim under §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), by pleading: (1) a material misrepresentation or omission; (2) made with scienter; (3) in connection with the purchase or sale of a security; (4) relied upon by plaintiffs; (5) a loss causally connected to the alleged fraud; and (6) economic loss or damages. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

Defendants do not dispute that Plaintiff has properly pled several of the elements of its §10(b) claim, such as security purchases and reliance.  Defendants also concede, by their silence, that their statements regarding the Bungie relationship were material.  As Defendants themselves stated during the Class Period, *Destiny* was one of Activision's "key products" and was expected to generate billions-of-dollars of revenue.  The remaining elements of Plaintiff's §10(b) claim are likewise satisfied.

Defendants' motion re-writes critical allegations in the Complaint and incorrectly contends that regardless what stage of dissolution the Activision/Bungie relationship was in, Defendants had no legal duty to inform investors until the breakup was completed.  Defendants are wrong.  Under the federal securities laws, when Defendants chose to speak about the Activision/Bungie relationship, they were under a duty to speak completely and truthfully.  Plaintiff has specifically identified Defendants' statements about *Destiny* and the Activision/Bungie relationship, and detailed why they were misleading when made. *See* §IV, *infra*.  Plaintiff has also pled the requisite "strong inference" of scienter, by alleging Defendants' knowledge and reckless disregard of the true, undisclosed facts regarding the status of the Activision/Bungie relationship. *See* §V, *infra*.  Plaintiff has also adequately alleged loss causation (*see* §VI, *infra*) and control person liability. *See* §VII, *infra*.

- 2 -

4849-0972-3298.v1

The Complaint satisfies the pleading requirements of the Exchange Act, the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rules 8(a)(2) and 9(b) of the Federal Rules of Civil Procedure.  Plaintiff respectfully requests that the Court deny Defendants' motion in its entirety.

## II.    STATEMENT OF FACTS

Activision is a developer, publisher and distributor of interactive gaming products.  ¶8.  Activision trades on the Nasdaq National Market under the symbol "ATVI."  *Id.*  During the Class Period, Activision was responsible for publishing the role-playing, first-person shooter videogame known as *Destiny*, which had been developed by Bungie.  ¶¶16-22.

### A.    Activision's Licensing Agreement with Bungie and the *Destiny* Franchise

Bungie is a privately held, Seattle-based company originally known for developing the acclaimed *Halo* franchise of videogames.  ¶19.  On April 16, 2010, Bungie and Activision entered into the Licensing Agreement.  ¶21; *see also* Licensing Agreement.  Pursuant to its terms, Bungie agreed to continue development of the *Destiny* franchise with Activision handling publication and distribution of the product.  After the Licensing Agreement was executed in April 2010, Bungie President Harold Ryan stated the parties had "work[ed] together over the past nine months on this agreement."  ¶21.

The Licensing Agreement provided that Bungie would develop four major retail installments of the *Destiny* franchise, as well as four expansions (add-ons with new game areas, equipment and weapons) for each installment.  ¶22.  The major installments were scheduled to be released beginning in the fall of 2013 and every other year afterward ending in 2019.  *Id*.  The expansions were to be released in the even-numbered years through 2020.  *Id.*  Activision agreed to pay development advances and fully fund Bungie's operations as Bungie developed the *Destiny* installments and expansions.  *Id*.  By the end of the Class Period, Bungie had

- 3 -

4849-0972-3298.v1

delivered two of the four major game installments as the Licensing Agreement stipulated. ¶¶22, 30-34.

In return for funding and marketing the *Destiny* franchise, Activision was entitled to up to 80% of all *Destiny*-related revenue. ¶23; *see also* Licensing Agreement, ¶11. The Licensing Agreement with Activision allowed Bungie to keep the intellectual property rights in *Destiny* during the contractual period. ¶23. After release of the four installments and accompanying expansions, Activision would "have a right of first negotiation to publish and distribute such Future Destiny Games." *Id*.; Licensing Agreement, ¶19.

Activision – but not Bungie – possessed the right to terminate the Licensing Agreement, without penalty, following the release of the second *Destiny* expansion (then referred to as "Comet #2") "for any reason in Activision's sole discretion." Licensing Agreement, ¶17.1. An Activision-initiated termination would automatically cause licenses for future works in the *Destiny* franchise to revert back to Bungie. *Id*. Both parties could terminate the agreement in the event of an uncured, material breach. *Id*., ¶17.2.

The Licensing Agreement also required that any disputed issue requiring the mutual approval of the parties for resolution had to be "elevated to senior-level executives to try to resolve the disagreement" and that "[s]uch senior-level dispute resolution procedures may also be triggered by either party hereto in the event a party reasonably believes that any activity or action being taken by the other party could adversely impact (a) the long-term viability of the Destiny Property franchise, (b) sales or revenues associated with the Products, and/or (c) the ability to attract and retain top talent and community viability." ¶26; Licensing Agreement, ¶20. The Licensing Agreement further specified that "[a]ll notices, statements and payments to be given to Activision shall be delivered to" Activision's Vice President of Finance, as well as the Company's General Counsel. Licensing Agreement, ¶21.15.

- 4 -

4849-0972-3298.v1

The first installment of the *Destiny* franchise was released on September 9, 2014. ¶28. Activision shipped $500 million worth of the game in the first 24 hours after release and proclaimed it "the biggest new video game franchise launch in history." *Id.* Between 2014 and 2018, *Destiny* games generated over $1.6 billion in revenue for Activision and represented one of the Company's most successful game franchises.

