COOLEY LLP
KOJI F. FUKUMURA (189719)
(kfukumura@cooley.com)
RYAN E. BLAIR (246724)
(rblair@cooley.com)
ERIN C. TRENDA (277155)
(etrenda@cooley.com)
HEATHER M. SPEERS (305380)
(hspeers@cooley.com)
4401 Eastgate Mall
San Diego, CA  92121
Telephone: (858) 550-6000
Facsimile:  (858) 550-6420

*Attorneys for Defendants Activision Blizzard, Inc.,
Robert A. Kotick, and Collister Johnson*

[*Additional counsel listed on signature page*]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHASE HAMANO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ACTIVISION BLIZZARD, INC., ROBERT A. KOTICK, SPENCER NEUMANN AND COLLISTER JOHNSON,<br><br>Defendants. | Case No. 2:19-CV-03788-SVW-AFM<br><br>**REDACTED DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT**<br><br>Date:      March 9, 2020<br>Time:      1:30 p.m.<br>Judge:     Hon. Stephen V. Wilson |

**[REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL]**

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION. ...................................................................................................... 1

II.   PLAINTIFF'S SCIENTER ALLEGATIONS ARE INSUFFICIENT. .............. 2

    A.    The ▮▮▮▮▮▮▮ Emails Do Not Create a Strong Inference of Scienter. .......................................................................................................... 3

        1.    "▮▮▮▮" are inherently unreliable and inadequate to demonstrate scienter. ............................................................ 3

        2.    Temporally ambiguous idioms do not constitute particularized allegations. ................................................ 4

        3.    Companies routinely reallocate resources for commercial reasons. ................................................................................... 6

    B.    Plaintiff's Allegation that Defendants "Would Have Known" Does Not Create a Strong Inference of Scienter. ................................ 7

    C.    Plaintiff's Theory of Fraud Is Neither Cogent nor Compelling............... 9

III.  NONE OF THE CHALLENGED STATEMENTS WERE MATERIALLY FALSE OR MISLEADING. .................................................. 10

IV.   CONCLUSION ...................................................................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)..............................................................................................9

*Benedict v. Hewlett-Packard Co.,*
2014 WL 234218 (N.D. Cal. Jan. 21, 2014)..........................................................5

*In re Caere Corp. Sec. Litig.,*
837 F. Supp. 1054 (N.D. Cal. 1993)....................................................................11

*In re Express Scripts Holding Co. Sec. Litig.,*
2017 WL 3278930 (S.D.N.Y. Aug. 1, 2017) .......................................................12

*Hi-Crush Partners L.P. Sec. Litig.,*
2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013)...................................................12, 13

*Hutchins v. NBTY, Inc.,*
2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) ................................................12, 13

*Lormand v. US Unwired, Inc.,*
565 F.3d 228 (5th Cir. 2009) ................................................................................7

*Maeve Inv. Co. v. Teekay Corp.,*
2017 WL 5158059 (W.D. Wash. Nov. 7, 2017)......................................................9

*In re Maxwell Techs., Inc. Sec. Litig.,*
18 F. Supp. 3d 1023 (S.D. Cal. 2014) ...................................................................4

*Metzler Inv. GMBH v. Corinthian Colls., Inc.,*
540 F.3d 1049 (9th Cir. 2008) ..............................................................................9

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.,*
2013 WL 1188050 (D. Conn. Mar. 23, 2013).........................................................4

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.,*
380 F.3d 1226 (9th Cir. 2004)...............................................................................7

*In re NVIDIA Corp. Sec. Litig.,*
768 F.3d 1046 (9th Cir. 2014)...............................................................................8

*Plevy v. Haggerty,*
38 F. Supp. 2d 816 (C.D. Cal. 1998)......................................................................5

*Portfolioscope, Inc. v. I-Flex Sols. Ltd.,*
473 F. Supp. 2d 252 (D. Mass. 2007)...................................................................12

*Ronconi v. Larkin,*
253 F.3d 423 (9th Cir. 2001) ................................................................................2

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

ii.