**B.   Escalating Problems Between Activision and Bungie**

Under the terms of the Licensing Agreement, *Destiny 2* was scheduled for release in the fall of 2015. ¶30. Because the first installment was belatedly released in September 2014, Bungie and Activision instead released a first expansion for *Destiny 1* in September 2015. *Id.* Then, in mid-January 2016, it was announced that there would be significant delays in the release of *Destiny 2*. *Id.* Industry analysts at the time noted a growing sense of "malaise" among the game's hardcore fans triggered by a "drought of new content." *Id.*

On January 27, 2016, just days after the *Destiny 2* delay announcement, Bungie disclosed that its president was stepping down and would be replaced by Bungie's then-COO, Pete Parsons. ¶31. Parsons issued a statement reassuring *Destiny* gamers that the franchise would be his "number one priority," stating his belief that gamers "ha[d] yet to see our studio's best work" and that he would be "entirely focused on fulfilling that promise." *Id.*

Analysts and insiders attributed the delays and lack of updates to a host of behind-the-scenes disputes regarding how to best manage the *Destiny* franchise. ¶32. For example, in October 2015, Bungie added new "micro-transactions" to the game at Activision's request. *Id.* Although Bungie had initially told gamers that these for-purchase additions would be "cosmetic only," the industry publication *Kotaku* reported that "soon enough the studio quietly started selling level boosters as well" to allow players to actually advance more quickly in the game. *Id.*

- 5 -

4849-0972-3298.v1

In December 2015, Bungie also introduced changes to *Destiny 1*'s online matchmaking system in an effort to boost revenue. ¶¶33, 35. But a month later, on January 26, 2016, Bungie reversed course and announced that in response to player concerns about connection speeds, they would change the matchmaking system to prioritize connection quality. ¶33. Meanwhile, Activision vacillated on whether future *Destiny* content would be free or paid. *Id.* *Kotaku* reported that Bungie employees were frequently kept in the dark about these decisions, indicating that Activision – rather than Bungie – was driving the moves pursuant to its contractual authority over the process. *Id.*

Activision released *Destiny 2* on September 6, 2017. The game was widely praised by critics and, on September 15, 2017, Activision announced that *Destiny 2* had "surpassed the original's records for engagement and digital sales in launch week." ¶34.

Despite the success of *Destiny 2*, the tension between Activision and Bungie continued to grow. ¶35. As previously noted, prior to and during the Class Period, Bungie grew frustrated with Activision's push for increased control over *Destiny*. This took the form, *inter alia*, of Activision demanding more micro-transactions in *Destiny 1* (released September 2014), *Destiny 2* (released September 2017) and *Destiny 2: Forsaken* (released September 2018). *Id.* Activision's push for these micro-transactions created the perception among loyal *Destiny* players that they had to pay to win and that Activision prioritized profit over player satisfaction. *Id.*

As a result of the late roll-out of major installments of *Destiny*, Activision supplemented Bungie's developmental efforts with game developers from two of Activision's subsidiaries: High Moon Studios and Vicarious Visions. ¶36. But, in late Spring 2018, High Moon Studios development personnel gathered for an all-hands meeting during which High Moon Studios senior management informed the *Destiny* developers that Activision was shifting significant amounts of High Moon

- 6 -

4849-0972-3298.v1

Studio's development team away from *Destiny* and onto the *Call of Duty* franchise. *Id.*

In June 2018, Bungie announced that it had reached a deal with another publisher, China-based NetEase, which netted Bungie $100 million in cash. ¶37. Bungie's CEO, Parsons, publicly stated the move was "really about who are the teams we want to build with and what are the games we want to make [and] what are the business models[.]"  An *Engadget* reporter noted "Bungie may be setting itself up for life after the [Activision] arrangement ends." *Id.*

Following the disclosure of the deal with NetEase, Bungie and Activision's continued clashes led to negotiations on the termination of the Licensing Agreement. ¶38.  Because the Licensing Agreement did not allow Bungie to terminate the contract, other than for an uncured, material breach, Bungie would have to pay Activision to extricate itself from the Licensing Agreement. *Id*.  As a result, the parties had to negotiate the amount it would cost Bungie to terminate the Licensing Agreement. *Id.*

Activision and Bungie's imminent separation heightened the tension between the two companies.  ¶39.  For instance, during Activision's November 8, 2018 earnings call, defendant Johnson blamed Activision's poor results on the quality of *Destiny* and its purported "underperformance against our expectations to date." *Id.* Bungie immediately objected, stating: "We are not disappointed with Forsaken [the most recent *Destiny* expansion].  We set out to build a game that Destiny players would love, and at Bungie, we love it too . . . Building Destiny for players who love it is and will remain our focus going forward." *Id.*

**C.**    **Activision's Deteriorating Financial Condition and Stock Price**

During the fall of 2018, as the relationship with Bungie collapsed, Activision was dealing with a falling stock price due to the departure of Activision Blizzard CEO and President Mike Morhaime, the resignation of Blizzard CFO Amrita Ahuja, the

- 7 -

4849-0972-3298.v1

termination of defendant Neumann, disappointing sales of the *Call of Duty: Black Ops 4* game and the failure to release another installment in the *Diablo* game franchise. ¶42. Activision also continued to lose ground to competitor Epic Games, publisher of the game *Fortnite*, and the Company's overall player base had declined by 7 million players. *Id*. As a result, between July 2018 and December 2018, Activision's stock price dropped from $80.00 per share to under $47.00, and, therefore, Defendants were under pressure to stem the flow of bad news. ¶43.