**REPLY ISO MOTION TO DISMISS FAC**
**2:19-CV-03788-SVW-AFM**

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*S. Ferry LP, No. 2 v. Killinger,*
542 F.3d 776 (9th Cir. 2008) ...................................................................... 8

*Schneider v. Cal. Dep't of Corr.,*
151 F.3d 1194 (9th Cir. 1998) .................................................................. 12

*In re Silicon Storage Tech., Inc.,*
2006 WL 648683 (N.D. Cal. Mar. 10, 2006) .............................................. 9

*In re Stac Elecs. Sec. Litig.,*
89 F.3d 1399 (9th Cir. 1996) ..................................................................... 3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007) ............................................................................... 5, 9

*In re Tempur Sealy Int'l, Inc. Sec. Litig.,*
2019 WL 1368787 (S.D.N.Y. Mar. 26, 2019) ........................................ 3, 12

*Twinde v. Threshold Pharm. Inc.,*
2008 WL 2740457 (N.D. Cal. July 11, 2008) ........................................... 10

*In re Wachovia Equity Sec. Litig.,*
753 F. Supp. 2d 326 (S.D.N.Y. 2011) ....................................................... 5

*Webb v. Solarcity Corp.,*
884 F.3d 844 (9th Cir. 2018) ................................................................. 2, 9

*In re Wet Seal, Inc. Sec. Litig.,*
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ..................................................... 9

*Zucco Partners, LLC v. Digimarc Corp.,*
552 F.3d 981 (9th Cir. 2009) ................................................................. 3, 8

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iii.

REPLY ISO MOTION TO DISMISS FAC
2:19-CV-03788-SVW-AFM

## I. INTRODUCTION.

The entire premise of this lawsuit is that by August 2 and November 8, 2018, Activision Blizzard knew its subsidiary, Activision Publishing, Inc. ("Activision"), would part ways with Bungie and hid that information from investors. (FAC ¶¶ 49–52.) The fundamental problem with that premise, however, is that no well-pled facts support it. It is true that the companies terminated their relationship, effective December 31, 2018. But the FAC fails to cite a single contemporaneous document, conversation, or meeting supporting Plaintiff's contention (i) that the companies were "negotiating" the terms of the relationship's end, and (ii) that Defendants knew the outcome of these negotiations when they made the earlier, challenged statements. (FAC ¶ 52.)

The Opposition cannot fix this defect, so it largely abandons the FAC's central theory—*i.e.*, that Defendants purportedly committed fraud by failing to disclose that termination negotiations were underway. (*Id.*) Instead, Plaintiff now suggests that Defendants knew, and should have disclosed, that the relationship was simply in "jeopardy," not in "good health," and had been "unwinding" for months. (ECF No. 138-2 ("Opp.") at 1:17–24, 2:23–3:2, 13:20–23.) This sleight of hand only underscores the weaknesses of the FAC. The new theory is not premised on reliable confidential witnesses or contemporaneous documents—as in most cases that move beyond the motion to dismiss stage in a PSLRA case—but on two emails created by a third party more than two months after the last contested statement on November 8, 2018. (*Id.* at 1:12–2:3, 2:16–17, 4:5–7.) Contrary to what the Opposition claims, these emails are far too vague to be credited, say nothing about the state of mind of any Defendant, and actually undercut Plaintiff's theory of fraud.

The Opposition also continues to point to NetEase's $100 million investment in Bungie in June 2018 and Activision's shift of developmental resources as support for the purported deterioration of the Activision-Bungie relationship. But in so doing, Plaintiff ignores what Bungie actually said about its relationship with Activision

immediately following the investment (*i.e.*, Bungie was committed to "continue to work with [its] partners at Activision") and ignores the practical (and non-nefarious) reality of one of the largest videogame companies in the world shifting resources among its numerous key franchises as needs arise.

In the end, after several tries, Plaintiff still has not pled the requisite "strong inference" (or any inference) of Defendants' scienter, and Plaintiff has not identified any statement that was false or misleading when made. The FAC's failure to plead with the requisite particularity a contemporaneous meeting, discussion, or communication between Activision and Bungie regarding their relationship or anything at odds with what Activision disclosed publicly makes clear that Plaintiff cannot do so. The FAC should therefore be dismissed with prejudice.