**D.    Defendants' Misleading Statements and Material Omissions**

On August 2, 2018, defendants filed Activision's 2Q18 Form 10-Q with the SEC. The 2Q18 Form 10-Q stated that *Destiny* is one of the Company's "***key product franchises***" and "***[w]e have also established a long-term alliance with Bungie to publish its game universe, Destiny***." ¶45.

On November 8, 2018, Defendants filed Activision's 3Q18 Form 10-Q with the SEC. The 3Q18 Form 10-Q repeated the same language quoted in bold and italics in the prior paragraph. ¶48.

Defendant Neumann signed the 2Q18 and 3Q18 Form 10-Qs and defendants Kotick and Neumann certified that the information in the Form 10-Qs fairly represented, in all material respects, the financial condition and results of Activision's operations. ¶¶45, 48.

**E.    Disclosure of the Truth About the Licensing Agreement**

After the market closed on January 10, 2019, Activision revealed that its relationship with Bungie had permanently ended, that Bungie would "assume full publishing rights and responsibilities for the Destiny franchise" and the Company no longer "expect[ed] to recognize material revenue, operating income or operating loss" from *Destiny*. The same day, Bungie reported that "[t]he planned transition process is already underway in its early stages." ¶51.

- 8 -

After Activision's January 10, 2019 disclosure, market participants observed: It is "earthshattering news that Bungie was extracting itself from its deal with Activision"; "the severing of Activision's relationship with Bungie will create a hole in earnings"; "we don't like losing a multi-hundred million dollar annual game franchise"; and as a result of the disclosure, "we have thoroughly questioned our ability . . . to recommend ATVI stock." ¶¶52, 53. As a result of investors learning the truth about the collapse in of Activision's relationship with Bungie, Activision's stock priced dropped by $4.77 per share on January 11, 2019. ¶54.

Subsequently, Defendants disclosed that Bungie agreed to pay the Company $164 million to end the Licensing Agreement. ¶55. The Licensing Agreement did not provide that Bungie could pay to terminate the relationship with Activision. *Id.* As *Forbe*s subsequently noted: "[T]hey recently got a $100 million investment from China mobile giant NetEase, which no doubt made this transition easier, if it's not the entire reason it's possible." *Id.*

## III.   LEGAL STANDARD

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must "consider the complaint in its entirety," "accept all factual allegations . . . as true," and construe those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). A complaint "does not need detailed factual allegations," but need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). *See also In re Snap Inc. Sec. Litig.*, No. 2:17-CV-03679-SVW-AGR, 2018 WL 2972528, *4 (C.D. Cal. June 7, 2018).

Along with Rule 12(b)(6)'s requirements, a complaint alleging securities fraud must satisfy the requirements of Fed. R. Civ. P. 9(b) and the PSLRA. *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake."

- 9 -

4849-0972-3298.v1

Fed. R. Civ. P. 9(b). To satisfy Rule 9(b), the factual allegations must include "'the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Likewise, the PSLRA requires a plaintiff to specify the alleged false statements, identify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. §78u-4(b)(1)(B)-(2)(A).

## IV. THE COMPLAINT ADEQUATELY ALLEGES DEFENDANTS' MISLEADING STATEMENTS AND MATERIAL OMISSIONS

To adequately plead false and/or misleading statements under Rule 9(b) and the PSLRA, a complaint must identify what statements were misleading and who made the allegedly misleading statements, where and when the statements were made, and explain why the statements were misleading. *See VeriFone*, 704 F.3d at 710; *In re Questcor Sec. Litig.*, No. SA CV 12-01623 DMG (FMOx), 2013 WL 5486762, at \*28 (C.D. Cal. Oct. 1, 2013) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). As demonstrated below, the Complaint meets these pleading requirements.

Defendants do not dispute that the Complaint adequately identifies Defendants' misleading statements and why those statements were misleading when made. Rather, Defendants' primary legal argument is the alleged misleading statements are not actionable because Defendants were under no duty to disclose the non-public material facts regarding the status of the Licensing Agreement termination. MTD at 1:27-2:7, 11:14-17, 13:11-15. For the reasons stated below, the Court should reject that argument. Defendants repeatedly touted their "long-term alliance" with Bungie, while Activision and Bungie were already in the process terminating that alliance, which would result in the loss of the *Destiny* franchise and all revenue and profits generated by the game.

- 10 -

4849-0972-3298.v1

**A.  Defendants Were Under a Legal Obligation to Disclose the True Status of the Activision/Bungie Relationship**

Because Defendants chose to speak and characterize the Activision/Bungie relationship as a "***long-term alliance***" that supported and produced a "***key-product franchise***," they triggered a legal duty to disclose the material information regarding the actual status of that alliance.  When a defendant chooses to speak to investors about a particular topic, the defendant must disclose all material information necessary to make the "statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (citing 17 C.F.R. §2401.10b-5(b)) (adding "companies can control what they have to disclose [under §10(b) and Rule 10b-5] by controlling what they say to the market"). In other words, whether or not there was an independent duty to speak in the first instance becomes irrelevant once a party chooses to discuss material issues, because upon choosing to speak, one has a duty to be both accurate and complete. *Questcor,* 2013 WL 5486762, *11 (Section 10(b) "forbids omissions of 'material fact[s] necessary in order to make the statements made . . . not misleading'"); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) (same); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 236 (S.D.N.Y. 2006) (same).