## II.  PLAINTIFF'S SCIENTER ALLEGATIONS ARE INSUFFICIENT.

To meet the Ninth Circuit's exacting scienter standard, Plaintiff must plead, in great detail, allegations that create a strong inference that Defendants knew they were lying or ignored an obvious duty to disclose. *Webb v. Solarcity Corp.*, 884 F.3d 844, 850 (9th Cir. 2018); *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). In most securities fraud cases (successful ones anyway), one sees allegations from confidential witnesses who had contact with the defendants during the class period, or allegations about meetings or documents where information was shared with defendants that contradicted their public statements. Not here. Instead, Plaintiff's theory of scienter boils down to three things: (1) a pair of after-the-fact internal emails from an investor, ▮▮▮▮▮▮▮, that "▮▮▮▮" at "▮▮▮▮" and contain fatally non-specific shorthand notes about an unidentified speaker's statement that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (FAC ¶ 41), (2) speculation about what Activision's "senior executives" would have known (Opp. at 3:3–20), and (3) a theory of motive that Plaintiff does not contest is "weak" (*id.* at 10:14–11:13). None of these allegations, considered individually or collectively, give rise to a strong inference of scienter.

**A.     The ▮▮▮▮▮▮▮▮ Emails Do Not Create a Strong Inference of Scienter.**

Plaintiff makes great hay of the ▮▮▮▮▮▮▮ emails, but the rampant speculation and temporal non-specificity contained therein fall woefully short of the PSLRA's particularized pleading standards. (Opp. at 2:5–10:13.)

**1.     "▮▮▮▮" are inherently unreliable and inadequate to demonstrate scienter.**

In one email, someone at ▮▮▮▮▮▮ reacted to the January 2019 news of the Activision-Bungie split by stating: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" (FAC ¶ 42.) But neither the email nor the FAC provides any insight into who started these "▮▮▮▮," whether those individuals were within Activision, what information the "▮▮▮▮" were based upon, or whether the Individual Defendants held the same view. Indeed, it is precisely because "▮▮▮▮" and hearsay are inherently unreliable that they are inadequate to raise a strong inference of scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996–97 (9th Cir. 2009).

Plaintiff further claims that the email "confirmed" ▮▮▮▮ that Bungie took money from NetEase in June 2018 to set itself up for life after Activision. (Opp. at 4:5–7.) Setting aside the absurdity of characterizing a "▮▮▮▮" as a confirmation, nothing in this email suggests that **Defendants** knew why Bungie did anything. Plaintiff merely speculates that Activision would have known such things—"presumably via clairvoyance and a secret window into the corporate thinking and workings of [Bungie]." *In re Tempur Sealy Int'l, Inc. Sec. Litig.*, 2019 WL 1368787, at *8 (S.D.N.Y. Mar. 26, 2019). But courts repeatedly have cautioned against assuming knowledge of another company's plans. *See, e.g., In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1407 (9th Cir. 1996) ("[A]nother company's plans cannot be known to a certainty."). Indeed, as this Court previously observed, "evidence of Bungie's potential preparation to leave

the relationship is not particularly relevant to *Activision's* intent to terminate." (ECF No. 111 at 2 (emphasis added).) Moreover, Bungie publicly stated that the investment did ***not*** reflect tension with Activision and that the relationship would continue. (ECF No. 132-2, Ex. J at 82 ("If you're a player of Destiny, this news won't impact the hobby you've come to know. Destiny is an experience that will grow for many years to come. We'll continue to work with our partners at Activision to foster this global community . . ..."); FAC ¶ 37.) The most plausible inference is that Activision took Bungie at its word, and nothing in the ███████ email suggests Activision knew anything more about Bungie's intent following the NetEase investment than the public knew.[1]