As an initial matter, Defendants erroneously argue that the Complaint does not allege a duty to disclose and "simply [alleges] that the lack of disclosure somehow rendered the challenged statements misleading." MTD at 11:14-17.  The Complaint clearly alleges Defendants made statements regarding Activision's purported "long-term alliance" with Bungie and "omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  ¶¶45, 48, 50, 71.

Defendants could have followed the guidance in *Matrixx* and remained silent about status of the relationship with Bungie.  But Defendants touted the purported "long-term alliance" with Bungie that would allow Activision to publish and profit

- 11 -

from the "key-product franchise," *Destiny*. ¶¶45, 48. As a result, investors were led to believe that there had been no change to the Activision/Bungie relationship and there was no risk to the Company's ability to continue generating billions of dollars in revenue from sales of *Destiny*. ¶28. That Activision and Bungie were – at the time these statements were made – already negotiating the termination of the Licensing Agreement and the resulting cessation of Activision's profit stream from *Destiny* is certainly something a reasonable investor would view as changing the total mix of information. *Matrixx*, 563 U.S. at 38; *Basic, Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).[2] *See also Thompson v. Paul*, 547 F.3d 1055, 1062-63 (9th Cir. 2008) (same).

The guidance in *Levinson v. Basic, Inc.*, 871 F.2d 562 (6th Cir. 1989), is instructive. In *Basic*, the plaintiff alleged that over the course of two years preceding December 1978, Combustion Engineering, Inc. and Basic had been having meetings and discussions regarding a merger. During those two years of meetings, it was alleged that the defendant made several public statements denying that merger negotiations were taking place. *Id*. at 563. The Sixth Circuit, in sending the case back to the district court for consideration of whether the defendant was under a duty to disclose, stated that the duty would be triggered if the probability that the merger would go through was high, and the merger would be significant to Basic. *Id*. at n.1. Here, the Complaint alleges that by August 2, 2018, the relationship between Activision and Bungie was already doomed – Defendants began reducing developer talent for *Destiny* in late Spring 2018 and Bungie obtained $100 million from NetEase in June 2018. ¶¶36-37. And, as Defendants themselves conceded, both *Destiny* and

---

[2] Defendants apparently concede the Activision/Bungie relationship and the *Destiny* franchise were material to the Company and its investors. "Over the course of those eight years [of the Bungie/Activision relationship], Activision released two stand-alone Destiny games . . . unquestionably making it a key product franchise for Activision." MTD at 9:22-10:2. *See In re DDi Corp. Sec. Litig.*, No. CV 03-7063 NM, 2005 WL 3090882, *11 (C.D. Cal. July 21, 2005) (complaint may not be dismissed on the grounds of materiality of the alleged omitted fact "'unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance'"). *See also In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996).

- 12 -

the Activision/Bungie relationship were critical to Activision.  MTD at 9:22-10:2. Indeed, under the facts and circumstances here, *Basic* supports that Defendants were under a duty to disclose.

Other cases addressing the legal duty controlling Defendants' conduct in this case are equally instructive.  For example, in *Hutchins v. NBTY, Inc.*, No. CV 10-2159 (LDW) (WDN), 2012 WL 1078823, *5-*6 (E.D.N.Y.  Mar. 30, 2012), the plaintiff alleged that defendants made actionable statements about their positive financial results by failing to disclose that a large customer – Wal-Mart – had begun to entertain competitive bids for the business that was otherwise going to NBTY.  The court, in rejecting Defendants' argument that there was no duty to disclose, held that "it is plausible that a reasonable investor would view NBTY's ***potential loss*** of Wal-Mart's business – or retaining it at lower prices – significant to an investment decision under the circumstances."  *Id.*[3]

In *In re High-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557 (CM), 2013 WL 6233561, at *13-*15  (S.D.N.Y. Dec. 2, 2013), the plaintiff alleged that when defendants stressed that they had a "long-term" contract with Baker Hughes, they were under a duty to disclose the "purported termination" of the agreement.  In fact, defendants had publicly touted the "long-term" contract at issue, but the counter-party to the contract had indicated that it intended to repudiate it.  *Id.* at *14.  The defendants' motion to dismiss was denied and the allegation was upheld because "High-Crush had publicly hyped the importance of its relationship with Baker Hughes, explicitly stating that Baker Hughes was one of its 'largest customers' and emphasizing the long-term nature of the . . . agreement."  *Id.*

Here, the facts are similar to *NBTY and Hi-Crush*.  Like *Hi-Crush*, Defendants here had affirmatively spoke about the "long-term alliance" with Bungie, even after

---

[3]  This case directly collides with Defendants' overly broad assertion that "companies are not required to disclose the details of ongoing negotiations where the outcome is uncertain."  MTD at 14:11-12.

- 13 -

the process of terminating the alliance had begun.  Similar to the facts in *NBTY*, and despite the fact that Activision and Bungie were negotiating the termination of the Licensing Agreement that would lead to the loss of *Destiny* revenue, Defendants led investors to believe that the relationship remained a "long-term alliance" and there was no threat to *Destiny* remaining a "key-product franchise."