### 2. Temporally ambiguous idioms do not constitute particularized allegations.

The other ███████ email purportedly reflects the notes of someone's conversation with an unnamed Activision employee in January 2019 after the split was announced. (FAC ¶ 41.) The notes say, among other things, that "████████████████ ████████████████████████" (*Id.*) Although Plaintiff reads much into that statement, in a 10b-5 case, it is fatally non-specific—it is unclear what "███████" means, what "███████" means, and what "███████" means. It is not even clear who said what. *See In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1034 (S.D. Cal. 2014) (refusing to credit allegation where plaintiff did not give a "sufficiently clear indication" of what witness actually said). To be clear, this is not an evidentiary objection, as Plaintiff claims. (Opp. at 7:3–10.) It is a common sense observation that the allegation is too vague to convey anything meaningful. *See NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, 2013 WL 1188050, at *27–28 (D. Conn. Mar. 23,

---

[1] Indeed, as recently as August 26, 2019, Bungie publicly stated that it was ***not*** problems with Activision that led to the termination of the Licensing Agreement, stating "we need to dispel the notion Activision was some prohibitive overlord that wasn't letting us do awesome things." https://www.gamesradar.com/we-need-to-dispel-the-notion-activision-was-some-prohibitive-overlord-says-bungie/ (last visited Feb. 20, 2020).

2013) ("Allegations that are so amorphous as to time periods are not pled with the requisite specificity."); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) ("[A]llegations about an unspecified time period cannot supply specific contradictory facts available to Defendants *at the time* of an alleged misstatement.") (emphasis added).

Failing to appreciate the PSLRA's and *Tellabs'* heightened standard for pleading scienter, Plaintiff argues that any ambiguity "weighs in Plaintiff's favor," and that it is entitled to a "reasonable inference" that an unspecified someone's "████████" meant "more than a few weeks." (Opp. at 9:4–10.) That may be sufficient under *Twombly* or Federal Rule of Civil Procedure ("Rule") 8. (*See* Opp. at 7:3–10 (citing *Benedict v. Hewlett-Packard Co.*, 2014 WL 234218, at *7 n.7 (N.D. Cal. Jan. 21, 2014) (permitting double hearsay under *Twombly* in a fair labor standard act case not subject to the PSLRA's heightened pleading standards)).) But that is not enough to plead scienter here. A plaintiff in a securities fraud class action is required to plead specific facts giving rise to an inference of fraudulent intent that is both "cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Facts from which an inference "*could* be drawn" are insufficient, and "ambiguities count *against* inferring scienter." *Id.* at 323, 326 (emphasis modified). Here, it is not even clear from the Opposition *what* Plaintiff thinks took "more than [a] few weeks" to accomplish—negotiating terms of the split (as alleged at FAC ¶ 52) or some nebulous "dissolution" or "unwinding" of a relationship (Opp. at 9:4–21).[2]

---

[2] Plaintiff also rehashes its argument that because "it took nine months to create the Licensing Agreement . . . it is difficult to imagine that '████' would mean just a few weeks." (Opp. at 9:10–16.) As previously noted, this argument only underscores Plaintiff's misunderstanding of business relationships. It is undoubtedly faster and simpler to undo a relationship (with a single cash payment) than to negotiate a set of financial and operational terms governing the development and release of an entire video game franchise over a multi-year period. Plaintiff's speculation to the contrary cannot substitute for pleading particularized facts as required by the PSLRA. *See Plevy*

### 3. Companies routinely reallocate resources for commercial reasons.

Similarly, Plaintiff claims the ▓▓▓▓▓▓▓▓ notes "reflected Activision's awareness that there '▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓'" (Opp. at 5:5–7.) Companies, however, shift resources on and off projects for many reasons, and Plaintiff does not plead facts warranting an inference that the purported shifting of High Moon Studio's and/or Vicarious Visions' resources here had anything to do with a permanent wind-down of *Destiny*'s development, problems between Activision and Bungie, or intentions to terminate the Licensing Agreement. Moreover, Plaintiff fails to acknowledge the undisputed facts that (i) Bungie (not Activision) was responsible for game development under the Licensing Agreement, and (ii) in 2018, Bungie was developing an expansion pack, not a full-length stand-alone game. (*See* FAC ¶ 22.) Accordingly, given the substantially reduced scope of work required to create an expansion pack, the far more compelling inference is that High Moon Studio's and Vicarious Visions' resources shifted away from *Forsaken* because they were no longer needed for the time being, and could be better utilized in the immediate future on one of the many other Activision Blizzard franchises (*e.g.*, *Call of Duty*). Thus, as this Court previously observed, "this shift of development resources does not imply an impending dissolution of the relationship or Activision's knowledge thereof." (ECF No. 111 at 2.)