Defendants' contend that the alleged misleading statements are not actionable since they are "all unambiguously true." MTD at 9:12-11:4.  As discussed, the statements were not true and complete in light of the ongoing dissolution of the Activision/Bungie relationship.  As the Ninth Circuit recognized in *Miller v. Thane Int'l., Inc.*, 519 F.3d 879, 886 (9th Cir. 2008), "statements literally true on their face may nonetheless be misleading when considered in context . . . [and] the disclosure required by the securities laws is measured not by literal truth, but by the ability [to] inform rather than mislead."  Of course, the statements that the Company was then in a "long-term alliance" with Bungie to sell a "key-product franchise" contained some element of truth.  But by failing to inform investors that the relationship was ending, putting at risk all of the revenue and profits Activision would generate from *Destiny*, rendered those statements actionable.  *NBTY, Inc.*, 2012 WL 1078823, *5-*6.  *See Paul*, 547 F.3d at 1062-63 (holding that when a defendant chooses to speak on a material subject, the defendant assumes a duty to speak fully and truthfully on that subject).

Defendants also argue that the Complaint does not adequately allege particularized facts regarding the circumstances of the termination of the Licensing Agreement.  MTD at 11:19-12:22.  Defendants are incorrect.  As early as January 2016, Bungie developers were already complaining that Activision was over-reaching with its attempts to gain more control over the game – relating to whether *Destiny* would be a free or paid game, whether and how micro-transactions should be utilized, and regarding matchmaking changes – which, according to one report, made it "a tough situation for everyone, exacerbated by . . . Activision's revenue demands." ¶33.

- 14 -

4849-0972-3298.v1

By late Spring 2018, Activision, through its subsidiary High Moon Studios, informed Bungie that it was withdrawing significant amounts of development resources from *Destiny*. ¶36. And, in June 2018, Bungie received $100 million in cash from NetEase, which was later characterized as potentially "the entire reason" why the Activision/Bungie split was possible. ¶¶38, 55. Plaintiff has sufficiently alleged the dissolving relationship of Activision and Bungie, and that the movement towards terminating the Licensing Agreement was material by August 2018.

Defendants' motion is peppered with questions directed to the issue of falsity/misrepresentations. MTD at 12:4-10. For instance, Defendants contend that the Complaint does not allege when the process of terminating the "long-term alliance" began. *Id.* at 12:10. As noted herein, Plaintiff has alleged facts indicating that the relationship was materially compromised by August 2018. It makes no sense to argue – as Defendants implicitly do – that unwinding the Licensing Agreement only took a matter of weeks (*i.e.,* between the misleading statement made on November 8, 2018 and December 31, 2018[4]), when it took nine months to finalize it in 2010. ¶21. Defendants also contend that the Complaint's allegations of the duration of problems in the Activision/Bungie relationship is "undermined" by the "productivity" that occurred during the alliance. That makes no sense. The first installment of *Destiny* was late. The second installment of *Destiny* was late. Because of the disputes between the parties, Bungie was only capable of performing half of what it was required to perform over 10 years. That does not sound like the productivity Activision expected.

The process of terminating the Licensing Agreement, moreover, took much longer than Defendants suggest. Bungie did not have a quick or easy out from the Licensing Agreement. To extricate itself from the Licensing Agreement, Bungie first

---

[4]  *See* Declaration of Ryan E. Blair in Support of Defendants' Motion to Dismiss the Consolidated Complaint (ECF No. 78-2), Ex. H at 50 ("Effective December 31, 2018, Activision and Bungie, mutually agreed to terminate their publishing relationship related to the Destiny franchise.").

- 15 -

4849-0972-3298.v1

had to inform Activision that it wished to terminate the agreement. ¶26. Then the parties would have to negotiate and determine the financial penalty Bungie would have to pay Activision (to compensate Activision for expected future revenues or to calculate excess advanced royalty payments Activision had paid against "underperformance against [Activision's] expectations to date"). ¶¶24, 47. Then, Activision and Bungie would have to negotiate the transition of full control of *Destiny* to Bungie.

Defendants urge the Court to grant their motion based on the strained argument that the "challenged statements only discussed . . . joint efforts to develop and improve the *Destiny* games." MTD at 12:23-14:5. The Court should reject this argument. The meaning of Defendants' Class Period statements is simple: Activision was in a "long-term alliance" with the developer – Bungie – of the Company's "key-product franchise," *Destiny*.[5] The undisclosed fact that the relationship was dissolving by August 2018 is information a reasonable investor would want to know before engaging in an Activision stock transaction during the Class Period.

Defendants also suggest that because their statements regarding the "long-term alliance" and "key-product franchise statements" were not coupled with "guarantees on revenues or future products," they were under no duty to disclose the collapse in the Activision/Bungie relationship. MTD at 17:22-18:14. Defendants are wrong. Plaintiff has made no allegation that Defendants "explicitly" promised future success under the terms of the Licensing Agreement. Rather, Plaintiff alleges Defendants should have disclosed that the relationship was in the process of being terminated and,

---

[5] *See* MTD at 13:8-10. Defendants' reliance on *Nasyrova v. Immunomedics, Inc.*, No. 14-1269 (SRC), 2015 WL 382846, *8 (D.N.J. Jan. 25, 2015), is also misplaced. Unlike the allegations in this case, the defendants in *Immunomedics* did not make affirmative statements characterizing their contract with Takeda as a "long-term alliance." Further, the court in *Immunomedics* emphasized that plaintiff had not alleged anything regarding the "durability" of the contract at issue. Here, calling an agreement a "long-term alliance" clearly implies to investors that the relationship has been and remains durable. Defendants, do not even address that alleged statement ("long-term alliance") in attempting to analogize the *Immunomedics* case.