\* \* \*

Remarkably, Plaintiff even tries to revisit its failed motion for reconsideration by arguing that the Court did not reverse its findings of "equally-plausible" culpable and nonculpable explanations. (Opp. at 2:7–15, n.3.) In denying that motion, however, the Court was clear that, "as evidenced by the analysis in the Order, the Court intended to explain that the nonculpable explanation for the Defendants' conduct is ***more*** plausible than the unlawful explanation." (ECF No. 122.) Indeed, Plaintiff's own cases show by

*v. Haggerty*, 38 F. Supp. 2d 816, 829 (C.D. Cal. 1998) (dismissing complaint in light of plaintiffs' "pure speculation and conjecture").

comparison how paltry the scienter allegations based on the ███████ emails actually are. (Opp. at 7:14–27.) In *Lormand*, for example, the plaintiff pointed to "numerous contemporaneous documents, such as internal emails and memos," and "admissions from the defendants themselves regarding their state of mind at the time of their representations (as found in the defendants' post-class period deposition testimony and emails)." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009). Those contemporaneous documents and post-class period admissions consistently told the same story: the defendants privately knew facts at odds with their public statements. *Id.* Likewise, in *Oracle*, the complaint alleged specific statements from former employees and managers testifying to a major slowdown in sales that the company publicly denied. *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004). And those employee statements did not stand alone; they were coupled with allegations of accounting improprieties and "astronomical" stock sales by the CEO— $900 million worth—just one month before the company reported lower-than-expected sales. *Id.*

By contrast here, the FAC does not point to any specific, contradictory information Defendants possessed when they made the challenged statements. Plaintiff's allegations of scienter rest almost entirely on speculative inferences derived from vague phrases in an unnamed person's email about a conversation with another unnamed person after the events in question occurred. Plaintiff has cited no case in which such threadbare allegations sufficed under the PSLRA.

### B. Plaintiff's Allegation that Defendants "Would Have Known" Does Not Create a Strong Inference of Scienter.

Unable to plead the scienter of any Defendants through the ███████ emails, Plaintiff falls back on the same "would have known" allegations that appeared in the last deficient complaint. (Opp. 3:3–14, 10:4–6.) Plaintiff simply assumes Defendants, as "senior executives," would have been aware of "disputes between Activision and Bungie." (*Id.* at 3:3–24.) Plaintiff further claims that it is "irrelevant" that no

allegations expressly mention the Individual Defendants. (*Id.* at 4 n.4.) This assertion—a variation on the "core operations" doctrine—is grossly misleading.

As the Ninth Circuit has held, a "core operations" theory can be used to plead scienter only in the "exceedingly rare" case where the falsity of the challenged statements "is patently obvious," *i.e.*, "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 n.3, 786 (9th Cir. 2008); *Zucco*, 552 F.3d at 1001; *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014). Here, there is not a single allegation that suggests the termination of the Activision-Bungie relationship was "patently obvious" to the Individual Defendants at any specific time, much less when the challenged statements were made. (*See* ECF No. 135 ("Op. Br.") at 10:18–13:2.)

Moreover, Plaintiff again conflates Activision Blizzard (the parent) and Activision (the subsidiary), and overstates the financial importance of the *Destiny* franchise.[3] To be clear, the corporate Defendant in this case is Activision Blizzard. Although *Destiny* was a key product franchise for Activision, it was not a "top franchise" for Activision Blizzard in 2016, 2017, or 2018:

> For the year ended December 31, 2018, our top three franchises—Call of Duty, Candy Crush, and World of Warcraft—collectively accounted for 58% of our net revenues. For the years ended December 31, 2017 and 2016, our top four franchises—Call of Duty, Candy Crush, World of Warcraft, and Overwatch—collectively accounted for 66% and 69% of our net revenues, respectively. ***No other franchise comprised 10% or more of our net revenues in the respective periods discussed above***.