- 16 -

4849-0972-3298.v1

as a result, the Company and investors could no longer count on billions-of-dollars in future Destiny revenues.  The game had produced $1.6 billion in revenues for Activision between 2014 and 2018.  ¶28.  Accordingly, *River Birch Capital, LLC v. Jack Cooper Holdings Corp.*, No. 17CV9193, 2019 WL 1099943 (S.D.N.Y. Mar. 8, 2019) and *Steckman v. Hart Brewing, Inc.*, No. 96-1077-K, 1996 WL 881659 (S.D. Cal. Dec. 24, 1996), are not persuasive.  Defendants do not have to agree with Plaintiff's allegations.  But that doesn't mean that Plaintiff has not pled why the statements were materially misleading when made.

## V.   THE COMPLAINT'S ALLEGATIONS RAISE A STRONG INFERENCE OF SCIENTER

To plead scienter under the PSLRA, a complaint must "'state with particularity facts giving rise to a ***strong inference*** that the defendant'" made the "false or misleading statements intentionally or with deliberate recklessness." *Reese v. Malone*, 747 F.3d 557, 568-69 (9th Cir. 2014) (emphasis in original); 15 U.S.C. §78u-4(b)(2)(A).  Deliberate recklessness is defined as "'a highly unreasonable omission, involving . . . an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Matrixx v. Siracusano Initiatives, Inc.*, 585 F.3d 1167, 1180 (9th Cir. 2009), *aff'd*, 562 U.S. 27 (2011).

In determining whether the facts pled give rise to a strong inference of scienter, a court must: (1) accept all factual allegations in the complaint as true; (2) consider all of the allegations collectively; and (3) entertain only those plausible opposing inferences that can be "rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 314; *Reese*, 747 F.3d at 568-69.  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.  A court must conclude that a strong inference of scienter has been pled "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one

- 17 -

could draw from the facts alleged." *Id.* As set forth below, the Complaint's allegations when viewed as a whole raise a strong inference of Defendants' intent to deceive Plaintiff and the putative class.

As argued in the briefs, the parties have presented the Court with two competing inferences regarding Defendants' alleged intent to deceive. Plaintiff's inference is that the Complaint's allegations of fact show that Defendants were aware of the dissolving relationship between Activision and Bungie, as well as the negotiations to end the Licensing Agreement prior to August 2, 2018. Defendants' inference is that Defendants were not aware of any material changes in the relationship, or the risk those changes posed to the ongoing *Destiny* revenue and profit streams, before November 8, 2018, or shortly before the Company disclosed the relationship was over on January 10, 2019. MTD 23:19-22. Even if this Court was to conclude that Defendants' inference is equally plausible as Plaintiff's – which it is not – the Court should find that Plaintiff has adequately pled Defendants' intent to deceive. *Tellabs*, 551 U.S. at 324 (if a reasonable person could find the competing inference of scienter equally or less plausible than Plaintiff's inference, a court must find in Plaintiff's favor).

**A.   The Terms of the Licensing Agreement Raise a Strong Inference of Scienter**

The Licensing Agreement itself indicates that given the seriousness of disputes between Activision and Bungie regarding the future of *Destiny* and the processes associated with termination of the Licensing Agreement, the Individual Defendants would have been aware of them.[6] Any dispute requiring the mutual approval of the parties had to be "elevated to senior-level executives to try to resolve the

---

[6] Defendants suggest that Individual Defendants' awareness of the dispute resolution terms in the Licensing Agreement supports little more than knowledge of the "day-to-day" workings of Activision's business. MTD at 20:12-21:12. That argument, however, flies in the face of the language of the contract itself. Indeed, the dispute management provisions indicate that the Company's highest-ranking officers would be notified almost immediately regarding specific disputes arising as a result of the Activision/Bungie relationship. *See* Licensing Agreement, ¶¶18.2, 20, 21.15.

- 18 -

4849-0972-3298.v1

disagreement" regarding the long-term viability of *Destiny* and, *inter alia*, sales associated with *Destiny*.  ¶26; Licensing Agreement, ¶18.2.  In addition, if problems associated with *Destiny* arose and entered a "critical risk" state, including problems related to sales revenue and the overall status of *Destiny*, then those problems were to be brought to the attention of the CEO (who held the "tie-breaking vote").  ¶5; Licensing Agreement, ¶8.2(c).  The Licensing Agreement also required all written notices of problems to be delivered to the Company's Vice President of Finance and General Counsel.  ¶26; Licensing Agreement, ¶¶20, 21.15.