(Declaration of Ryan E. Blair ("Blair Decl.") Exhibit ("Ex.") L at 7 (emphasis added).)[4]

---

[3] The "multi-billion-dollar" figure Plaintiff touts is the $1.6 billion in total revenue earned to date from the ***inception*** of the *Destiny* franchise. (Opp. at 9:5–6; FAC ¶ 28.)

[4] Exhibit L is an excerpted copy of Activision Blizzard's 2018 10-K. Defendants previously requested that Court incorporate by reference and take judicial notice of other portions of this same document. (ECF No. 133, Ex. G.) For the same reasons, Defendants request that Court incorporate by reference and take judicial notice of

In short, Plaintiff overstates the magnitude of the *Destiny* franchise as to the relevant party—Activision Blizzard. *See Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988) (requiring a "balancing of both the indicated probability that [a particular outcome] will occur and the anticipated magnitude of [that outcome] *in light of the totality of the company activity*" (emphasis added)).

### C. Plaintiff's Theory of Fraud Is Neither Cogent nor Compelling.

Plaintiff does not even contest that its alleged motive is anything other than "weak." (Opp. at 11:3–8.) For good reason: it makes no sense. Plaintiff claims that Defendants concealed the Bungie split to "stem a wave of contemporaneous bad news." (*Id.* at 10:15–22.) But even if the facts supported that alleged motive—they do not (Op. Br. at 13:17–14:1)—why would Defendants do so? Defendants are alleged to have postponed the day of reckoning by a few months, at most, and no Defendant is alleged to have sold Activision stock in the interim or otherwise benefitted in any way. (*Id.* at 14:11–13.)

Plaintiff argues that a personal profit motive is not "required" to state a claim for securities fraud. (Opp. at 11:9–13.) This misses the point; the absence of such allegations "is noteworthy." *Maeve Inv. Co. v. Teekay Corp.*, 2017 WL 5158059, at *6 (W.D. Wash. Nov. 7, 2017). *Tellabs* instructs courts to consider all potential inferences—not only those that favor Plaintiff. 551 U.S. at 324. And, the fact that no Individual Defendant is alleged to have sold stock when the price was supposedly inflated suggests "there was no insider information from which to benefit." *Metzler*, 540 F.3d at 1067; *see Webb*, 884 F.3d at 856 ("[A] lack of stock sales can detract from a scienter finding."); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1177–78

---

Exhibit L. *See, e.g.*, *In re Silicon Storage Tech., Inc.*, 2006 WL 648683, at *2 (N.D. Cal. Mar. 10, 2006) ("If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a Rule 12(b)(6) motion the documents referred to in the complaint to show that they do not support plaintiff's claim."); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008) (taking judicial notice of SEC filings).

(C.D. Cal. 2007) ("the lack of *any* tangible, personal benefit" from an alleged fraud weighs against a finding of scienter).

## III. NONE OF THE CHALLENGED STATEMENTS WERE MATERIALLY FALSE OR MISLEADING.

Plaintiff not only fails to plead the basis for a strong inference of scienter, Plaintiff also fails to plead a single actionable misrepresentation. (Op. Br. at 14:19–16:20.) Plaintiff concedes that Defendants' statements "may technically have been true" (Opp. at 13:7–10), but Plaintiff insists that the statements were somehow misleading "in context" (*id.* at 11:16–20, 13:4–7). That does not withstand scrutiny.

**Conference calls.** Plaintiff challenges two statements by Mr. Johnson during investor conference calls. The FAC alleges that on November 8, 2018, Mr. Johnson said that *Destiny*'s new expansion pack, *Forsaken*, had the "highest quality content we've seen in the franchise to date. ***And it really kind of have [sic] Activision and Bungie working together to address community concerns post-Destiny 2 holistically***." (FAC ¶ 48 (emphasis and brackets in the FAC).) Clearly, there is something off with that quotation. What Mr. Johnson actually said was that *Forsaken*'s high-quality content "came out of having" Activision and Bungie working together.[5] Defendants used the correct phrasing in their opening brief. (Op. Br. at 16:12–15.) Plaintiff (not realizing the mistake) now tries to spin Defendants' correct phrasing as some type of