**B.**   **Core Business Inference:  Destiny Was a "Key Product Franchise"**

The inference of knowledge or reckless disregard is strong here because *Destiny* was, as Defendants admitted themselves, a "***key product franchise***."  ¶¶45, 48.  As the Ninth Circuit has acknowledged, "[i]t may also be reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies."  *Reese*, 747 F.3d at 569.  A plaintiff should show specific admissions by one or more corporate executive's detailed involvement in the minutia of a company's operations.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008).  Here, the Complaint alleges numerous facts that support the core operations doctrine.  In September 2014, the Company touted $500 million in sales in one day as "the biggest new video game franchise launch in history" and in subsequent communications with investors assured them that it was one of Activision's two "key product franchise[s]."  ¶28.  In January 2016, Activision's senior management admitted that *Destiny* was the Company's "***number one priority***" in light of continued delays in the release of *Destiny 2,* and vowed to be "***entirely focused***" on the development status of the game.  ¶31.  Between 2014 and 2018, *Destiny* games generated over $1.6 billion in revenue for Activision.  ¶28.  In addition, defendant Johnson's statements during Class Period analyst and investor conference calls – that Activision and Bungie teams had made a "lot of strides [the] last two quarters" to improve *Destiny* and were "working together"

- 19 -

to address *Destiny* gamers' concerns about the game (¶¶44, 46) – indicate that Johnson either knew or recklessly disregarded the factual circumstances leading up to the collapse in the Activision/Bungie relationship.  *See, e.g.*, *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009) ("Among the facts alleged by Shareholders, the most power evidence of scienter is the content and context of [defendants'] statements themselves"); *Washtenaw Cty. Emps. Ret. Sys. v. Celera Corp.*, 5:10-cv-02604 (EJD), 2012 WL 3835078, *3 (N.D. Cal. Sept. 4, 2012) ("[t]he wording of Defendants' statements on these calls suggests they understood what was going on").

Continued delays in the major releases of *Destiny*, persistent disputes between Activision and Bungie regarding the itself control of a "key product franchise," and the language in the Licensing Agreement itself defining how this information would make it to the Individual Defendants, raise a strong inference that the Defendants would have been fully aware of the processes of terminating the Activision/Bungie relationship at the time they made their misleading statements.  *Matrixx*, 585 F.3d at 1180 (noting that a pleading raises a strong inference of scienter where allegations of undisclosed problems were "so obvious that the actor must have been aware" of them).  *See also Berson v. Applied Signal Tech., Inc.,* 527 F.3d 982, 988-89 (9th Cir. 2008) (noting core operations allegations may satisfy the PSLRA where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest management was without knowledge of the issue).

Defendants focus on the allegations regarding the High Moon Studio's developer meeting (¶36) to argue that the allegations of scienter are "vague and conclusory,"  MTD at 16:7-8, 19:16-20:9.  But that allegation goes to the dissolution of the Activision/Bungie relationship and the misleading quality of Defendants' Class Period statements and omissions, not to scienter.  The inference of Defendants' knowledge or reckless disregard of the truth is driven by the fact that the Licensing Agreement required notification of problems regarding the relationship to the highest-

- 20 -

4849-0972-3298.v1

ranking officer at the Company and *Destiny* was, by Defendants' admission, a "key-product franchise." ¶¶28, 31. Moreover, Defendants invite the Court to ignore the more logical factual inference: It was Activision's senior management (including the Individual Defendants) who made the decision to remove Activision development staff from the *Destiny* project in late Spring 2018. Here, the Court should reject Defendants' invitation.

Defendants' reliance on *Curry v. Yelp, Inc.*, 875 F.3d 1219 (9th Cir. 2017), to refute the core operation inference, is misplaced.[7] MTD at 21:1-5. As the Ninth Circuit confirmed in *Yelp*, "management's role in a corporate structure and the importance of the corporate information about which management made . . . misleading statements may also create a strong inference of scienter." *Id.* at 1227. In *Yelp,* plaintiff did not allege that a defendant had information regarding the "review manipulation" Yelp's employees were using to sell advertising. *Id.* In contrast, here the Complaint alleges how Defendants would necessarily have known about the negative undisclosed information regarding the Activision/Bungie relationship pursuant to the terms of Licensing Agreement. Activision senior management, and at times the Company's CEO, were identified as the persons who would be informed of problems with the Licensing Agreement, with the CEO even casting a "tie-breaking" vote to resolve serious disputes. ¶¶25-26; Licensing Agreement ¶¶8(c), 21.15.

### C. Defendants' Motive and Opportunity to Commit Fraud Only Adds to the Strong Inference of Scienter

As a result of the cascade of bad news during the second half of 2018, Activision's stock price had steadily fallen from over $80.00 per share to under $47.00. ¶¶42-43. In an effort to break, or at least avoid exacerbating the cycle of bad news negatively impacting the Company's stock price, Defendants deliberately

---

[7] *S. Ferry*, 542 F.3d at 784-85, also is of no help to Defendants. MTD at 20:12-21:5. As the Ninth Circuit noted in *S. Ferry*, "federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective").

4849-0972-3298.v1

delayed disclosing the truth about the Licensing Agreement for as long as they could. The Complaint identifies that prior to and during the Class Period, Activision was dealing with the fallout from the departure of Activision CEO and President Mike Morhaime, the resignation of Blizzard CFO Amrita Ahuja, the termination of defendant Neumann, disappointing sales of *Call of Duty: Black Ops 4* and the failure to release the next installment of *Diablo*. At the same time, Activision was seen by market participants as losing market share to the competing game *Fortnite*, and Activision's overall player base was declining by 7 million players. ¶42. This news contributed to the near 50% decline in the Company's stock price prior to Activision disclosing the end of the Activision/Bungie relationship on January 10, 2019.