---

[5] Plaintiff's error presumably stems from a transcript of the call prepared by a third party. (ECF No. 132-2 at 75.) However, that transcript expressly "does not guarantee the accuracy" of its contents. (*Id.* at 80.) The actual statement is clear from the audio of the November 2018 conference call (Blair Decl., Ex. N at 29:50–30:25 [compact disc]; *see also id.*, Ex. M at 39 [certified transcript]). The Court may take judicial notice of the content of audio recordings to establish what was actually said. *See Twinde v. Threshold Pharm. Inc.*, 2008 WL 2740457, at *11 (N.D. Cal. July 11, 2008) (taking judicial notice of an audio recording of an investor call where the authors of the complaint had relied on an inaccurate transcript). To the extent Defendants requested judicial notice of the same inaccurate transcript in connection with their motion to dismiss (ECF No. 133), they hereby withdraw that request in favor of the accurate audio recording. For the Court's convenience, audio of the call is also available online. *See* https://www.youtube.com/watch?v=-o-M8Fv-3Ko at 30:15–25.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

10.

REPLY ISO MOTION TO DISMISS FAC
2:19-CV-03788-SVW-AFM

cover-up: "Perhaps aware of how misleading the statement about *Destiny*'s health was, Defendants "change the wording of Defendant Johnson's response from present tense ('have Activision and Bungie working together') to past tense ('"[came out of] Activision and Bungie working together"'), suggesting that Johnson's answer was limited to past events and not the ongoing relationship . . . ."  (Opp. at 13:24–28.) Ironically, when the Court considers what Mr. Johnson actually said, and not the FAC's garbled quotation, Plaintiff effectively admits that the statement was not misleading because it clearly references past events.  (*Id.* at 14:5–8 ("The difference between past and present tense is critical in the context of analyst questions about *Destiny*'s health.").

The other statement was on August 2, 2018.  Mr. Johnson told analysts: "[W]e've talked a lot about listening to the Destiny community to provide a deeper ongoing experience . . . ***And the team at Bungie and the team at Activision have made a lot of strides in doing that, particularly [the] last 2 quarters with the ongoing improvements in the end game and the overall***."  (FAC ¶ 46 (emphasis in the FAC).)  Again, this statement expressly references past events, which Plaintiff admits is "critical" to the falsity analysis (Opp. at 14:5–8), and undermines any notion that the statement is misleading as to the future of the Activision-Bungie relationship.  *See In re Caere Corp. Sec. Litig.*, 837 F. Supp. 1054, 1058 (N.D. Cal. 1993) ("Statements regarding past events contain no implicit prediction that those events or conditions will continue in the future.").  Moreover, as discussed in the opening brief—and left unaddressed in the Opposition—these statements were expressions of puffery and optimism, that were not objectively verifiable, and were entirely consistent with the allegations in the FAC. (Op. Br. at 16 n.16.)

**Quarterly reports.**  Two quarterly reports referred to Activision's "long-term alliance with Bungie," and called *Destiny* a "key product franchise[]."  (FAC ¶¶ 47, 50.) The Opposition abandons the FAC's allegation that these statements were misleading because the companies were "already . . . negotiating the terms of the termination of the Licensing Agreement."  (FAC ¶ 52.)  Instead, the Opposition offers a new (and far more

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

11.

**REPLY ISO MOTION TO DISMISS FAC**
**2:19-CV-03788-SVW-AFM**

nebulous) theory that the statements were misleading, not because negotiations were already underway, but because, months earlier, the companies each took unilateral actions—*i.e.*, Bungie accepting foreign investment and Activision shifting resources— that supposedly began the "unwinding" of the relationship. (Opp. at 12:20–22.)

This theory fares no better. As an initial matter, it is not pled in the FAC. It is "axiomatic that a Plaintiff may not amend its pleadings in the opposition memorandum." *Portfolioscope, Inc. v. I-Flex Sols. Ltd.*, 473 F. Supp. 2d 252, 256 (D. Mass. 2007); *see Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998) (new "allegations" asserted in an opposition are "irrelevant for Rule 12(b)(6) purposes"). Critically, FAC paragraph 52, which purports to explain why these statements were misleading, says nothing about a gradual winding down of the relationship (whatever that means). Instead, it focuses entirely on negotiations to terminate the Licensing Agreement. (FAC ¶ 52.)