Defendants argue that the motive and opportunity allegations, standing alone, are insufficient to raise a strong inference. MTD at 21:15-22:17. But the allegations do not stand alone. As part of its scienter inquiry, the Court is to review the Complaint's allegations of motive and intent holistically with all other allegations in the Complaint. *Tellabs*, 551 U.S. at 314; *Reese*, 747 F.3d at 568-69; *VeriFone*, 704 F.3d at 703); *Snap*, 2018 WL 2972528, *5. These allegations simply buttress the strong inference that Defendants knew the true, but undisclosed, facts about the Activision/Bungie relationship. *See* §§V.A. and V.B., *supra*.

## VI. THE COMPLAINT ADEQUATELY PLEADS LOSS CAUSATION

At the pleading stage, a plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other related facts. *Cf. Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F.3d 750 (9th Cir. 2018), *cert. denied*, _U.S._, 139 S. Ct. 2741 (2019).

During the Class Period, Defendants failed to disclose that the Licensing Agreement was already in the process of being terminated. ¶¶45, 48. On January 10, 2019, after the markets closed, Activision finally revealed that the relationship with

- 22 -

Bungie had dissolved and, as a consequence, the Company would no longer derive revenue or profits from *Destiny*. ¶5. The revelation of the truth behind a defendants' fraud does not need to "mirror" earlier misrepresentations and nothing in *Dura Pharms.*, 544 U.S. at 336, "prevent[s] a plaintiff from alleging or proving loss causation by showing partial or indirect disclosures of such by persons other than the defendants." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 264 (5th Cir. 2009). As a result of that unexpected disclosure, the Company's stock price dropped by \$4.77 per share, paring \$3.64 billion from Activision's market capitalization. *Id.*, ¶¶51-55, 57-58. There was no other company-specific news disclosed that day that could have caused that price decline, the overall market was flat and the other gaming companies' stock prices did not suffer declines like Activision's.[8] ¶59. The Complaint need allege no more.

Defendants attempt to buttress their loss causation argument by claiming the Complaint's allegations of motive and opportunity (*i.e.,* Defendants were motivated to delay disclosure because the Company's stock price had been on a steady decline for reasons *other* than a timely disclosure about the Activision/Bungie relationship) "undermines its loss causation argument." MTD at 24. But Defendants are not insulated from liability because forces other than the fraudulent conduct at issue caused the stock price to drop *during* the Class Period. Loss causation focuses on the cause of the stock price decline when the alleged truth is disclosed (*i.e.,* at the end of the Class Period). That argument would have some relevance if the facts indicated that other non-fraud information disclosed on the evening of January 10, 2019 caused the stock price to drop. Defendants have not and cannot make that argument here.

---

[8] Defendants cite to *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527 (S.D.N.Y. 2007), to argue that the Company's stock price decline during the Class Period is "detrimental" to Plaintiff's §10(b) claim. MTD at 24. But *In re Rhodia* is not persuasive for the simple reason that Plaintiff has alleged a corrective disclosure and does not rely on a "realization-of-the-risk" theory of loss causation.

- 23 -

## VII.  THE COMPLAINT ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

Defendants do not dispute that the Complaint sufficiently alleges each Defendants' control and participation. *See* MTD at 25:11-15. Because Plaintiff has sufficiently alleged a primary violation of §10(b) and Rule 10b-5, the Complaint properly pleads control person liability under §20(a).

## VIII.  CONCLUSION

For the reasons set forth above, Plaintiff has satisfied all applicable pleading standards and Defendants' motion to dismiss should be denied in its entirety.

DATED:  August 23, 2019                        Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
TOR GRONBORG
TRIG R. SMITH
ALEXI H. PFEFFER-GILLETT


                                                          TRIG R. SMITH

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Lead Plaintiff

- 24 -

4849-0972-3298.v1

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on August 23, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ TRIG R. SMITH
TRIG R. SMITH

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  TrigS@rgrdlaw.com

- 1 -

4849-0972-3298.v1

# Mailing Information for a Case 2:19-cv-03788-SVW-AFM Chase Hamano v. Activision Blizzard, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Alaina Ashley Bird**
  lbird@irell.com

- **Ryan E Blair**
  rblair@cooley.com,efiling-notice@ecf.pacerpro.com,chourani@cooley.com

- **Koji F Fukumura**
  kfukumura@cooley.com,efiling-notice@ecf.pacerpro.com,chourani@cooley.com

- **Carol V Gilden**
  cgilden@cohenmilstein.com

- **Tor Gronborg**
  torg@rgrdlaw.com,crosini@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Todd L Kammerman**
  tkammerman@aftlaw.com

- **Tricia L McCormick**
  triciam@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Marvin A Miller**
  mmiller@millerlawllc.com,JRamirez@millerlawllc.com

- **Danielle S Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Alexi Pfeffer-Gillett**
  agillett@rgrdlaw.com

- **Trig Randall Smith**
  trigs@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Heather Marie Speers**
  hspeers@cooley.com,bbrant@cooley.com,efiling-notice@ecf.pacerpro.com

- **Erin Carey Trenda**
  etrenda@cooley.com,kjones@cooley.com,efiling-notice@ecf.pacerpro.com

- **Craig Varnen**
  cvarnen@irell.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)