In any event, Plaintiff's unpled theory fails for the same reason as the old theory: companies are not required to disclose the mere ***potential*** loss of a business partner, even where companies tout the relationship. *See In re Tempur Sealy*, 2019 WL 1368787, at *12-13 (dismissing securities fraud claims based on failure to disclose a dispute with a customer where plaintiff failed to plead sufficiently that the relationship "already had deteriorated"); *In re Express Scripts Holding Co. Sec. Litig.*, 2017 WL 3278930, at *11 (S.D.N.Y. Aug. 1, 2017) ("Where an outcome is merely speculative, the duty to disclose does not attach.").

Plaintiff says that even the "potential loss" of customers can create a duty to disclose. (Opp. at 5:15–6:2 (citing *Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *13–15 (S.D.N.Y. Dec. 2, 2013) and *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at *5–6 (E.D.N.Y. Mar. 30, 2012)).) But the cases on which Plaintiff relies are distinguishable.

In *Hi-Crush*, there was a sharp dividing line as to when statements became misleading—*i.e.*, when the customer formally repudiated the contract. 2013 WL

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

12.

REPLY ISO MOTION TO DISMISS FAC
2:19-CV-03788-SVW-AFM

6233561, at *13–15.  Prior to that, the court held that although the relationship was purportedly "strained," Hi–Crush had no duty to disclose. *Id.* at *12–13.  Here, there is no allegation that either Bungie or Activision formally repudiated or terminated the Licensing Agreement prior to the date of the challenged statements.  Accordingly, under the standard used in *Hi-Crush*, Defendants' statements were not misleading.

*Hutchins* is a completely different fact pattern.  In that case, the plaintiff challenged positive statements about NBTY's gross margins and future operating performance, alleging they were unrealistic because NBTY's largest customer—which accounted for 30% of NBTY's net sales and 80% of its private-label sales—informed NBTY that it was soliciting competitive bids from other suppliers, when previously NBTY had been the exclusive supplier.  2012 WL 1078823, at *1, *6.  This notification, combined with the customer's actual solicitation of other bids, was sufficient to threaten NBTY's future gross margins because NBTY was, at that point, faced with the choice of lowering its pricing (which would in turn lower its gross margin), or losing its largest customer.  Here, conversely, Bungie had no unilateral right to seek a new partner for *Destiny*, nor does Plaintiff challenge any statement regarding Activision's future revenues or gross margins.  Moreover, at the time of Defendants' statements, there had been no change to the contractual relationship, and Bungie had expressly denied that its foreign investment reflected any tension with Activision.

## IV.    CONCLUSION.

For the foregoing reasons, and those discussed in the opening brief, the Court should dismiss the FAC with prejudice.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

13.

REPLY ISO MOTION TO DISMISS FAC
2:19-CV-03788-SVW-AFM

Dated:    February 21, 2020    COOLEY LLP
KOJI F. FUKUMURA (189719)
RYAN E. BLAIR (246724)
ERIN C. TRENDA (277155)
HEATHER M. SPEERS (305380)


_/s/ Koji F. Fukumura_
Koji F. Fukumura (189719)

Attorneys for Defendants
ACTIVISION BLIZZARD, INC.,
ROBERT A. KOTICK, AND
COLLISTER JOHNSON

Dated:    February 21, 2020    IRELL & MANELLA LLP


_/s/ Craig Varnen_
Craig Varnen (170263)

Attorneys for Defendant
SPENCER NEUMANN

## ATTESTATION

Pursuant to Civil Local Rule 5-4.3.4(a)(2)(i), I, Koji F. Fukumura, attest on behalf of all other signatories that concurrence in the content of this filing and authorization to make this filing have been obtained from each of the other signatories.


Dated:    February 21, 2020    _/s/ Koji F. Fukumura_
Koji F. Fukumura